To: All Field Offices   From: San Antonio
Re: 300A-SA-NEW, 10/23/2006

LEAD(s):

Set Lead 1:   (Action)

   ALL RECEIVING OFFICES

      Receiving offices are requested to canvas local sources and
report positive threat information to the Austin RA/CTXJTTF point of
contact SA _____                                           b6
                                                                  b7C
                                                                  b2

Set Lead 2:   (Info)

   COUNTERTERRORISM

      AT WASHINGTON, DC

      DTOU: Read and clear.

◆◆

                                3

---

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                    Date:  11/02/2006

To:  San Antonio

From:  San Antonio
       Squad CT-2/CTXJTTF/Austin Resident Agency
       Contact:  SA _____                              b6
                                                              b7C

Approved By: _____

Drafted By: _____ ejr

Case ID #: 300A-SA-59072-2 (Pending)

Title:  NATIONAL SOCIALIST MOVEMENT (NSM)
        TEXAS AWAKENING RALLY
        TEXAS STATE CAPITOL
        11/11/2006

Synopsis:  To request approval for holiday pay.

Details:  The above Special Event is to occur on 11/11/2006, a
Saturday.  Significant planning, coordination of travel of
employees from other Divisions, source debriefings, SOG
briefings, surveillance by Case Agents, and other activities may
need to be conducted on 11/10/2006, a Friday that is designated
as a federal holiday.  Approval is requested for the below
Special Agents to be eligible to receive holiday pay, in the
event they are required to work on 11/10/2006.

        SA
        SA                                                    b6
        SA                                                    b7C
        SA

◆◆

                                        300A-SA-59072-2



(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                    **Date:** 11/03/2006

**To:** San Antonio

**From:** San Antonio
   Squad CT-2/CTX JTTF/Austin Resident Agency
   **Contact:** SA [ ]

b6
b7C

**Approved By:** [ ] GCR/RKH

**Drafted By:** [ ] ejr

**Case ID #:** √300A-SA-59072-4 (Pending)
            100A-MP-63291-137 (Pending)
            2660-SA-58574-30 (Pending)

**Title:** NATIONAL SOCIALIST MOVEMENT (NSM)
       TEXAS AWAKENING RALLY
       TEXAS STATE CAPITOL
       11/11/2006

**Synopsis:** To memorialize news stories on above captioned rally.

**Details:** On 11/01/2006, KVUE presented a lead story on the upcoming NSM rally. During the story, the interviewer spoke telephonically to NSM [ ] and in person to a member of Anti Racist Action (ARA) identified as "Zach" at an undisclosed location. [ ] statements confirmed previously obtained intelligence that he would be attending in person, that the group intends to employ riot shields, and that approximately 100 NSM members are anticipated to attend. These items indicate that this is a significant event in NSM circles.

b6
b7C

Analysis of the video segment with Zach revealed the presence of pads similar to the type used for collapsible baton training and lengths of what appears to be pipe or something similar. [ ]

b2
b7E

On 11/03/2006, the Austin American-Statesman newspaper ran a story about the rally in which an ARA representative confirmed previously obtained intelligence that the group will stage at Republic Park in downtown Austin an hour before the rally and that the group intends not to merely protest the rally, but to "confront" attendees, including "any Nazi supporters found in the general area". This last statement indicates that the

300A-SA-59072-4

---

group may not limit its violent acts to official rally members. They seem to be laying the groundwork to justify assaulting any person in the crowd they choose.

[ ]

b2
b7E

[ ] Copies of the video and article will be distributed to appropriate Divisions and DTOU.

♦♦

2

  

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                          Date:  10/31/2006

To:  Counterterrorism        Attn:  SSA [        ] DTOU        b6
                                    IA  [        ] DTOU        b7C
     Kansas City            Attn:  TFO [        ]
                                    Wichita RA
     Minneapolis            Attn:  SA [        ]
     Oklahoma City          Attn:  SA [        ]
     San Diego              Attn:  SA [        ]

From:  San Antonio
       Squad CT-2/CTXJTTF/Austin Resident Agency        b2
       Contact:  SA [                        ]           b6
                                                         b7C
Approved By:  [                    ]

Drafted By:  [        ] bjr [        ]

Case ID #:  300A-SA-59072    (Pending) — 1383
            100-MP-63291     (Pending)

Title:  NATIONAL SOCIALIST MOVEMENT (NSM)
        TEXAS AWAKENING RALLY
        TEXAS STATE CAPITOL
        AUSTIN, TEXAS
        11/11/2006

Synopsis:  To provide notice of approval for [        ]        b2
[        ] San Antonio Division for captioned                   b7E
Special Event.

Details:  San Antonio approves requests from the above referenced
field offices of Kansas City, Oklahoma City, and San Diego to [        ]
[        ] the captioned Special Event.

    An operational briefing will occur on Saturday,
11/11/2006, at 12:00 noon and San Antonio requests that all
Agents traveling to the RA territory attend.  Because source
information will be exchanged, a separate Command Post will be
established at the Austin RA for the use of traveling Agents and
San Antonio SOG, in addition to the Texas Department of Public
Safety (DPS) primary Command Post that will coordinate all State
and Local aspects of the event.

    As of instant date, the NSM has not perfected their
petition with the State Preservation Board to use the Capitol

304B7R0l,EC

300A-SA-5G072-6

---

To:  Counterterrorism   From:  San Antonio
Re:  300A-SA-59072, 10/31/2006

    grounds, therefore, formal barriers, law enforcement escorts, and
other safety precautions are not planned by either DPS or the
Austin Police Department (APD).  NSM appears to be undeterred,
and has announced that they will march on the public streets in
the area of the Capitol regardless of permits.  This is a
significantly more volatile situation than the anticipated
Capitol steps rally, with the members of NSM and counter-
protestors in close proximity to each other and with law
enforcement presence very limited due to the unstructured and
fluid nature of a march.  Local counter-protest groups,
particularly Anti Racist Action (ARA) are aware of the rally and
are attempting to recruit large numbers of attendees.  In the
past, ARA has been the primary source of crowd instigation and
violent acts. [                                                    ]        b2
[                                                              ]           b7E

    Source information has provided the location of the NSM
member's primary hotel and a description of the planned staging
area, however, the exact location of these activities and any
post-rally activities, which are common, is yet to be determined.

    An Assistant United States Attorney assigned to the
CTXJTTF will be on hand to provide assistance as needed. [        ]        b2
[                                                              ]           b7E

    San Antonio requests that any positive source
information regarding the event be provided to the Austin RA.

2




To:  Counterterrorism  From:  San Antonio
Re:  300A-SA-59072, 10/31/2006

**LEAD(s):**

**Set Lead 1:  (Info)**

    <u>COUNTERTERRORISM</u>

        <u>AT WASHINGTON, DC</u>

        DTOU - Read and clear.

**Set Lead 2:  (Info)**

    <u>KANSAS CITY</u>

        <u>AT WICHITA, KS</u>

        Read and clear.

**Set Lead 3:  (Info)**

    <u>MINNEAPOLIS</u>

        <u>AT MINNEAPOLIS, MN</u>

        Read and clear.

**Set Lead 4:  (Info)**

    <u>OKLAHOMA CITY</u>

        <u>AT OKLAHOMA CITY, OK</u>

        Read and clear.

**Set Lead 5:  (Info)**

    <u>SAN DIEGO</u>

        <u>AT SA DIEGO, CA</u>

        Read and clear.

♦♦

3

---

FD-888 (Rev. 3-17-05)

## ARREST PLAN FORM

| FILE NUMBER | 300A-SA-59072 | | | |
|---|---|---|---|---|
| FIELD DIVISION/SQUAD | San Antonio/Squad CT-2/CTXJTTF | | | |
| Date Prepared  11/01/2006 | | Planned Date of Operation  11/11/2006 | | |
| TITLE OF CASE | NATIONAL SOCIALIST MOVEMENT (NSM) | | TEXAS AWAKENING RALLY | |
| | TEXAS STATE CAPITOL | | AUSTIN, TEXAS | |
| | 11/11/2006 | | | |

| | | | | | b6 |
|---|---|---|---|---|---|
| CASE AGENT/OFFICER  SA | | | PH # | | b7C |
| ALTERNATE CA/OFFICER  SA | | | PH # | | |

### SITUATION/MISSION

| Type of Operation | Location of Activity |
|---|---|
| ☐ Arrest<br>☐ Search<br>☒ Surveillance<br>☐ Other | The rally will occur in the vicinity of, or on the South steps, of the Texas Capitol Building. Operations will occur in the area of the primary hotel of the participants, the local residences of certain counter-protestors, the staging areas of both groups, and any area in which marching or rally activities are deemed to be occurring. |

Warrant Information

No outstanding warrants at this time, however,_____ has advised that they have probable cause to obtain an Arrest Warrant for_____

b2
b6
b7C
b7E

Overall Concept of Mission  (Brief statement of who, what, why, when, and where)

The operation is designed to provide surveillance coverage of the above-described Special Event in order to monitor the activities of known subjects and others on both sides of the event. There will be subjects from several FBI Divisions present, as well as a number of sources. Other goals are: to gather intelligence on both groups and their methods, to identify leaders or other significant members, and to identify individuals vulnerable to approach in the future as sources.

CAUTION STATEMENT

### SITUATION/MISSION CONTINUED

300 A-SA-59072 - 13

This Document has been prepared by the Federal Bureau of Investigation.
FOR LAW ENFORCEMENT USE ONLY

| SEARCHED GEN_____ FOIMS_____ |
|---|
| SERIALIZED_____ INDEXED_____ |
| FILED_____ |
| JAN 1 6 2007 |
| FBI — SAN ANTONIO |

1

 **SUBJECT INFORMATION** 

| Name: N/A | | Race: | Sex: | DOB: |
|---|---|---|---|---|
| Aliases: | | Height: | Weight: | |
| | | Eyes: | Hair: | |
| Fingerprint Code: | | SSAN: | FBI#: | |

**Identifying Marks and Tattoos:**

**Address:**

**Vehicle Info:**

**Criminal History:**

**REASON FOR CAUTION STATEMENT** (subject specific)
No Caution Statements outstanding

Identify other legal process outstanding to include issuing official, district and date issued, and warrant location.
_____ has indicated that they have probable cause to obtain a warrant for the arrest of _____      b2  b6  b7C  b7E

Other Information Regarding Subject (Can include items such as possible locations of subject, identification of associates, and information provided by informants and other law enforcement agencies. Provide Photo If Available.
Photos of leaders and significant members of the two groups are attached. Also attached are _____

Use copies of this page for information on additional subjects and number as 2-A, 2-B, etc.

This Document has been prepared by the Federal Bureau of Investigation
**FOR LAW ENFORCEMENT USE ONLY**

2

---

**SITUATION/MISSION CONTINUED**

| INTELLIGENCE - Additional pertinent information can be added as an attachment |
|---|

**LAW ENFORCEMENT PARTICIPANTS IN THE OPERATION**
Identify personnel directly involved in the operation, as well as their assignment (entry/perimeter) for the operation

| | NAME | ASSIGNMENT | SIGNAL # | |
|---|---|---|---|---|
| 1 SA | | Case Agent, Surv. Team 1 | | b6 b7C b2 |
| 2 SA | | Surv. Team 2 | | |
| 3 TFO | | Surv. Team 3 | | |
| 4 TFO | | Surv. Team 3 | | |
| 5 TFO | | Surv. Team 3 | | |
| 6 SA | | Command Post | | |
| 7 TFO | | Surv. Team 2 | | |
| 8 TFO | | Surv. Team 2 | | |
| 9 TFO | | APD Liaison | | |
| 10 TFO | | Surv. Team 1 | | |
| 11 SA | | Surv. Team 1 | | |
| 12 TFO | | Surv. Team 1 | | |

**Other Law Enforcement Personnel**
Identify personnel who are not directly involved in the subject operation, but may support the overall mission (e.g., mass interviews, evidence technicians, photo specialists, traffic control, etc.)

| SA | Oklahoma City | SA | San Diego | SA | b6 b7C b2 |
|---|---|---|---|---|---|
| Pittsburg | SA | Houston | SA | Minneapolis, | |
| IA | DTOU, | SA | Dallas | | |
| | SA | SA | | | b2 b7E |

This Document has been prepared by the Federal Bureau of Investigation
**FOR LAW ENFORCEMENT USE ONLY**

3

   

**EXECUTION**

## OVERALL SUMMARY OF PRIMARY PLAN
Provide surveillance coverage of the above-described Special Event; Monitor the activities of known subjects; Report any violations of federal statutes noted; Gather intelligence on both groups; Identify leaders or other significant members; and, Identify individuals posssibly vulnerable to approach as sources.

## SPECIFIC DUTIES
(Concise, detailed statements directing how each unit, squad, team, or individual accomplishes their duties.)

Surveillance Team 1 -                                                                    b2
                                                                                          b7E

Surveillance Team 2 -                                                                    b2
                                                                                          b6
                                                                                          b7C
                                                                                          b7E

Suveillance Team 3 -                                                                     b2
                                                                                          b7E

Team 4 -

Command Post - SA [                    ] will be present at the APD/DPS Command Post for the duration of the event.    b6
                                                                                                                        b7C

(Continue on additional blank sheet(s) of paper as necessary)

This Document has been prepared by the Federal Bureau of Investigation
**FOR LAW ENFORCEMENT USE ONLY**

4

---

**EXECUTION CONTINUED**

## COORDINATING INSTRUCTIONS
(Include here instructions common to all. Examples include times and dates for specific phases of the operation, coordination intra-office or with other agencies, warrant verification, danger areas, rehearsals, debriefings, etc.)

Assistant United States Attorney [                    ] will be on call both the day before and the day of the event.    b6
                                                                                                                          b7C

A briefing will be held at the Austin RA for any FBI employees, to include Agents/TFO's from other Divisions, SOG personnel, if available, and any other participants in the operation. This briefing will serve to provide any last minute intelligence and to ensure that all personnel are introduced.

Deconfliction briefings have been held with representatives of APD, DPS, UTPD, Travis County Sheriff's Office, City of Austin, and others. Intelligence has been both received from and disseminated to these agencies.

## FBI DEADLY FORCE POLICY (effective 7/1/2004)
Agents may use deadly force only when necessary, that is, when the Agents has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the Agent or to another person.

A. Deadly Force may not be used solely to prevent the escape of a fleeing suspect.
B. Firearms may not be fired solely to disable moving vehicles.
C. If feasible and if to do so would not increase the danger to the Agent or others, a verbal warning to submit to the authority of the Agent shall be given prior to the use of deadly force.
D. Warning shots are not permitted outside of the prison context.
E. Agents will be trained in alternative methods and tactics for handling resisting subjects which must be used when the use of deadly force is not authorized by this policy.

This Document has been prepared by the Federal Bureau of Investigation
FOR LAW ENFORCEMENT USE ONLY

5

## CONTINGENCIES

The alternate Command Post site will be the Austin RA.  Contact SA [ ] at the Command Post with any non-emergency contingencies.  SA [ ] will coordinate further dissemination.

Any emergencies should be reported immediately to 911 and the Command Post.

If weather does not permit the use of [ ] Team 1 will assume the surveillance duties assigned to the [ ]

If other sites, hotels, etc. are identified, surveillance members may be re-deployed as needed.

b6
b7C

b2
b7E

## ADMINISTRATION AND EQUIPMENT

### WEAPONS AND AMMUNITION
Standard duty weapon, concealed for surveillance.

### CLOTHING AND EQUIPMENT
(Includes protective gear, identifying clothing, and special equipment, e.g. [ ] clothing with access to required weapons and radio communications.

b2
b7E

### HANDLING OF INJURED
(Be specific. Include EMS telephone numbers, local radio channels, and addresses of medical facilities and/or EMS)
Any injuries will be immediately transported to the Brackenridge Hospital trauma facility at 15th St. and Interstate 35.
This is the primary area trauma center and is in the general vicinity of both the Capitol and the anticipated staging areas.

This Document has been prepared by the Federal Bureau of Investigation
FOR LAW ENFORCEMENT USE ONLY

## CONTROL AND COMMUNICATION

| Command Post (if utilized) | | |
|---|---|---|
| Supervisor in Charge:  SSA [ ] | Location:  Command Post | |
| Phone #: [ ] | Radio Channel: [ ] | Call Sign: [ ] |

| On-Scene Command | | |
|---|---|---|
| Agent in Charge:  SA [ ] | Location:  Surveillance Team 1 | |
| Phone #: [ ] | Radio Channel: [ ] | Call Sign: [ ] |

b2
b6
b7C
b7E

### RADIO COMMUNICATIONS (include channels, frequencies, private or clear mode, and call signs)

| Channel Information | USE |
|---|---|
| [ ] | all communications |
| | |
| | |

**CAUTION STATEMENT**   None outstanding

This Document has been prepared by the Federal Bureau of Investigation
FOR LAW ENFORCEMENT USE ONLY



VNN Broadcasts
Podcasts and
individual shows

Vanguard News Network Forum > News & Discussion > Politics & Philosophy > White Nationalism

**Letter from Bill White + Ongoing Trial Coverage (12/09 forward)**

| User Name | User Name | ☐ Remember Me? |
| Password | | |
| | Log in | |

Register    Multimedia ▼    Blogs ▼    Today's Posts    Search

« First ‹ 35 41 42 43 44 **45** 46 › »

Thread ▼ | Display Modes ▼ | Share ▼

---

**M. Gerard**
Senior Member

Join Date: Oct 2012
Posts: 1,094

January 29th, 2014                #881

🔍 old 2012 article on the new case against Bill White

Published on the day Bill was arrested in Mexico. He gets a mention as a Virginia neo-Nazi at the end.

All the American Front people were released except the leader. I wonder if any of them will be involved in the trial.

The new case is 6:13-cr-00304, Florida. - M. Gerard

White supremacists threaten state attorney, judge, agent
4:55 p.m. EST, June 8, 2012]
By Henry Pierson Curtis, Orlando Sentinel

ST. CLOUD - Central figures in the prosecution of the American Front white supremacy group have received death threats on several websites in recent weeks.

Family members of Orange-Osceola State Attorney Lawson Lamar, Circuit Judge Walter Komanski and an agent assigned to the FBIJoint Terrorism Task Force are named in the detailed threats demanding the immediate release of more than a dozen American Front members arrested last month.

The deadline passed in late May without any known acts of violence.

"We are at your houses, we are at your kids houses we are your grandkids houses and we are sitting outside their schools," it reads in part. "Don't believe me? Here you are pigs, here you are:... we are going to CUT THEIR ...HEADS OFF and leave them in A COOLER OUTSIDE YOUR OFFICE."

The anonymous writer included what were claimed to be the unlisted home addresses of Lamar, Komanski and agent Kelly Boaz.

"We are aware of the threats and there is an active federal investigation," FBI spokesman Dave Couvertier said Friday afternoon. "We always address these threats with the utmost seriousness."

Lamar, who has 40 years of experience as a prosecutor and former Orange County Sheriff, described deaths threats as an occasional test of public servants' resolve to uphold the rule of law.

"If a threat is successful...there will be more good guys standing ready to carry out the mission," he said Friday. "I have been shot at before and would just as soon not be shot at again but it comes with the territory."

Komanski could not be reached. Boaz declined comment.

Arrests of American Front members began May 4 after a two-year undercover investigation of allegations of anti-government paramilitary training in a remote area of eastern Osceola County.

So far, 13 men and women have been charged and one suspect remains at large in what has become one the largest U.S. domestic terrorism cases in more than a decade. Unlike most cases with one to four defendants, the 14 accused American Front members include nine charged with conspiring to attack an undisclosed target.

A raid by the Joint Terrorism Task Force of a 10-acre wooded lot and home near Holopaw seized about 20 firearms from its owners, American Front leader Marcus Faella and his wife Patricia. That's where all 14 defendants are charged with conducting anti-government paramilitary training, court records show.

The threats were posted on the websites of the Anti-Defamation League, Virtual Jerusalem: The Place Where Jews Click, as well as white supremacist blogs and a yahoo.com article, "American Front: Terrorism in the United States.".

"No threats allowed," reads a warning at nimbusters.org, a blog that removed the threat, screen grabs show. But another post on the blog repeats the addresses of Lamar, Komanski and Boaz with a claim that the FBI has taken over the American Front's website.

Attacks on judges, prosecutors and cops in cases remain rare in the United States, according to ADL Research Director Mark Pitcavage, who formerly held the same position at the U.S. Department of Justice's State and Local Anti-Terrorism Training (SLATT) program.

However, a death threat was recently made against the judge in the George Zimmerman case, Seminole County Circuit Judge Kenneth Lester, as well as a federal judge in Virginia as a case involving a neo-Nazi. All three threats use similar phrases and provided the judges' home addresses.

An authority on domestic terrorism, Pitcavage said anti-government extremists have been linked to retaliation attacks more often than white supremacists or other groups. Violence most often is the work of a "lone wolf" or a couple of members of a group frustrated by other members' inaction.

"It's disturbing when people responsible for protecting our society are getting threatened," Pitcavage said.

hcurtis@Tribune.com or 407-420-5257.

---

**M. Gerard**
Senior Member

Join Date: Oct 2012
Posts: 1,094

January 29th, 2014                #882

Looks like the media got tired of covering Faella - he was supposed to go to trial last November (after having his trial postponed at least twice) but the hearing was postponed again until this coming February.

Old article -

American Front leader's domestic-terrorism trial postponed
Marcus Faella is the only one of 14 defendants to stand trial. All others walked or took plea bargains.

Marcus Faella in court last year. (Ricardo Ramirez Buxeda,...)
May 13, 2013]By Henry Pierson Curtis, Orlando Sentinel

EXHIBIT F(d)

KISSIMMEE — The case against the American Front white-supremacy group, scheduled to begin in Osceola County Monday, has been postponed until July.

Marcus Faella is the one remaining defendant, whose case has not been resolved. Early Monday, officials announced his trial on charges of training to fight a race war, teaching and participating in paramilitary training and conspiring to shoot into a building, would be continued until the summer.

Charges against the other 13 defendants have been dismissed or plea bargained without a single substantial sentence — despite a two-year investigation by the FBI's Joint Terrorism Task Force, court records show.

The arrests that began May 4, 2012, attracted international attention to the existence of an armed, racist skinhead group in rural Osceola County.

Now, Central Florida's largest domestic-terrorism case ever is widely perceived as having fallen apart.

Marcus Faella, who headed the group, faces life in prison if convicted this week of the most serious charge: directing the activities of a gang evidencing prejudice, records show.

During last year's roundup, JTTF members and local sheriff's deputies seized 22 firearms, bulletproof vests and numerous other military-style items that were legal to own. All were found in a series of structures on land belonging to Faella near Holopaw that was described as a 10-acre compound with a shooting range, court records show.

An informant who was paid $40,000 to infiltrate racist groups in Central Florida secretly recorded Faella at the range telling members to visualize their targets as the heads of black people and made "threatening remarks toward Jewish people," records state.

Faella, 40, was a longtime follower of the white-supremacist movement, including ties to the Confederate Hammerskins, according to interviews last year with the Anti-Defamation League. He and his wife, Patricia, rose to prominence in early 2011 after the shooting death in California of longtime leader David Lynch, according to Mark Pitcavage, ADL's head of research.

"These are hard-core skinheads," Pitcavage said at the time, referring to the American Front's 17 active members and associates in Central Florida. He described the group as one of the oldest continually active racist-skinhead groups in the country.

Questions about the investigation began shortly after the arrests, when bond for most members was set at $500,000 while Faella only had to post $50,000 and his wife Patricia just $5,000. The disparity was never explained by authorities.

In April, all charges against Patricia Faella were dropped without explanation on the day of her scheduled trial.

The decision was reached after consultation with Orange-Osceola State Attorney Jeff Ashton.

"While the State Attorney respects the public's right to know what motivated this morning's dismissals, the State Attorney requests patience from the public as it is inappropriate for him or his assistants to comment until the charges against Marcus Faella are also resolved," Ashton's spokesman Richard Walsh said in a written statement at the time.

Only three of the 14 initially arrested in connection with the case have been convicted so far: Christopher Brooks, 28, was sentenced to three years in prison for possession of a firearm by a convicted felon; and Luke Leger, 32, and Kent McLellan, 22, were sentenced to four years of probation after pleading no contest to participating in paramilitary training.

The remaining charges against Faella also include teaching and participating in paramilitary training and conspiring to shoot into a building, all felonies.

The trial is set to begin at 8:30 a.m. Monday before Circuit Judge Jon Morgan in the

Osceola County Courthouse.

hcurtis@tribune.com or 407-420-5257

---

**January 25th, 2014** #883

**M. Gerard**
Senior Member
Join Date: Oct 2012
Posts: 1,094

L.

U.S. District Court
Middle District of Florida (Orlando)
CRIMINAL DOCKET FOR CASE #: 6:13-cr-00304-JA-GJK-1
Case title: USA v. White
Date filed: 12/11/2013

Date Filed #

12/16/2013 5
NOTICE of estimated length of trial by USA Estimated trial length: Five days. (Irick, Daniel) (Entered: 12/16/2013)

12/16/2013 6
CERTIFICATE of interested persons and corporate disclosure statement by USA (Irick, Daniel) (Entered: 12/16/2013)

12/23/2013 7
NOTICE of pendency of related cases re order of compliance to Local Rule as to William A White by USA. Related case(s): Yes (Irick, Daniel) (Entered: 12/23/2013)

01/02/2014 8 MOTION for miscellaneous relief, specifically demand for speedy trial by William A White. (MAL) Modified on 1/9/2014 (MAL). (FILED PRO SE) (Entered: 01/02/2014)

01/21/2014 9 NOTICE of filing objection to the misuse of the term "White Supremacist" by William A White (Attachment: # 1 Exhibit)(MAL) (Entered: 01/22/2014)

---

**January 25th, 2014** #884

**M. Gerard**
Senior Member
Join Date: Oct 2012
Posts: 1,094

L. **From Document Nine in the American Front Case**

(Bill's American Front case, not Faella's.)

Two snips from Bill's handwritten court document. (There are foot-notes to these paragraphs, I have not included all of them.)

Defendant's Objection to the Misuse of the the Term "white Supremacist"

... 2) White supremacy is a doctrine which states that whites and blacks should live together in a society in which blacks are either enslaved or legally subordinated to whites. This doctrine was developed in the 15th century by Rabbis who sought the Church's endorsement of the Midrashic story of Ham in order to permit Jews to engage in the African slave trade, and has generally been associated with Jewish power in the United States.

3. The Defendant believes in Traditionalist National Socialism, which does not teach that blacks and whites should live under a single state that legally subordinates blacks. I believe that people exist naturally in organic unities that find collective expression in culture - similar to what Hegel called the Volk and Volkgeist. This idea is derived from the Platonic ideal and is original to Indo-European or Aryan peoples. It leads to the conclusion that the state should reflect a nation, and act for the good of the nation, and not be multi-national in nature. This is not what is generally called "white supremacy," which has become little more than a Marxist term of abuse.

Footnotes:

sentenced to a ten-month prison term and is expected to be released in late 2012/early 2013.

---

*If we exterminate termites because they destroy the foundations of our houses, how much more lenient should we be in our treatment of Jews, who destroy the foundations of our society?*

---

**February 7th, 2014**                                                                                     #886

**M. Gerard**
Senior Member

Join Date: Oct 2012
Posts: 1,094

**Orange County Sheriff's Office intelligence squad duped Aryan Nations' leader August Kreis III**

There is probably a better thread for this post, but it's late and I'm going to stick it here.

Kelly Boaz (male) is the JTTF agent that Bill White is charged with threatening. This article is about Boaz' undercover work with a Florida gang.

From the article it looks like this "big case" was a somewhat typical fake terror entrapment where the undercover agent was getting the bomb materials and making the bombs while the gang shot their mouths off.

I believe Kreis was a one time associate of Bill's. Kreis gets a mention in paragraph three and then mysteriously drops out of the story.

The bikers were sentenced today, according to this.

ARTICLE:

**Agent: Osceola neo-Nazi biker gang talked about targeting Obama officials, Orange County Sheriff**
Case against 1st SS Kavallerie Brigade Motorcycle Division handled by FBI Joint Terrorism Task Force.
January 23, 2014|By Henry Pierson Curtis, Orlando Sentinel

KISSIMMEE — Brian Klose and his fellow members of the 1st SS Kavallerie Brigade Motorcycle Division organization thought their club was a creation of the Aryan Nations hate group.

They were wrong.

A member of the Orange County Sheriff's Office intelligence squad duped Aryan Nations' leader August Kreis III into founding what he believed would be the militant arm of white supremacists across the country, according to court records.

This week, the story of the 1st SS Kavallerie Brigade was told for the first time in detail at the Osceola County Courthouse, where one of several agents with the FBI Joint Terrorism Task Force described living undercover for months as a renegade bomb maker and probationary member of both the Outlaws and the neo-Nazi biker gang.

Deputy Kelly Boaz, the undercover agent, testified Wednesday that the domestic terrorism case began in 2008-09 in part because bikers at the St. Cloud clubhouse had been talking about targeting members of the Obama administration, as well as then newly elected Orange County Sheriff Jerry Demings, the first black sheriff in Central Florida.

Klose, 51, and Carlos "Gino" Dubose, president of the Outlaws' Osceola chapter, were scheduled to be sentenced at the end of Wednesday's hearing on drug trafficking and bomb-related charges. But lengthy testimony prompted Circuit Judge Jon B. Morgan to reschedule the sentencing for next month.

In separate plea agreements, Klose faces 15 years in prison and Dubose, 56, faces up to 35 years. They'll be sentenced on Feb. 7.

During his testimony, Boaz told how JTTF members likely averted two killings, including a member of the Hell's Angels — mortal enemies of the Outlaws — who walked into the St.

Cloud clubhouse one night thinking it was a white supremacist bar without ties to any other group.

"Klose put a gun to his head and cocked the gun," Boaz said, describing how he grabbed and roughed up the Hell's Angel and ran him out of the clubhouse to save his life.

The other incident involved a motorist high on cocaine who struck and killed Klose's 79-year-old father. Boaz said an SS guy while the would-be butcher from the retired Outlaw from Albany, N.Y. walked across Old Canoe Creek Road in St. Cloud. Afterward, Dubose was accused of, but not charged with, planning a contract murder of the motorist then being held in the Osceola County Jail, records show.

"We were very nervous he was going to lose his life," Boaz said. Someone from the JTTF called in an anonymous tip to Crimeline, which prompted Osceola County law enforcement to provide motorist David Lanier with protection to keep him alive. "This was a very real situation."

After the hearing, Klose told the Orlando Sentinel he did nothing to harm Lanier because he promised his mother, Ann, who died two years after her husband, that he would not retaliate.

The majority of Boaz's testimony discussed how he was sent undercover partly to keep the 1st SS Kavallerie Brigade from finding a bomb maker willing to build them remote-controlled explosives. In his role, he obtained remote-control detonators from Quantico, Va. — the site of the FBI National Academy — and built several demonstration bombs with as much as 1-pound of black powder.

On April 28, 2009, court records state Boaz detonated a remote-control bomb to show Klose what he could do. The blast so excited Klose, he fired a pistol and told Boaz "he had a target for him to use the explosives on and that was the [rival] Warlock motorcycle gang's clubhouse."

Undercover agents had become so entrenched in the biker gang by then that three of them traveled with Klose to Chicago to meet with national leaders of the Outlaws about opening Kavallerie Brigade chapters in the Midwest, records state. The outcome of the discussions was not disclosed.

Another defendant, Harold "Hope" Kelow, faces trial next month on charges that he asked Boaz to build a bomb so he could kill his brother-in-law, a black police officer.

The neo-Nazi group's demand for white racial purity was so strong that Dubose was not allowed to join the 1st SS Kavallerie Brigade because his mother was Cuban, Boaz testified.

After the arrests began in 2012, then Orange-Osceola State Attorney Lawson Lamar said the case was the most complex undercover investigation in decades of Central Florida.

"The underlying aspect through all of it was that they were obtaining explosives and explosives expertise, and they intended to use them to kill people in the United States," Lamar said. "We have a duty to stop what they were doing."

In the spring of 2010, the Joint Terrorism Task Force began investigating the American Front, another Nazi-influenced group of white supremacists suspected to be conducting combat training in rural Osceola County for a race war. Records show the FBI paid a former drug dealer who had sold cocaine in the 1st SS Kavallerie Brigade's club house to infiltrate the group.

The case against 14 accused members of the American Front has mostly fallen apart, with just three convictions without lengthy sentences. The only member awaiting trial is accused leader Marcus Faella.

**M. Gerard**
Senior Member

Join Date: Oct 2012
Posts: 1,094

**└ The feds set the gang up in the first place**

Okay, this is old news, but I wasn't paying attention at the time.

From a Daily Mail article in 2012:

"...The original investigation began in 2007, with an agent from the Orange County Sheriff's Office trading emails with August Kreis III, a leader of the Aryan Nations hate group.

Once one of the country's leading white-supremacist groups, the Aryan Nations, who believe the 'white race' to be an 'endangered species', had been in decline since 2004 after founder Richard Butler's death and lawsuits by the Southern Poverty Law Centre which had depleted its funds.

Kreiss wanted to form a neo-Nazi biker club which would serve as the paramilitary arm of white supremacists across the U.S., according to records seen by the Sentinel. Following the email exchange, an undercover agent from Orange County became the Aryan Nations' top Florida recruiter for what would become the 1st SS Kavallerie Brigade Motorcycle Division.

Early members of the gang included two undercover FBI agents, who used their knowledge of explosives to gain the trust of others, and a biker who allegedly offered $1,000 to anyone who shot a black man riding an ATV in rural Osceola County, according to records seen by the Sentinel.

Kreis came to central Florida in 2008 to meet his new followers after Brian Klose, a 6ft 6in enforcer with the Outlaws Motorcycle Club, became the Kavellerie Brigade's new 'fuhrer'.
+6

A CCTV feed from FBI hidden cameras in the Kavallerie Brigade clubhouse, which was used to gather evidence against members of the group

The investigation into the group underway, the FBI Joint Terrorism Task Force installed a range of bugs and hidden cameras into the Kavallerie Brigade's clubhouse in St Cloud, Osceola County, allowing them to begin collecting the evidence they would use to snare any members suspected of illegal activity.

Unaware of the covert recording equipment tracking his every move, Klose warned members to be wary of anti-terrorist legislation like the post 9/11 Patriot Act, which gave police extensive surveillance powers, and to never admit their membership of the Kavallerie Brigade.

However, Klose never suspected that his own in-house explosives experts were in fact undercover agents and he asked them repeatedly to build bombs and hand grenades for planned attacks, records show.

And footage obtained from the many cameras concealed in the Kavallerie Brigade clubhouse enabled officers to gather the evidence to put together drug-trafficking charges to arrest members...

Read more: http://www.dailymail.co.uk/news/arti...#ixzz2scDu5EKX
Follow us: @MailOnline on Twitter | DailyMail on Facebook

---

February 7th, 2014                                                                 #888

**M. Gerard**
Senior Member

Join Date: Oct 2012
Posts: 1,094

└

I know what Hadding will say (what he always says) but Bill White claims he was framed by somebody else posting as him on his Facebook page and, after seeing how these Florida Neo-Nazi-hunters work, I don't see that as so far-fetched.

Don't ban me for saying that!

Case 6:15-cv-00298-ACC-DAB   Document 22   Filed 11/24/15   Page 1 of 2 PageID 76          Case 6:15-cv-00298-ACC-DAB   Document 1   Filed 02/25/15   Page 1 of 14 PageID 1

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 12 of 38   Page ID #388

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DEBORAH PLOWMAN,

      **Plaintiff,**

v.

                    Case No:  6:15-cv-298-Orl-22DAB

KELLY BOAZ, individually,

      **Defendant.**

_____

### JUDGMENT IN A CIVIL CASE

**Decision by Court.**   This action came before the Court and a decision has been rendered.

    **IT IS ORDERED AND ADJUDGED**

    that Plaintiff Deborah Plowman shall recover from the Defendant Kelly Boaz the amount

    of $30,000.00,

    for which sum let execution issue.

Date: November 24, 2015

                    SHERYL L. LOESCH, CLERK

                    s/R. Olsen, Deputy Clerk

---

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

                         CASE NO:_____

DEBORAH PLOWMAN,

      Plaintiff,

vs.                      **COMPLAINT FOR CIVIL**
                         **RIGHTS VIOLATIONS**
                         **(JURY TRIAL DEMANDED)**

KELLY BOAZ,
individually.

              Defendant.
_____/

### COMPLAINT

    COMES NOW, DEBORAH PLOWMAN (hereinafter "PLAINTIFF"), by and through her undersigned counsel, and sues KELLY BOAZ, individually (hereinafter "DEFENDANT BOAZ"), and states as follows:

### INTRODUCTION

    1.    This is an action to redress violations of PLAINTIFF'S Civil Rights guaranteed by the the Fourth, Fifth and Fourteenth Amendments to the United States Constitution; under federal law §§1983 and 1988 of Title 42 of the United States Code; and violations of state tort law of the State of Florida.

### JURISDICTION

    2.    PLAINTIFF invokes the jurisdiction of this Court under §§ 1331, 1343 and 1367 of Title 28, and §§1983 and 1988 of Title 42 of the United States Code.

EXHIBIT F(e)(1)

Case 6:15-cv-00298-ACC-DAB   Document 1   Filed 02/25/15   Page 2 of 14 PageID 2          Case 6:15-cv-00298-ACC-DAB   Document 1   Filed 02/25/15   Page 3 of 14 PageID 3

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 13 of 38   Page ID #389

## VENUE

3.   The acts and practices constituting the violations alleged below have occurred within the jurisdiction of the Middle District of Florida, in particular, Orange and Osceola Counties.

4.   In connection with the acts and violations alleged below, DEFENDANT BOAZ has either directly or indirectly violated Plaintiff's constitutional rights and rights under federal law.

## PARTIES

5.   DEFENDANT BOAZ was at all times relevant to this Complaint, a duly appointed employee and agent of the Orange County Sheriff's Office, in Orange County, Florida, assigned to the Metropolitan Bureau of Investigation and the lead agent in the investigation of whom he wrongly assumed was the PLAINITFF.

6.   At all times, DEFENDANT BOAZ was acting under color of law while working with the Orange County Sheriff's Office and the Metropolitan Bureau of Investigation.

7.   At all times, DEFENDANT BOAZ was a citizen of the State of Florida, resided in the Middle District of Florida, and was over 18 years of age and was sui juris.

8.   DEFENDANT BOAZ is sued in his individual capacity.

9.   At all times material hereto, PLAINTIFF was over 18 years of age, resided in the State of Illinois, and was sui juris.

## FACTUAL ALLEGATIONS

10.   At all times material hereto, DEFENDANT BOAZ was employed by the Orange County Sheriff's Office and was assigned to the Metropolitan Bureau of Investigation that was spearheading an undercover investigation known as "Primitive Affliction."

11.   At all times material hereto, The Metropolitan Bureau of Investigation, was a multi-agency task force, that was empowered to conduct narcotics, vice, and organized crime investigations across jurisdictional boundaries throughout the Ninth Judicial Circuit consisting of Orange and Osceola Counties in Florida.

12.   In 2008, law enforcement personnel, including DEFENDANT BOAZ, began conducting an undercover investigation in the Central Florida region.

13.   At all times material hereto, the lead investigator of the undercover operation at the time was DEFENDANT BOAZ, working undercover for approximately 1.5 years under the alias of "Kevin Post" in order to infiltrate groups that he believed were committing crimes.

14.   The undercover investigation's original focus was a Neo-Nazi movement group and later focused on individuals interested in bomb making and detonating bombs.

15.   On May 23, 2009, DEFENDANT BOAZ was notified by a target of the investigation by the name of Ronald Cusack, that he was to meet with him and another target of the investigation known as Brian Klose, at Old Town, in Kissimmee, Osceola County, Florida.

16.   DEFENDANT BOAZ, followed targets Brian Klose and Ronald Cusack to Old Town and met up with a female known by her nickname as "Sin" and her girlfriend known as Christina (last name unknown).

Case 6:15-cv-00298-ACC-DAB   Document 1   Filed 02/25/15   Page 4 of 14 PageID 4      Case 6:15-cv-00298-ACC-DAB   Document 1   Filed 02/25/15   Page 5 of 14 PageID 5

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 14 of 38   Page ID #390

17.     While at Old Town, the group, including DEFENDANT BOAZ, had dinner with "Sin", and during this dinner meeting Brian Klose asked "Sin" if she wanted vicodin prescription pills.

18.     "Sin" informed Brian Klose that she would love some pills and Brian Klose went to Ronald Cusack's vehicle and retrieved a pill bottle filled with a variety of pills.

19.     DEFENDANT BOAZ, was with Brian Klose as the pills were retrieved and counted.

20.     Brian Klose then gave the pills to "Sin" while DEFENDANT BOAZ observed the entire transaction.

21.     "Sin" then ingested two vicodin pills and immediately began to exhibit physical signs of impairment from the narcotic pain medication.

22.     During the evening, DEFENDANT BOAZ discussed with "Sin" an individual by the name of Peter James from Illinois.

23.     "Sin's" legal name is Kristy Pryzbylla.

24.     Throughout the evening with "Sin" (Kristy Pryzbylla), DEFENDANT BOAZ was present and participated in the dinner and was able to get a detailed physical description of "Sin" that included her multiple tattoos covering her entire arms, neck, chest, and legs, her approximate weight and height, her hair color and style, her eye color and approximate age.

25.     On May 23, 2009 the PLAINTIFF, DEBORAH PLOWMAN, was nowhere near Florida and could fully account of her whereabouts as it was her birthday, and she was in Illinois with her husband, Peter James.

26.     The PLAINTIFF in this matter looks nothing like "Sin" (Kristy Pryzbylla) and in fact does not even have a single tattoo on her entire body.

27.     At all times material hereto, the PLAINTIFF in this matter was 5 feet 6.5 inches in height and approximately 185 lbs. in weight with brown hair.

28.     At all times material hereto, "Sin" (Kristy Pryzbylla) was 5 feet 3 inches in height and 130 lbs. in weight with jet-black hair with purple highlights in it.

29.     DEFENDANT BOAZ incorrectly assumed that "Sin" was the common law wife of Peter James out of Chicago, Illinois; an individual that was on DEFENDANT BOAZ'S radar and one that DEFENDANT BOAZ also incorrectly assumed was involved in criminal activity.

30.     At all times material hereto, PLAINTIFF was legally married to Peter James and had obtained her marriage license in the State of Illinois.

31.     At all times material hereto, PLAINTIFF had a valid Illinois driver's license.

32.     On March 28, 2012 a Probable Cause Order was issued by a Circuit Court Judge from Osceola County after the Circuit Court Judge reviewed the sworn affidavit of DEFENDANT BOAZ, and the Order authorized the clerk of court to issue a capias for the arrest of the PLAINTIFF.

33.     On or about March 29, 2012, PLAINTIFF was resting at home in Brookfield, Illinois after taking her dog for a walk when all of a sudden there was loud banging on the front door and bright lights penetrating through the windows of her home.

34.     PLAINTIFF answered the door and was asked to come outside and was immediately handcuffed and fully searched by one of approximately 15-20 law enforcement personnel that were visibly armed.

Case 6:15-cv-00298-ACC-DAB    Document 1    Filed 02/25/15    Page 6 of 14 PageID 6        Case 6:15-cv-00298-ACC-DAB    Document 1    Filed 02/25/15    Page 7 of 14 PageID 7

Case 3:16-cv-00948-JPG    Document 25-5    Filed 07/17/17    Page 15 of 38    Page ID #391

35.    PLAINTIFF was frightened as one of the law enforcement personnel had his rifle out asking if PLAINTIFF'S dog was friendly.

36.    PLAINTIFF begged the rifled law enforcement personnel not to shoot her dog.

37.    PLAINTIFF was then taken to a police car located in front of her neighbor's home where law enforcement then further searched her mouth and nose.

38.    PLAINTIFF was taken to the local law enforcement agency jail where she was fingerprinted, photographed and was given a small amount of toilet paper.

39.    The following day, on or about March 30, 2012, PLAINTIFF was transferred to Cook County Jail in Illinois for a bond hearing regarding extradition proceedings to Florida.

40.    While being held at Cook County Jail in Illinois, PLAINTIFF was fingerprinted and had a full body-scan.

41.    While being held in the Cook County Jail in Illinois, PLAINTIFF was forced to use extremely dirty toilets in front of complete strangers.

42.    A Judge in Cook County reviewed the extradition documentation and heard argument from the prosecutor regarding the extradition and proceeded to set PLAINTIFF a bond.

43.    During the extradition bond hearing, PLAINTIFF was also informed by the Judge that she would need to reappear in court in Cook County, Illinois on Monday, April 2, 2012 to see if Florida could provide identifying information on the PLAINTIFF as the PLAINTIFF was contesting extradition as she proclaimed her innocence and that law enforcement had wrongly arrested the incorrect person.

44.    PLAINTIFF bonded out of Cook County Jail in Illinois on March 30, 2012.

45.    On or about April 2, 2012, PLAINTIFF again appeared as requested at the Cook County Courthouse for identification purposes as she was disputing the fact that the State of Florida through DEFENDANT BOAZ'S intentional actions and inactions had had a warrant issued wrongly against her.

46.    During the court hearing on April 2, 2012, the Judge hearing the extradition matter informed PLAINTIFF that she would need to appear on April 26, 2012 for an extradition hearing unless she turned herself into the authorities in Osceola County, Florida prior to that date.

47.    On April 18, 2012, PLAINTIFF made flight and lodging arrangements and flew down to Florida in order to turn herself in at the Osceola County Jail in lieu of being extradited from Illinois to Florida for the felony charge of Possession of a Controlled Substance in case number 12-CF-1234.

48.    On April 19, 2012, PLAINTIFF turned herself in at the Osceola County Jail in Florida and posted a $5,000.00 bond.

49.    While at the Osceola County Jail, PLAINTIFF was fingerprinted, had a mug shot taken of her and was forced to once again use a toilet that allowed others to watch her.

50.    PLAINTIFF was to be released within a two-hour window, however, she was not released for several more hours as the Osceola County Jail was instructed to wait for DEFENDANT BOAZ to arrive in order to interview the PLAINTIFF.

Case 6:15-cv-00298-ACC-DAB  Document 1  Filed 02/25/15  Page 8 of 14 PageID 8          Case 6:15-cv-00298-ACC-DAB  Document 1  Filed 02/25/15  Page 9 of 14 PageID 9

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 16 of 38   Page ID #392

51.     DEFENDANT BOAZ asked PLAINTIFF several questions including her name, who she was married to, whether Peter James was her husband, all to which she replied with a "yes".

52.     DEFENDANT BOAZ asked PLAINTIFF if she has ever used a nickname or has ever been called "Sin" to which she replied with a "no".

53.     DEFENDANT BOAZ immediately began to break out into a sweat upon viewing and questioning PLAINTIFF, realizing he caused the wrong person, PLAINTIFF, to be arrested in his undercover operation, instead of "Sin" (Kristy Pryzbylla).

54.     At the Osceola County Jail, DEFENDANT BOAZ stated that he was really not interested in the PLAINTIFF and what he really wanted was to interview the PLAINTIFF regarding her husband, Peter James, and any alleged criminal activity on his part.

55.     On May 7, 2012, the State Attorney's Office for the Ninth Judicial Circuit in Osceola County formally filed a Nolle Prosequi dismissing the third degree felony charge of Possession of Hydrocodone in case number 12-CF-1234.

56.     DEFENDANT BOAZ failed to conduct any investigation into the identity of "Sin" (Kristy Pryzbylla) or that of the PLAINTIFF, or to utilize any of the many file and computer databases available to him through local and federal law enforcement, in order to ascertain the true identity of "Sin" (Kristy Pryzbylla).

57.     DEFENDANT BOAZ failed to conduct any investigation whatsoever to ensure the accuracy of his misidentification of PLAINTIFF, or to determine who the true perpetrator of the controlled substance possession charge really was.

58.     DEFENDANT BOAZ did not have, and failed to provide, probable cause for the issuance of an arrest warrant for PLAINTIFF through his utterly deficient and grossly inadequate failure to properly utilize law enforcement identification techniques previously taught to him when he attempted to identify "Sin" (Kristy Pryzbylla).

59.     DEFENDANT BOAZ failed to conduct the simplest identification process of pulling and reviewing PLAINTIFF'S driver license and photograph from the State of Illinois, and had he bothered to review the driver's license information and photograph of PLAINTIFF, he would have easily recognized that PLAINTIFF was not the person he assumed her to be.

60.     A picture of "Sin" (Kristy Pryzbylla) is attached as Exhibit A to this Complaint.

61.     A picture of PLAINTIFF is attached as Exhibit B to this Complaint.

## COUNT I – FALSE ARREST / IMPRISONMENT

62.     Paragraphs 1 through 61 of this complaint are incorporated by reference into this count of this complaint, as if set out in full.

63.     PLAINTIFF presented her claim in writing to DEFENDANT BOAZ, Sheriff Jerry L. Demings of the Orange County Sheriff's Office, and Director Larry Zwieg of the Metropolitan Bureau of Investigation pursuant to Florida Statute 768.28.

64.     In committing the acts complained of herein, DEFENDANT BOAZ acted under color of state law by providing intentional false information in an affidavit that was presented to a Circuit Court Judge in Osceola County, which in turn caused a warrant to be issued leading to the PLAINTIFF being falsely arrested in Illinois and also a second time in Florida.

Case 6:15-cv-00298-ACC-DAB   Document 1   Filed 02/25/15   Page 10 of 14 PageID 10          Case 6:15-cv-00298-ACC-DAB   Document 1   Filed 02/25/15   Page 11 of 14 PageID 11

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 17 of 38   Page ID #393

65.     By means of the unlawful detention and arrest of PLAINTIFF, DEFENDANT BOAZ intentionally, or with deliberate indifference and callous disregard of PLAINTIFF'S rights, deprived PLAINTIFF of her right to be free of unlawful arrest.

66.     As a direct and proximate result of the false arrest and false imprisonment of PLAINTIFF, she has suffered grievously, has been brought into public scandal, and with great humiliation, mental suffering and damaged reputation.

67.     As a further direct and proximate result of the false arrest and imprisonment of Plaintiff, she has further suffered mental anguish, loss of capacity for the enjoyment of life, physical injury, humiliation personally, loss of income and earning capacity, and loss of her freedom and civil rights.

WHEREFORE, PLAINTIFF prays:

a) Judgment for compensatory damages against DEFENDANT BOAZ;

b) Costs of suit;

c) Trial by jury as to all issues so triable; and

d) Such other relief as this Honorable Court may deem just and appropriate.

## COUNT 2 – VIOLATION UNDER 42 U.S.C. § 1983 VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS

68.     Paragraphs 1 through 61 of this complaint are incorporated by reference into this count of this complaint, as if set out in full.

69.     This cause of action is brought by the PLAINTIFF against DEFENDANT BOAZ for the deprivation of PLAINTIFF'S constitutional rights within the meaning of 42 U.S.C. § 1983.

70.     While DEFENDANT BOAZ was acting under the authority of the State of Florida and under color of law as an agent for the Orange County Sheriff's Office as well

as the Metropolitan Bureau of Investigation, he subjected PLAINTIFF to the deprivation of the rights and privileges secured to her by the Constitution of the United States including her constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States including, but not limited to the right to be free from unreasonable searches and seizures, the right not to be deprived of liberty without due process of law, and the right to be from false arrest and imprisonment.

71.     By means of the unlawful detention and arrest of PLAINTIFF, DEFENDANT BOAZ intentionally, or with deliberate indifference and callous disregard of PLAINTIFF'S rights, deprived PLAINTIFF of her right to be free of unlawful arrest and unreasonable searches and seizures.

72.     DEFENDANT BOAZ intentionally violated PLAINTIFF'S right to be free from false arrest and violated the PLAINTIFF'S rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

73.     The conduct of DEFENDANT BOAZ was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

WHEREFORE, THE PLAINTIFF prays:

a) Judgment against DEFENDANT BOAZ for compensatory and punitive damages;

b) Costs of suit pursuant to 42 U.S.C. 1988;

c) Reasonable attorney's fees pursuant to 42 U.S.C. 1988;

d) Trial by jury as to all issues so triable; and

e) Such other relief as this Honorable Court may deem just and appropriate.

Date: February 26, 2015.

/s/ Gerasimos "Jerry" Theophilopoulos
Gerasimos "Jerry" Theophilopoulos, Esq.
1247 South Pinellas Ave.
Tarpon Springs, FL 34689
Tel. 727-945-1112
Fx. 727-945-9224
Email: jtlaw@tampabay.rr.com
Florida Bar Number 0068380
Attorney for Plaintiff

...asts: Deputy, Officer Earn Praise Along With Complaints - tribunedigital-orlandosen...    Page 1 of 3          ...asts: Deputy, Officer Earn Praise Along With Complaints - tribunedigital-orlandosen...    Page 2 of 3

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 19 of 38   Page ID #395

Home → Collections → Palm Bay

Use of force: Sorting through the complaints

Recommend 0

## A Study In Contrasts: Deputy, Officer Earn Praise Along With Complaints

Tweet      0

G+1

**Deputy Kelly Boaz**

September 8, 1991

Orange   County Deputy Kelly Boaz says he always tries to stay calm on the job. He'd rather use his voice than his fists.

But Boaz broke   a robbery suspect's arm during an October 1989 arrest.

Four months later he used a martial-arts hold to drag another man across a parking lot while telling fellow deputies on the scene to "back off." The charge: Underage possession of alcohol .

Then in March 1990, Boaz hit a fleeing suspect with his nightstick and twisted the man's arm so hard he defecated. The charge: Disorderly conduct.

Two of those cases were among the five citizen complaints of brutality filed against Boaz between his hiring in July 1989 and the end of last year. Only one other deputy was cited as often in the past five years.

The sheriff's office investigated the complaints and ruled that Boaz acted properly four of the times. In one case a supervisor wrote that Boaz used excessive force, but he was not disciplined.

The man whose arm was broken did not file a complaint, on the advice of his attorney, but he recently sued Boaz and the sheriff's office in federal court. Neither has responded to the lawsuit.

Boaz, 29, is a Miami native who worked for 4 1/2 years in Palm Bay and nine months in Indian River Shores as a firefighter and a police officer before joining the Orange County sheriff's office.

He originally was assigned to patrol east Orange County, historically not a high-crime zone, before being made an undercover narcotics officer in April.

Boaz' record with all three departments is a study in contrasts. Supervisors routinely describe him as personable and intelligent. They praise him for being aggressive and making a lot of arrests.

But that same aggressiveness has drawn criticism.

"At times he would be overzealous and create cases," Palm Bay Lt. Doug Dechenne wrote.

In Boaz' 1991 job evaluation, Sheriff's Sgt. Gene Mallard wrote, "His most glaring deficit is the paranoia which manifests itself in his constantly believing others are speaking ill of him."

The deputy would not comment for this report, but in an interview about police work several months ago he said he would "try everything" to avoid using force.

"You've got to feel people out, try to reason with them," Boaz said. "But sometimes people don't want to listen, and then you have to put your foot down. . . . If you wear a badge these days, you're basically wearing a bull's eye. Everybody can kill you. I'm sorry to say it, but that's the way it is."

Boaz sometimes uses a form of martial arts known as aikido. The lawsuit and one excessive-force complaint involved his use of painful aikido holds.

A fellow deputy said in a sworn statement involving one of those cases that Boaz enjoys showing deputies new holds he has learned to use on suspects.

In the February 1990 case involving a 19-year-old man who had a can of beer on the car seat next to him, Boaz grabbed the man's arm and yanked it out behind him, forcing him to drop to his knees. The man did not resist, reported Mallard, Boaz' supervisor, who was on the scene.

The deputy dragged the suspect across a parking lot, telling two other deputies who moved in with handcuffs to "back off." The suspect was not seriously injured.

Boaz reported he was so intent on making the man lie on the ground to be handcuffed that he got "tunnel vision." But he felt the use of force was proper.

Mallard did not discipline Boaz. But he called the deputy's conduct "unprofessional" and recommended that he see a department psychologist to deal with "significant" personal and professional stress. Mallard did not elaborate in his report, and there is no record in Boaz' personnel file of his seeking counseling.

Boaz also used an aikido hold when he broke the arm of a robbery suspect. The man, 19, was lying still on his stomach, surrounded by three deputies with guns drawn, when Boaz put a knee on the suspect's back and grabbed his right arm in a hold to handcuff him, according to arrest reports.

Boaz said in a sworn statement that he thought the suspect was reaching for a knife in his back pocket with his other arm, and he continued to twist the right arm until it broke.

The suspect's attorney said his client was only rolling in pain from the hold. He filed a federal lawsuit in July, charging Boaz with violating his civil rights.

**From the Web**                                                        Sponsored Links

**Forget Yoga Pants - These Are What You Should Be Wearing This Summer**
American Giant | Refinery29

**These 70s Child Stars Are Unrecognizable Now**
Trend Chaser

**The Story Behind Your Last Name Will Surprise You**
Ancestry

**Top Longevity Scientist Provides Leading Expertise For Your Daily Use**
Boston Globe | Elysium Health

**8 Sleeping Positions And Their Effects On Health**
AGL Health

**Investing in Private Real Estate is Potentially Better than REITs**
Techcrunch | Realtyshares

Related Articles

2 Jailed After Deputy Plays Trick On Caller
*May 11, 1990*

Officials Say Inmate Wanted Deputy Killed
*November 12, 1994*

Detective Is Cleared In Man's Death
*December 13, 2000*

Man Shot By Deputy Stays Critical
*August 10, 2000*

Gang Leader Gets 5 Years After Deal In Sex Cases
*August 17, 1995*

Find More Stories About

Palm Bay

Boaz

EXHIBIT E(e)(ii)

semi-annual sale
Hotels.com
Up to $100 Rebate
Find out more

...red In Man's Death - tribunedigital-orlandosentinel     Page 1 of 2     ...red In Man's Death - tribunedigital-orlandosentinel     Page 2 of 2

Case 3:16-cv-00948-JPG    Document 25-5    Filed 07/17/17    Page 20 of 38    Page ID #396

NOTICE:

This site contains REAL police records (court records of driving citations, speeding tickets, felonies, misdemeanors, sexual offenses, mugshots, etc.), background reports, photos, court documents, address information, phone numbers and much more. Please BE CAREFUL when conducting a search

[ I Understand ]

TruthFinder   Home → Collections → Altamonte Springs

[ Recommend 0 ]

# Detective Is Cleared In Man's Death

### Deputy Shot Suspect Driving Truck At Him

Tweet   0

0

G+1

December 13, 2000 | By Pedro Ruz Gutierrez of The Sentinel Staff

An Orange County deputy sheriff who fatally shot a wanted felon at an Altamonte Springs shopping center last summer was cleared Tuesday of any wrongdoing by his agency.

Detective Kelly Boaz, 38, shot Joshua Inman, 26, on Aug. 8 after Inman drove his rental truck at the officer, an internal investigation found. Boaz, fearing for his life, opened fire. Inman, who was unarmed, died three days later.



**1 Worst Carb After Age 50**

healthplus50.com

If you're over 50 and you eat this carb you will never lose belly fat.

**Arrest Records: 2 Secrets**

instantcheckmate.com

Enter Name and State, then Access Full Background Checks Instantly.

The administrative review said there is "a preponderance of the evidence to demonstrate Detective Kelly Boaz acted within Orange County Sheriff's Office written directives" on the use of deadly force.

However, Sgt. Chris Thomas, who was Boaz's supervisor, was demoted to deputy for not alerting Seminole County authorities about their stakeout. The racketeering squad that Thomas ran also was disbanded.

A separate shooting investigation by the Altamonte Springs police department also cleared Boaz two months ago. And the Brevard-Seminole State Attorney's Office found the shooting was "lawful and justified."

The morning of the shooting, Boaz traveled to the Target store at the Altamonte Crossings Plaza at 882 W. State Road 436 after being tipped off by Cathy Inman, the suspect's wife. Joshua Inman, who also used the alias Josh Young, was wanted on two warrants for grand theft and dealing in stolen property.

Boaz and other deputies planned to block Inman's U-Haul truck and arrest him.

The internal review said Boaz drew his 9 mm semiautomatic Beretta handgun, identified himself and ordered Inman to the ground. Inman's reaction was to put the truck in reverse. He struck another deputy's vehicle and then put the truck into drive to go forward. Boaz, who was about 5 feet ahead, fired and shot Inman in the head.

Boaz has had more than a dozen internal investigations since joining the department in 1989. Several of those have involved allegations of excessive force. Sheriff's officials have attributed the high number of complaints against Boaz to the violent offenders he often has faced.

The martial-arts expert has been disciplined several times. His punishment has ranged from oral reprimands to 20 hours suspension of pay and loss of pay.

An Orange County citizens' review board will scrutinize the shooting at a later date.

### Related Articles

Man Shot By Deputy Stays Critical
August 10, 2000

Suspect Shot By Deputy Dies Of Injuries At Ormc
August 14, 2000

Ami Medical Center Orlando
August 31, 1989

Deputy Shoots Man In Parking Lot
August 9, 2000

The following are candidates for graduation from Mount...
May 24, 1995

### Find More Stories About

Altamonte Springs

Joshua

Inman

Boaz

## Public Arrest Records

instantcheckmate.com

See anyone's past criminal history. Unlimited searches. Peace of mind.

From the Web     Sponsored Links

...Important Legal Things Men And Women You Should Be Wearing This Summer
American Giant | Refinery29

**Research: The EGFR Mutation and Precision Therapy for Lung Cancer**
Dana-Farber Cancer Institute

**These 70s Child Stars Are Unrecognizable Now**
Trend Chaser

**The Story Behind Your Last Name Will Surprise You**
Ancestry

**Top Longevity Scientist Provides Leading Expertise For Your Daily Use**
Boston Globe | Elysium Health

**27 Giant Mistakes You Never Noticed In Major Motion Pictures**
My Daily Viral

**30 of Frank Sinatra's Lovers That You Probably Forgot About**
Womens Forum

**Why Men Love This New Bed Sheets Company**
Parachute

by Taboola

MORE:

Puerto Rico birth certificates: How to get a new one

Lottery results for Powerball, Florida Lotto

Lottery results for Powerball, Florida Lotto

Lottery results for Powerball, Florida Lotto

Lottery results for Powerball, Florida Lotto

Do your homework before painting or sealing cool deck



Orlando Sentinel    Index by Keyword | Index by Date | Privacy Policy | Terms of Service

Please note the green lined linked article text has been applied commercially without any involvement from our newsroom editors, reporters or any other editorial staff.

EXHIBIT F(e)(iii)

news / Breaking News

# Orange sheriff, MBI face lawsuit over mistaken identity



By Henry Pierson Curtis, Orlando Sentinel Reporter
Contact Reporter

APRIL 17, 2015, 5:38 PM

Orange County Sheriff Jerry Demings and the Metropolitan Bureau of Investigation face a lawsuit in federal court over a case of mistaken identity in a neo-Nazi biker investigation, court records show.

In 2012, one of the sheriff's top undercover agents filed arrest papers against the wife of Peter "Big Pete" James, then head of the Outlaws Motorcycle Club in Chicago, according to court records.

Undercover agent Kelly Boaz claimed that Deborah Plowman on May 23, 2009, took two Vicodin in front of him while she partied with white supremacist bikers in Osceola County, records show.

It turned out Plowman was the wrong person and looked much different from the woman Boaz saw in the bar that night. The differences included Plowman's being seven years older, 3 inches taller, 55 pounds heavier and with green eyes, brown hair and no tattoos. The woman Boaz claimed he saw taking drugs had blue eyes, jet-black hair with purple highlights and was covered in tattoos, according to the lawsuit and jail records.

The incident also happened the same day Plowman was celebrating her 44th birthday at her family's Illinois home, records show. Prosecutors dismissed the drug charge six weeks after her arrest, records show.

The recently filed lawsuit seeking punitive damages accuses Boaz of misidentifying Plowman and wrongly arresting her.

Following standard police practices such as checking government databases would have prevented the mistake, the lawsuit claims.

"Had Boaz pulled her drivers license, he would have known it wasn't her, and he'd made a huge mistake," said Plowman's lawyer Jerry Theophilopoulos of Tarpon Springs.

Sheriff's Office would not comment on lawsuit.

A day after a Florida judge signed Boaz's arrest-warrant application on March 27, 2012, Plowman was picked up on a drug-possession charge at her family's home outside Chicago.

Taken away in handcuffs by nearly 20 armed officers, Plowman was held overnight at a local jail and transferred to the Cook County Jail in Chicago, where she remained until posting bond six days after her arrest, the lawsuit states.

"In my 20 years of practice, I've never seen anything like what they did to Deborah Plowman," said Theophilopoulos.

Plowman traveled to Florida, was booked April 19, 2012, at the Osceola County Jail and posted $5,000 bail on the drug charge. Before Plowman was allowed to leave jail, she was held for hours until Boaz arrived to question her, according to the lawsuit.

"Boaz immediately began to break out into a sweat upon interviewing and questioning [Plowman], realizing he caused the wrong person to be arrested in his undercover operation," the lawsuit states.

Claiming he wasn't interested in Plowman, the lawsuit states Boaz then asked her for information about her husband and any alleged criminal activity.

"Peter James is an upstanding citizen who has no criminal records whatsoever," said Theophilopoulos, who acknowledged James once belonged to the Outlaws. "Mr. James has been retired for several years."

The U.S. Department of Justice classifies the Outlaws as a motorcycle gang involved in criminal activities, with more than 1,700 members in the U.S. and 12 foreign countries.

During the undercover operation, Boaz had been posing since 2008 as an outlaw biker and underworld bomb maker in an investigation of hate groups in Orange and Osceola counties.

MBI, a task force of local investigators, and the FBI Joint Terrorism Task Force joined the case after the sheriff's Intelligence Squad created a motorcycle club to attract white supremacists and neo-Nazis that was called the 1st SS Kavallerie Brigade Motorcycle Division.

The undercover agents opened a clubhouse in St. Cloud complete with Nazi flags, microphones and video cameras hidden in the walls to collect evidence, records show. The investigation ended in 2012 with six arrests, including Plowman.

EXHIBIT F(e)(iv)

final trial in the case is set for next month, when Boaz is expected to testify against a biker accused of attempted first-degree murder.

*hcurtis@orlandosentinel.com* **or** *407-420-5257*

Copyright © 2016, Orlando Sentinel

**This article is related to:** Trials and Arbitration, Crime, Orange County, Osceola County, Orange County Sheriff's Office, U.S. Department of Justice



EXHIBIT F(e)(v)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

GIOVANNI KRASNIQI, as Personal Representative of the Estate of PAL KRASNIQI, deceased, and PASHKA KRASNIQI,

Plaintiffs,

6:00-CV-259-ORL-22B

CASE NO. [redacted]

vs.

KEVIN BEARY, SHERIFF OF ORANGE COUNTY, in his official capacity, and the CITY OF ORLANDO, MELANIE HINES, Statewide Prosecutor, Office of the Statewide Prosecutor, Office of the Attorney General for the State of Florida; ROBERT BOND; ROBERT PIGMAN; SGT. JEFF O'DELL; LT. DAVID KOWALSKE; CPL. CHRISTOPHER THOMAS; SGT. MARCHIONE; MICHAEL LaFAY, ESQUIRE; KELLY BOAZ; SGT. PAUL ROONEY, and CAPT. FRED FINK,

Defendants.

______________________________/

NIGHT BOX FILED
2000 FEB 25 PM 1:
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, GIOVANNI KRASNIQI, as Personal Representative of the Estate of PAL KRASNIQI, deceased, and PASHKA KRASNIQI, by and through undersigned counsel, hereby file this cause of action against Defendants, KEVIN BEARY, SHERIFF OF ORANGE COUNTY, in his official capacity (hereinafter referred to as "SHERIFF'S OFFICE"); the CITY OF ORLANDO (hereinafter referred to as "CITY"); MELANIE HINES, Statewide Prosecutor, Office of the Statewide Prosecutor, Office of the Attorney General for

the State of Florida (hereinafter jointly referred to as "STATEWIDE PROSECUTOR"); ROBERT BOND; ROBERT PIGMAN; SGT. JEFF O'DELL; LT. DAVID KOWALSKE; CPL. CHRISTOPHER THOMAS; SGT. MARCHIONE; MICHAEL LAFAY, ESQUIRE; KELLY BOAZ; SGT. PAUL ROONEY, and CAPT. FRED FINK, and in support thereof say:

1. This cause of action is brought pursuant to 42 U.S.C. §1983.

2. At all times material hereto, PAL KRASNIQI and PASHKA KRASNIQI were residents of Orange County, Florida.

3. At all times material hereto, KEVIN BEARY was the duly elected Sheriff for Orange County.

4. The CITY OF ORLANDO is a municipality under the laws of the state of Florida.

5. At all times material hereto, the STATEWIDE PROSECUTOR was a governmental entity under the laws of the State of Florida.

6. In the early morning hours before sunrise of February 27, 1999, Orlando Police Officers and Orange County Deputy Sheriffs forcibly invaded Plaintiffs' home located at 1221 Bumby Avenue, Orlando, Florida. Plaintiffs, PAL KRASNIQI and PASHKA KRASNIQI were asleep in the home along with other family members.

7. Defendants stormed Plaintiffs' home by using a ram to batter down the front door, followed by lobbing concussion grenades and frantic yelling of officers.

8. KELLY BOAZ of the Sheriff's Office had previously obtained a search warrant signed by Judge Komanski attached hereto as Exhibit 1. Based on BOAZ's representations, the search warrant set forth items that were to be located by the law enforcement officers as follows:

> Assorted new shoes, most bearing anti-theft devices and with attached pricing tags from Payless Shoe Store and miscellaneous new clothes stored in garbage bags and bearing pricing tags from Dollar General Stores, and records and ledgers kept in regards to stolen property which is relevant to proving the violation of laws of this State, to whit: Florida Statute 812.014, governing grand theft and is currently being kept in or on certain property in Orange County, Florida, such property being under the custody of Pal or Pashka Krasniqi...

9. In search of allegedly stolen shoes and clothes, the officers of Defendants CITY and SHERIFF'S OFFICE rushed into the home, terrifying the occupants. In the process, Orlando Police Officer BOBBY BOND shot and killed PAL KRASNIQI. Officer BOND did not have just cause to fire upon PAL KRASNIQI, and utilized more force that was reasonably or necessary under the circumstances.

10. After fatally wounding PAL KRASNIQI, Defendants subsequently arrested PASHKA KRASNIQI. There was no basis whatsoever to arrest PASHKA KRASNIQI. PASHKA KRASNIQI committed no crime other than watching officers shoot her husband.

11. PAL KRASNIQI was survived by his wife, PASHKA KRASNIQI, as well as children and grandchildren, Anthony

Perakaj, Mirash Krasniqi, Martin Krasniqi, Giovanni Krasniqi, Lena Krasniqi-Prekaj and Toni Krasniqi-Mathis.

12. At all times material hereto, all Orlando Police Officers referenced herein were acting within the course and scope of their rights and duties as employees of the City of Orlando, and duly appointed police officers for the Orlando Police Department, a division of the City of Orlando. Moreover, the Orlando Police officers referenced herein were acting pursuant to color of law.

13. At all times material hereto, all Orange County Deputy Sheriffs referenced herein were acting pursuant to their rights and duties as Deputy Sheriffs for Kevin Beary, Sheriff of Orange County, or acting within the course and scope of their employment, and acting pursuant to their duties as conferred by Chapter 30, Florida Statutes. Kevin Beary, as Sheriff of Orange County, in his official capacity is legally responsible for the actions of the deputy sheriffs pursuant to Chapter 30, Florida Statutes. Moreover, the Orange County deputy sheriffs referenced herein were acting pursuant to color of law.

**COUNT I - AGAINST CITY FOR CIVIL RIGHTS VIOLATIONS**

14. Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 - 13 as if fully set forth herein.

15. At all times referred to herein, Defendant police officers and other police officers present at the scene of the raid acted under color of the laws, statutes, ordinances,

Case 6:00-cv-00259-GAP  Document 1  Filed 02/25/00  Page 5 of 24 PageID 5    Case 6:00-cv-00259-GAP  Document 1  Filed 02/25/00  Page 6 of 24 PageID 6

Case 3:16-cv-00948-JPG  Document 25-5   Filed 07/17/17   Page 24 of 38   Page ID #400

regulations, policies, customs, and usages of the State of Florida and the City of Orlando.

16.   The police officers referenced herein, as well as other Orlando police officers present at the scene of the shooting, violated the Constitutional rights of PAL KRASNIQI and PASHKA KRASNIQI.  They violated the rights guaranteed under the Fourth Amendment of the United States Constitution, based upon using more force than was reasonable or necessary under the circumstances.  Moreover, these officers engaged in unreasonable search-and-seizure practices.   The police officers had no lawful basis to invade Plaintiffs' home by battering down the door, creating havoc within the home by screaming and using concussion grenades, and unlawfully shooting PAL KRASNIQI.  There was no just cause for the use of force and the illegal tactics used in the process of enforcing a search warrant.

17.   It is believed that there were previous incidents involving Orlando police officers wherein those officers had used unreasonable force or had engaged in improper search-and-seizure practices during the raids of homes.  The CITY took no action to discipline these officers, provide the appropriate supervision, or provide reasonable training.   Further, the CITY had the policy and custom to tolerate and authorize the misconduct set forth herein.

18.   The CITY knew or should have known of a pattern of use of excessive force and improper search and seizure; the

CITY was aware that its policies regarding discipline or training of officers regarding use of force or search-and-seizure tactics in entering a person's dwelling were so inadequate that it was obvious that a failure to correct it would result in further incidents.

19.   The policies and custom for the use of unnecessary force and improper search-and-seizure techniques for the entry into the dwellings of people was the moving force behind the violation of Constitutional rights of Pashka and PAL KRASNIQI.

20.   Acting under color of law and pursuant to official policy, practice, or custom, the CITY intentionally, knowingly, and recklessly failed to instruct, supervise, control, and discipline, on a continuing basis, the individual police officers named herein in their duties to refrain from unlawfully using unreasonable and excessive force and engaging in excessive and unreasonable search-and-seizure tactics for the entry into a person's home.

21.   The CITY had knowledge, or, had it diligently exercised its duty to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs which were done, as heretofore alleged, were about to be committed.  The CITY had power to prevent, or aid in preventing, the commission of said wrongs, and could have done so by the reasonable diligence, and intentionally, knowingly, or recklessly failed to or refused to do so.

22.   The CITY, directly or indirectly, under color of law, approved or ratified the unlawful conduct of the Orlando police officers present during the subject raid.

23.   As a result of the actions of the CITY as set forth herein, PAL KRASNIQI was killed, and PASHKA KRASNIQI was falsely arrested. As a result of the death of PAL KRASNIQI, the survivors have suffered PAL KRASNIQI's past and future loss of support and services,        probable net income, loss of companionship and protection, pain and suffering, medical and funeral expenses, past and future loss of earnings, prospective net accumulations, and such other relief as the maybe provided for pursuant to Florida Law, including § 768.21, Fla. Stat. Further, the estate and survivors of PAL KRASNIQI are entitled to recover for the loss of life to PAL KRASNIQI and such other relief as is provided for by Federal Law.  In addition, PASHKA KRASNIQI has suffered damages, including but not limited to: pain and suffering, mental anguish, loss of the enjoyment of life, damage to reputation, past and future health care bills, past and future loss of income, and such other relief as is recognized un the laws of the State of Florida.  These damages are permanent and ongoing.

24.   Moreover, Plaintiffs have had to hire an attorney to represent their interests, and Plaintiffs and their attorney are entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendants named herein for damages, costs, and attorney's fees. Moreover, Plaintiffs hereby demand trial by jury on all issues so triable.

## COUNT II - AGAINST SHERIFF'S OFFICE FOR CIVIL RIGHTS VIOLATIONS

25.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 - 13 as if fully set forth herein.

26.   At all times referred to herein, Defendant police officers and other police officers present at the scene of the raid acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the State of Florida and the SHERIFF'S OFFICE.

27.   The Sheriff's deputies referenced herein, as well as other Orange County Sheriff's deputies present at the scene of the shooting, violated the Constitutional rights of PAL KRASNIQI and PASHKA KRASNIQI.   They violated the rights guaranteed under the Fourth Amendment of the United States Constitution, based upon using or promoting the use of more force than was reasonable or necessary under the circumstances.  Moreover, these Sheriff's deputies promoted or engaged in unreasonable search-and-seizure practices.  The law enforcement officers had no lawful basis to invade Plaintiffs' home by battering down the door, creating havoc within the home by screaming and using concussion grenades, and unlawfully shooting PAL KRASNIQI.  There was no just cause

Case 6:00-cv-00259-GAP   Document 1   Filed 02/25/00   Page 9 of 24 PageID 9          Case 6:00-cv-00259-GAP   Document 1   Filed 02/25/00   Page 10 of 24 PageID 10

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 25 of 38   Page ID #401

for the use of force and the illegal tactics used in the process of enforcing a search warrant. Moreover, the SHERIFF'S OFFICE engaged in unreasonable conduct by providing false or misleading information to the law enforcement officers that raided the KRASNIQI home, shot and killed PAL KRASNIQI, and falsely arrested PASHKA KRASNIQI.

28.   It is believed that there were previous incidents involving SHERIFF'S OFFICE wherein those deputies: had used or promoted unreasonable force; or had engaged in or promoted improper search-and-seizure practices during the raids of homes; or had provided false or misleading information to law enforcement officers who unnecessarily raided peoples' homes. The SHERIFF'S OFFICE took no action to discipline these deputies, provide the appropriate supervision, or provide reasonable training.  Further, the SHERIFF'S OFFICE had the policy and custom to tolerate and authorize the misconduct set forth herein.

29.   The SHERIFF'S OFFICE knew or should have known of a pattern of use of excessive force and improper search and seizure; the SHERIFF'S OFFICE was aware that its policies regarding discipline or training of deputies regarding: use or promotion use of unnecessary force; or unreasonable search-and-seizure tactics in entering a person's dwelling; or providing false or misleading information to law enforcement officers who unnecessarily raided peoples' homes, were so

inadequate that it was obvious that a failure to correct it would result in further incidents.

30.   The policies and custom set forth herein was the moving force behind the violation of Constitutional rights of PASHKA and PAL KRASNIQI.

31.   Acting under color of law and pursuant to official policy, practice, or custom, the SHERIFF'S OFFICE intentionally, knowingly, and recklessly failed to instruct, supervise, control, and discipline, on a continuing basis, the individual SHERIFF'S OFFICE employees named herein in their duties to refrain from: unlawfully using or promoting use of unreasonable and excessive force; engaging in or promoting excessive and unreasonable search-and-seizure tactics for the entry into a person's home; or providing false or misleading information to law enforcement officers who unnecessarily raided peoples' homes.

32.   The SHERIFF'S OFFICE had knowledge, or, had it diligently exercised its duty to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs which were done, as heretofore alleged, were about to be committed.  The SHERIFF'S OFFICE had power to prevent, or aid in preventing, the commission of said wrongs, and could have done so by the reasonable diligence, and intentionally, knowingly, or recklessly failed to or refused to do so.

33.   The SHERIFF'S OFFICE, directly or indirectly, under color of law, approved or ratified the unlawful conduct of the Orange County Sheriff's deputies and employees present during the subject raid.

34.   As a result of the actions of the SHERIFF'S OFFICE as set forth herein, PAL KRASNIQI was killed, and PASHKA KRASNIQI was falsely arrested.  As a result of the death of PAL KRASNIQI, the survivors have suffered PAL KRASNIQI's past and future loss of support and services,   probable net income, loss of companionship and protection, pain and suffering, medical and funeral expenses, past and future loss of earnings, prospective net accumulations, and such other relief as the maybe provided for pursuant to Florida Law, including § 768.21, Fla. Stat.   Further, the estate and survivors of PAL KRASNIQI are entitled to recover for the loss of life to PAL KRASNIQI and such other relief as is provided for by Federal Law. In addition, PASHKA KRASNIQI has suffered damages, including but not limited to: pain and suffering, mental anguish, loss of the enjoyment of life, damage to reputation, past and future health care bills, past and future loss of income, and such other relief as is recognized un the laws of the State of Florida. These damages are permanent and ongoing.

35.   Moreover, Plaintiffs have had to hire an attorney to represent their interests, and Plaintiffs and their attorney

are entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendants named herein for damages, costs, and attorney's fees. Moreover, Plaintiffs hereby demand trial by jury on all issues so triable.

### COUNT III - AGAINST STATEWIDE PROSECUTOR
### FOR CIVIL RIGHTS VIOLATIONS

36.   Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 - 13 as if fully set forth herein.

37.   The STATEWIDE PROSECUTOR's employees referenced herein, particularly MICHAEL LAPAY, violated the Constitutional rights of PAL KRASNIQI and PASHKA KRASNIQI. They violated the rights guaranteed under the Fourth Amendment of the United States Constitution, based upon: using or promoting the use of more force than was reasonable or necessary under the circumstances. Moreover, these STATEWIDE PROSECUTOR's employees engaged in or promoted unreasonable search-and-seizure practices.  No law-enforcement agency had a lawful basis to invade Plaintiffs' home by battering down the door, creating havoc within the home by screaming and using concussion grenades, and unlawfully shooting PAL KRASNIQI.  There was no just cause for the use of force and the illegal tactics used in the process of enforcing a search warrant. Moreover, the STATEWIDE PROSECUTOR's office engaged in unreasonable conduct by providing false or misleading

Case 6:00-cv-00259-GAP   Document 1   Filed 02/25/00   Page 13 of 24 PageID 13
Case 6:00-cv-00259-GAP   Document 1   Filed 02/25/00   Page 14 of 24 PageID 14
Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 26 of 38   Page ID #402

information to the law enforcement officers that raided the KRASNIQI home, shot and killed PAL KRASNIQI, and falsely arrested PASHKA KRASNIQI.

38.  It is believed that there were previous incidents involving the STATEWIDE PROSECUTOR's office wherein employees had used or promoted the use of unreasonable force; or had engaged in or promoted improper search-and-seizure practices during the raids of homes; or had provided false or misleading information to law enforcement officers who unnecessarily raided peoples' homes.  The STATEWIDE PROSECUTOR's office took no action to discipline its employees, provide the appropriate supervision, or provide reasonable training.  Further, the STATEWIDE PROSECUTOR had the policy and custom to tolerate and authorize the misconduct set forth herein.

39.  The STATEWIDE PROSECUTOR knew or should have known of a pattern of use of or promotion of the use of excessive force; the use of or the promoting of improper search and seizure; or providing false or misleading information to law enforcement officers who unnecessarily raided peoples' homes.; the STATEWIDE PROSECUTOR knew or should have known that its policies regarding discipline or training of employees regarding these practices were so inadequate that it was obvious that a failure to correct it would result in further incidents.

40.  The policies and custom set forth herein was the moving force behind the violation of Constitutional rights of PASHKA and PAL KRASNIQI.

41.  Acting under color of law and pursuant to official policy, practice, or custom, the STATEWIDE PROSECUTOR'S office intentionally, knowingly, and recklessly failed to instruct, supervise, control, and discipline, on a continuing basis, the individual STATEWIDE PROSECUTOR's employees named herein in their duties to refrain from unlawfully using or promoting unreasonable and excessive force and engaging in or promoting excessive and unreasonable search-and-seizure tactics for the entry into peoples' homes.

42.  The STATEWIDE PROSECUTOR had knowledge, or, had it diligently exercised its duty to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge that the wrongs which were done, as heretofore alleged, were about to be committed.  The STATEWIDE PROSECUTOR had power to prevent, or aid in preventing, the commission of said wrongs, and could have done so by the reasonable diligence, and intentionally, knowingly, or recklessly failed to or refused to do so.

43.  The STATEWIDE PROSECUTOR, directly or indirectly, under color of law, approved, encouraged, or ratified the unlawful conduct of the Orange County Sheriff's Department deputies and employees and also that of the Orlando police officers present during the subject raid.

44.  As a result of the actions of the STATEWIDE PROSECUTOR as set forth herein, PAL KRASNIQI was killed, and PASHKA KRASNIQI was falsely arrested.  As a result of the death of PAL KRASNIQI, the survivors have suffered PAL KRASNIQI's past and future loss of support and services,

probable net income, loss of companionship and protection, pain and suffering, medical and funeral expenses, past and future loss of earnings, prospective net accumulations, and such other relief as the maybe provided for pursuant to Florida Law, including § 768.21, Fla. Stat.  Further, the estate and survivors of PAL KRASNIQI are entitled to recover for the loss of life to PAL KRASNIQI and such other relief as is provided for by Federal Law.  In addition, PASHKA KRASNIQI has suffered damages, including but not limited to: pain and suffering, mental anguish, loss of the enjoyment of life, damage to reputation, past and future health care bills, past and future loss of income, and such other relief as is recognized un the laws of the State of Florida.  These damages are permanent and ongoing.

45.  Moreover, Plaintiffs have had to hire an attorney to represent their interests, and Plaintiffs and their attorney are entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendants named herein for damages, costs, and attorney's fees.

Moreover, Plaintiffs hereby demand trial by jury on all issues so triable.

### COUNT IV - AGAINST KELLY BOAZ
### FOR CIVIL RIGHTS VIOLATIONS

46.  Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 - 13 as if fully set forth herein.

47.  KELLY BOAZ engaged in an investigation of the KRASNIQI family.  It is believed that there were no exigent circumstances that justified the law enforcement officers' conduct in raiding the KRASNIQI home.  In the alternative, KELLY BOAZ disseminated information to other law enforcement officers regarding alleged violent propensities or connections to organized crime that he knew, or with the exercise of reasonable care, should have known were not true or were inaccurate.  Further, it is believed that KELLY BOAZ submitted information that he knew or should have known was false or misleading in connection with obtaining the search warrant.

48.  As a direct result of this misconduct, the Constitutional rights of PAL KRASNIQI and PASHKA KRASNIQI were violated, particularly those guaranteed under the Fourth Amendment of the United States Constitution.

49.  As a direct result of this misconduct, PAL KRASNIQI was killed, and PASHKA KRASNIQI was falsely arrested.  As a result of the death of PAL KRASNIQI, the survivors have suffered PAL KRASNIQI's past and future loss of support and services,          probable net income, loss of companionship

and protection, pain and suffering, medical and funeral expenses, past and future loss of earnings, prospective net accumulations, and such other relief as the maybe provided for pursuant to Florida Law, including § 768.21, Fla. Stat. Further, the estate and survivors of PAL KRASNIQI are entitled to recover for the loss of life to PAL KRASNIQI and such other relief as is provided for by Federal Law. In addition, PASHKA KRASNIQI has suffered damages, including but not limited to: pain and suffering, mental anguish, loss of the enjoyment of life, damage to reputation, past and future health care bills, past and future loss of income, and such other relief as is recognized un the laws of the State of Florida. These damages are permanent and ongoing.

50. Moreover, Plaintiffs have had to hire an attorney to represent their interests, and Plaintiffs and their attorney are entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendants named herein for damages, costs, and attorney's fees. Moreover, Plaintiffs hereby demand trial by jury on all issues so triable.

COUNT V – AGAINST MICHAEL LaPAY
FOR CIVIL RIGHTS VIOLATIONS

51. Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 - 13 as if fully set forth herein.

52. MICHAEL LaPAY engaged in an investigation of the KRASNIQI family. It is believed that there was no exigent circumstances that justified the law enforcement officers' conduct in raiding the KRASNIQI home. In the alternative, MICHAEL LaPAY disseminated information to other law enforcement officers regarding alleged violent propensities or connections to organized crime that he knew, or with the exercise of reasonable care, should have known were not true or were inaccurate. Further, it is believed that MICHAEL LAFAY submitted information that he knew or should have known was false or misleading in connection with obtaining the search warrant.

53. As a direct result of this misconduct, the Constitutional rights of PAL KRASNIQI and PASHKA KRASNIQI were violated, particularly those guaranteed under the Fourth Amendment of the United States Constitution.

54. As the result of the actions of MICHAEL LaFAY as set forth herein, PAL KRASNIQI was killed, and PASHKA KRASNIQI was falsely arrested. As a result of the death of PAL KRASNIQI, the survivors have suffered PAL KRASNIQI's past and future loss of support and services, probable net income, loss of companionship and protection, pain and suffering, medical and funeral expenses, past and future loss of earnings, prospective net accumulations, and such other relief as the maybe provided for pursuant to Florida Law, including § 768.21, Fla. Stat. Further, the estate and survivors of PAL

KRASNIQI are entitled to recover for the loss of life to PAL KRASNIQI and such other relief as is provided for by Federal Law. In addition, PASHKA KRASNIQI has suffered damages, including but not limited to: pain and suffering, mental anguish, loss of the enjoyment of life, damage to reputation, past and future health care bills, past and future loss of income, and such other relief as is recognized un the laws of the State of Florida. These damages are permanent and ongoing.

55. Moreover, Plaintiffs have had to hire an attorney to represent their interests, and Plaintiffs and their attorney are entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendants named herein for damages, costs, and attorney's fees. Moreover, Plaintiffs hereby demand trial by jury on all issues so triable.

COUNT VI – AGAINST ROBERT BOND, ROBERT PIGMAN,
SGT. JEFF O'DELL, LT. DAVID KOWALSKE, CPL. CHRISTOPHER
THOMAS, SGT. MARCHIONE, SGT. PAUL ROONEY, AND CAPT.
FRED FINK FOR CIVIL RIGHTS VIOLATIONS

56. Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 - 13 as if fully set forth herein.

57. OFFICERS ROBERT BOND, ROBERT PIGMAN, SGT. JEFF O'DELL, LT. DAVID KOWALSKE, CPL. CHRISTOPHER THOMAS, SGT. MARCHIONE, SGT. PAUL ROONEY, and CAPT. FRED FINK violated Plaintiffs' civil rights. In particular, they violated

Plaintiffs' Fourth Amendment rights by engaging in unreasonable search-and-seizure tactics. As more fully set forth above, they had no legal basis with which to raid Plaintiffs' home in the manner with which they did, and had no basis to shoot or kill PAL KRASNIQI. They also had no basis to arrest PASHKA KRASNIQI.

58. Moreover, CPL. CHRISTOPHER THOMAS, SGT. MARCHIONE, SGT. JEFF O'DELL, LT. DAVE KOWALSKE, and CAPT. FRED FINK planned, approved, and directed the implementation of the pre-dawn raid on the KRASNIQI home. Their actions involved an unreasonable search and seizure of the KRASNIQI home, and they are liable for those damages that resulted therefrom. Alternatively, they acted with reckless indifference to the rights of PAL and PASHKA KRASNIQI.

59. As the result of the actions of defendants as set forth herein, PAL KRASNIQI was killed, and PASHKA KRASNIQI was falsely arrested. As a result of the death of PAL KRASNIQI, the survivors have suffered PAL KRASNIQI's past and future loss of support and services, probable net income, loss of companionship and protection, pain and suffering, medical and funeral expenses, past and future loss of earnings, prospective net accumulations, and such other relief as the maybe provided for pursuant to Florida Law, including § 768.21, Fla. Stat. Further, the estate and survivors of PAL KRASNIQI are entitled to recover for the loss of life to PAL KRASNIQI and such other relief as is provided for by Federal

Law.   In addition, PASHKA KRASNIQI has suffered damages, including but not limited to: pain and suffering, mental anguish, loss of the enjoyment of life, damage to reputation, past and future health care bills, past and future loss of income, and such other relief as is recognized un the laws of the State of Florida.   These damages are permanent and ongoing.

60.   Moreover, Plaintiffs have had to hire an attorney to represent their interests, and Plaintiffs and their attorney are entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs demand judgment against Defendants named herein for damages, costs, and attorney's fees. Moreover, Plaintiffs hereby demand trial by jury on all issues so triable.

### PLAINTIFFS' DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury on all issues so triable.

Dated: February ___ , 2000.

JEFFREY K. GREEN, ESQUIRE
Florida Bar No.   0829307
Law Office of Jeffrey K. Green, P.A.
529 North Magnolia Avenue
Orlando, Florida 32801
Telephones:   (407) 649-9593
Facsimile:   (407) 649-4131
Attorneys for Plaintiffs

---

IN THE NINTH JUDICIAL CIRCUIT COURT
IN AND FOR ORANGE COUNTY, FLORIDA
COURT CASE NUMBER:
O.C.S.O. CASE NUMBER:   98-009454

### SEARCH WARRANT

IN THE NAME OF THE STATE OF FLORIDA

TO:   KEVIN BEARY
      SHERIFF OF ORANGE COUNTY FLORIDA, and/or any of his Deputies/Agents

WHEREAS, before me the undersigned Judge of the Ninth Judicial Circuit, in and for Orange County, Florida, personally appeared Detective Kelly Boaz of the Orange County Sheriff's Office and made sworn application for the issuance of a search warrant in connection with the crimes of Grand theft in violation of 812.014 Florida statutes or evidence related thereto.

WHEREAS, said facts made known to me in the sworn Application and Affidavit for Search Warrant of Detective Kelly J. Boaz, a lawfully sworn law enforcement officer, on this date have caused me to certify and find that there is probable cause to believe that certain evidence to-wit: Assorted new shoes, most bearing anti-theft devices and with attached pricing tags from Payless shoe store and miscellaneous new clothing stored in garbage bags and bearing pricing tags from Dollar General stores, and records and ledgers kept in regard to stolen property which is relevant to proving the violation of laws of this state, to-wit: Florida Statues 812.014 concerning Grand Theft and is currently being kept in or on certain property in Orange County Florida, such property being under the custody of one Pal or Paska Krasniqi, more particularly described as: See "Exhibit " "A"   attached hereto

NOW, THEREFORE, you or either of you, with such lawful assistance as may be necessary, are hereby commanded, in the day time, night time, or on any Sunday as the exigencies of the situation may require, to enter and search the aforesaid property, including   a   shed/workshop   thereon,   and   any   persons   thereon reasonably believed to be connected with the said illegal activity, for the property described in this warrant, and if the same or any part thereof beyond, you are hereby authorized to seize and secure same, giving proper receipt therefore and delivering a completed copy of this

1



---

EXHIBIT "A"

DESCRIPTION:   Red concrete and Brick two story structured house, four bedrooms, two and a half baths.   A two foot fence is located on the west side (Front)of the structure running the length of the front yard.   The numbers "1221" are attached on the front of the residence. Immediately after entering the residence from the front door is stair case leading to the upper story of the house.   The front of the residence faces west toward Bumby Ave.   There is currently a boat parked in the front yard with a For Sale sign on it.   Directly off the residence is a shed type structure.

The Legal Description from the Orange County Property Appraiser is as follows:   ARDMORE PARK 1ST ADD W/78- LOT 17 BLK B- 3874/727-OR B&P 5034/0905, OM 10-18-95, INST QC.

DIRECTIONS:   From the intersection of Bumby Avenue and CurryFord Road, Travel North on Bumby approximately 2/10 of one mile to 1221 Bumby Avenue.   The residence (1221 Bumby Ave.) to be searched is located on the east side of the road.   This is the only two story brick house in the immediate area.   There is also aerial photo's taken from the Orange County Sheriff's Office Aviation and Forensic unit, to verify the location.

---

warrant to the person in charge of the residence, or in the absence of any such person, leaving a completed copy where the property is found, and making a return of your doings under this warrant within ten (10) days of the date and also the bodies of the person or persons in possession thereof before the Court having jurisdiction of this offense to be disposed of according to law.

WITNESS my hand and seal this 19TH day of Feb , 1998.

JUDGE

2 - 19-98

2

STATE OF FLORIDA
COUNTY OF OSCEOLA

    BEFORE ME, the Honorable _____, (Circuit Judge) in and for Osceola County, Florida, personally appeared Agent Kelly Boaz, a sworn law enforcement officer, to wit; a sworn deputy for the Sheriff of Orange County, Florida, and a sworn Investigator with the Ninth Judicial State Attorney's Office (MBI) who first being duly sworn, says that the defendant, **John Wyczlinski**, did in violation of Florida State Statutes, 790.029 (3) (b), 777.04 (e) (b), 775.085(1) & 790.23 (1) (a) unlawfully commit the offense of Paramilitary training, Attempt to shoot into occupied dwelling, evidence of prejudice while committing offense & Possession of firearm by convicted felon.

    YOUR AFFIANT, in the course of his official duties, has come to investigate:

**Background:**

    The American Front (AF) is a militia-styled, anti-Semitic, white supremacist, skinhead organization and is a known domestic terrorist organization. Marcus Faella has been planning and preparing the AF for what he believes to be an inevitable race war. FAELLA has stated his intent during the race war is to kill Jews, immigrants, and other minorities. FAELLA believes the race war will take place within the next few years based on current world events. The AF has kept the traditional rhetoric of a typical Neo-Nazi skinhead group. CHS reporting did not indicate any affiliation with a political party or organized religious group.

    FAELLA views himself and the other members of the AF as the protectors of the white race. He regularly conducts firearms, explosive, and military/tactical training for AF members and other white supremacist groups. He conducts the training on his property located at 6173 Harris Road, Saint Cloud, Florida, and on the Bull Creek Wildlife Management Area (BCWMA), which is several hundred acres of Florida woodland and swamp. The BCWMA is adjacent to FAELLA's property and is located in a very rural part of Saint Cloud, Florida. FAELLA has adjacent property just north of the compound where he sometimes stores additional firearms on. There is also another gun range on the property FAELLA uses for his paramilitary training.

    The FAELLA property is surrounded by a barbwire fence, and contains 2 Pit Bull dogs. FAELLA and other AF members have built three fortified entrenchments out of railroad timbers, cements pilings, and other building materials, and these entrenchments are staggered and focused toward the driveway. He is storing on the property ammunition, meals ready to eat, water, and other supplies.

    FAELLA has fortified the ingress to the property, as well as, his residence. FAELLA has reinforced the walls and has cut firing ports out of the sides of his trailer. There are a few other trailers on the property along with some stables where FAELLA maintains horses. A former member reported FAELLA and the AF members would consider law enforcement entering the compound for any reason to be a provocation worthy of self defense. The former member also stated if FAELLA determined the AF needed to act violently, the AF members would proceed to act violently upon his orders. Others have reported that FAELLA is experiencing with attempting to make RICIN, which is categorized as a Weapon of Mass Destruction.

    In mid 2010, a reliable confidential informant began infiltrating and reporting on white supremacist groups in the Central Florida area. The informant had been vetted out and your affiant was able to verify the informants reporting. Your affiant instructed the informant to obtain photos and conversation of Faella's property and members of the AF if possible. In January 2011, the informant who was already a patched member of a violent white supremacist group came in contact with members of the AF. The informant began to hang out with members of AF for the next few months. Eventually the informant was given access to the AF website specifically the online forum. The informant was told that the AF may be interested in having the informant become a member but they wanted to get to know him better.

    In April 2011, the informant was introduced to Marcus Faella who was trying to purchase a 9mm handgun in Melbourne, Florida. Faella began to train the informant and other AF members on weapons handling and shooting techniques. Faella also demonstrated how to properly break down the following weapons: Two AK-47 assault rifles, 12 gauge pump shot-gun, 12 gauge self loading shot gun, tech 9, two 9mm pistols and another unidentified assault rifle. AF members train constantly under the leadership of Faella. Every Saturday is mandatory training for probates who are trying to seek membership into AF. Faella keeps most of the firearms on his property which he refers to as the AF compound.

    On June 11, 2011, AF held firearms training at Faella's compound. Chris Brooks, Richard Adam Stockdale and Kent McLellan are convicted felons but were given firearms by Faella anyway to train with. This occurred on a regular basis. The informant was able to capture on video from time to time, Brooks shooting weapons and Stockdale and McLellan training with firearms and other assorted weapons. Clearly a violation of statute and their probation.

    Throughout the summer of 2011, the informant continued to meet and train with other AF members on Faella's property to include the defendant on many occasions. The defendant was one of the enforcers for AF and at times carried firearms and other weapons though he is a convicted felon. Members from other AF chapters from around the country and state of Florida traveled to Faella's compound to continue their training. Faella would advise they were training for the upcoming race war. Faella also made plans for members of AF to go out and cause disturbances within communities to become known. During shooting drills, Faella would use jugs of water and told participants "to visualize the jugs being nigger's heads while they were shooting at them." Faella would also make threatening remarks toward Jewish people while conducting combat training. Pictures of the training including the jugs were secretly captured by the informant while on Faella's property.

EXHIBIT F(e)(vi)

In July of 2011, Ryan Riley who is a patched member of the AF Missouri chapter was present at an AF compound in north Florida. Riley is also a member of the United States National Guard. Faella had Riley conduct Para-military training on techniques (Hand to Hand Combat, edge weapon techniques) he learned from the National Guard. During this particular weekend a National AF meeting was being held. Additional training was conducted on breaking down assault rifles, water purification and other survival skills.

On August 2, 2011, the informant who by now was a patched member of AF was attending a closed meeting with other AF members. The meeting was held on Faella's property. Members began to discuss pulling Kent McLellan's patch. McLellan had not made contact with the group for several days and had recently had a run in with local law enforcement for beating up a local crack dealer and another altercation at a local bar. Faella had been in contact with another white supremacist group known as "Combat 18". Faella was conspiring with Combat 18 to retaliate against a person known as Jim Parazzo, who recently put a video on U-Tube making fun of Faella's AF chapter. Parazzo is believed to be living in Massachusetts.

On September 3, 2011, the informant participated in mandatory firearms training at Faella's compound. Other AF members present at the training were Marcus Faella, Paul Jackson and Chris Brooks who is a convicted felon currently on probation. The informant took photos of Brooks shooting firearms. Paul Jackson carries the pistol for Brooks at all times while off the property so if stopped by Law Enforcement Brooks could deny knowledge of the weapon. The informant reported that Faella ordered Jackson to hold the weapon because He (Faella) knows Brooks is a convicted felon. The informant was also shown a map of Faella's entire compound. The informant obtained a photo of the shooting range on Faella's property. Faella taught members to "bump" shoot the AK-47's. "Bump" shooting is a tactic used to help a semi automatic gun shoot like an automatic weapon. Also the informant identified a new person living on the AF (Faella's property) compound. This person is identified as Jessy Brown. Brown bragged about committing hate crimes in South Florida and purported to have close ties to other hate groups.

On October 9, 2011, the informant was present when Faella ordered AF member John Wyczlinski to travel to Tampa, Florida, and find AF member Jason Michael Sloane. Sloane was an AF member who was participating in mandatory training for AF. Faella instructed Wyczlinski to use force if necessary on obtaining the patch. On October 22, 2011, AF members met for a recreational day at the Mormon owned desert ranch off of highway 419 in Orange County, Florida. There Christopher Brooks (Convicted felon) was attempting to sell a Mack-11 firearm for $350.00.

On November 22, 2011, the informant reported that AF member Jessy Brown committed suicide with a 12 gauge shotgun on Faella's property. The shotgun was described as a "Savage" belonging to Marcus Faella. ATF Records indicate Brooks purchased the weapon from Wal-Mart Super Center in Melbourne, Florida in 2005. This was prior to Brooks being a convicted felon. Brown who was a convicted felon called 911 prior to shooting himself and said "send the cops before my friends find me." At the time of the suicide Marcus with his wife Patti Faella, were in Palm Bay, Florida visiting Marcus's father. Faella later told the informant that he was afraid to go retrieve his shotgun that Brown used to kill himself because

he (Faella) knew Brown was a convicted felon. Your affiant did obtain the police report from this incident as well as photos. In the photo's your affiant who is also a certified bomb technician observed a military ordinance on Faella's property. Your affiant could not determine from the photo if the ordinance was live or inert.

In November of 2011, Faella began intently expressing his vision to create an "Aryan Compound" where all the AF members could live when the United States Government fails.

In December of 2011, Marcus Faella and Christopher Brooks wanted to sell some of their weapons. Brooks recently obtained a new Mack 10 which is a 45 caliber.

On December 27, 2011, AF was having a Christmas Party on Faella's property. Diane Stevens purchased an AK-47 for Dustin Perry who is an AF member. Later the informant provided photos of Perry carrying the AK-47.

In January of 2012, the informant who was now a full fledge member of AF and sometimes staying on the AF compound reported that former AF member Kent McLellan, was receiving threats from Richie Meyers who is the leader of the Confederated Hammerskins, which is another White Supremacist group. Meyers had contacted Faella who agreed that McLellan is a problem and needs to be dealt with. Faella said that McLellan will at least be "sent to the hospital". Various members from the Hammerskins began teaming up with AF members under the direction of Faella to target McLellan.

On January 21, 2012, AF member Paul Jackson showed the informant and other AF members a two hour long video on how to beat people up in a bar fight. After the video Faella encouraged AF members to start going to "Old Town" so AF can be seen and they can start recruiting. Later that night back on Faella's property, Faella provided the informant with a weapon to sleep with during his stay. The weapon was described as a 9mm pistol, serial number 295135 (ATF checks show that the weapon was made prior to the marking and no information was found). The informant provided your affiant with two photos of the weapon. The informant also provided several pictures of Faella's property which includes a trailer where the Faella's stay in, a recreational vehicle where guest and sentry stay, weight training area, shooting range and other areas.

On January 24, 2012, the informant reported that AF member Paul Jackson and recruit member Dustin Perry were driving around the St. Cloud area looking for McLellan. They spotted McLellan at the Soldier City Bar. Perry "beat" McLellan for the comments made against the AF on face book. Police arrived as well as the emergency Medical Services. Your affiant obtained a photo of McLellan being treated by paramedics. The photo came from Chris Brooks. No charges were filed. The next day Marcus Faella handed Perry his AF patched for being McLellan and was told he was now a fully fledged member.

On February 21, 2012, the informant attended a mandatory training at the AF compound. Faella reported on the AF chapter in Oregon and how they are expanding. Faella advised that Oregon members were purchasing AK-47's

and conducting firearms training same as the Florida crew. Informant advised that Faella was stocking up on ammunition and training was increasing to include hand to hand combat, knife throwing, and other combat skills. Faella then started to organize the way they collect monthly dues which was on-going since the informant joined approximately one year earlier. The money goes to the treasurer of the group Jenny LNU. The money was to be used to purchase more weapons, expansion and propaganda. Informant advised that AF members are making "Gilly" suits and homemade body armor which the informant provided video & photos of. Informant also reported that Faella was looking to purchase a Setme 308 assault/sniper rifle.

Informant continued to provide videos and photos of Ak-47's and other firearms used in tactical practice.

On February 28, 2012, while attending another mandatory AF meeting, the informant with Richard Adam Stockdale (convicted felon), Marcus Faella, Patty Faella, Diane Stevens, Paul Jackson, Dustin Perry and others participated in firearms training. Members to include Stockdale were shooting AK-47's. After the training, Faella started planning to cause a disturbance at City Hall in Orlando, Florida. Faella advised that the AF had been dormant to long and wanted to cause a disturbance so the media would report on it and bring new members to AF.

On March 17, 2012, the informant was attending a mandatory meeting at the AF compound. In attendance were: Diane Stevens, Dustin Perry, John Wyczlinski, Chris Brooks, Adam Stockdale, Marcus and Parry Faella. Members practiced shooting Ak-47's and other weapons. Chris Brooks told the crew he had been traveling by Greyhound bus to California to assist Luke Legar with new AF recruits. Brooks is currently on probation and is not suppose to leave Brevard County, Florida. Kent McLellan had been given a second chance to associate with AF. McLellan was tasked by Faella to start hanging around with "SHARPS" (Skin Heads Against Racial Prejudice) and act as a double agent. Faella told McLellan he wanted him to lure "SHARP" members to an undisclosed location for an ambush. McLellan agreed. Faella also wanted to hunt down members of the REDS (A group that is Anti racism skinheads) as well and beat them up. Faella stated that REDS have "niggers" in their group and they need to be dealt with and "put their teeth to the curb," referencing violence acts portrayed in the "American History X" movie. The informant reported Brooks and Stockdale were now carrying sharpened screwdrivers and short sharpened shovels so they could get around getting in trouble for carrying "weapons". The informant provided photo's of Brooks holding one of the weapons.

Faella began to learn about an anarchist protest day around the country on May 1, 2012. This event is known as "May Day". Faella learned that members of the REDS were going to protest in Melbourne on that day. Faella wanted to retaliate against REDS and asked the group if it was a good idea. All the AF members agreed to participate including the defendant. AF members began to travel to Melbourne and recon the area. When traveling they used several cars. One of the cars was used was to stash weapons inside to include AK-47's and other firearms. This vehicle which was driven by Paul Jackson was present in case they found RED members. Faella put a plan in motion and told AF members they were going to counter protest the REDS on May 1 and start an altercation. Faella also advised they were looking for a RED member by the name of Dillon LNU, who lives in

Melbourne, Florida. Faella planned on finding Dillon and shooting up his house. Faella with other AF members began to make up signs for the protest. The items used to hold up the signs were actually modified as weapons to be used in an altercation with the REDS. The informant provided videos and photos of this.

Law Enforcement became concerned about the pending violence Faella was planning. On April 28, 2012, the informant was attending a mandatory meeting where the final plans were being put in motion for the disruption in Melbourne. Weapons disguised as sign holders were being made. Faella mentioned an Outlaw by the name of "Gino" who was recently arrested by the Feds. Faella advised he learned from Gino that people who try to infiltrate groups sometimes used phones to record criminal activity. Faella then asked to see everyone's phones. The informant became concerned because the informant was recording the events.

The informant had to walk over to Paul Jackson and hand over his phone. The informant quickly took the mini DS card out of his phone and crushed the phone. Jackson asked the informant why he was so nervous. The informant attempted to play it off. Nothing happened at this point and the entire crew traveled to Melbourne to conduct surveillance and watch a movie.

While at the theater Faella came up to the informant and other AF members asking for their cell phones. Faella, while looking at the informant made the comment "If I find out any of you are informants I will fucking kill you." Faella was carrying his 9mm pistol at that time. The informant had stashed the mini SD card in the bathroom of the theater. Members began to separate themselves from the informant and act suspiciously toward them. The informant became concerned for his safety and quickly fled the area after retrieving the SD card hidden earlier. The informant called the police due to his concern of the group finding him and killing him. A police report was taken which was verified by your affiant.

Over the last two years the informant has been reporting, recording when possible and infiltrating the American Front for your affiant and other members of law enforcement. On numerous occasions your affiant has verified the informants reporting and found it to be accurate. The informant has provided your affiant with taped statements and is willing to testify in court on his reporting.

Agent Kelly Boaz

SWORN TO AND SUBSCRIBED before me in Orange County this 9 day of May, 2012.

Circuit Judge



**SPLC**
**Southern Poverty
Law Center**
Intelligence Report

# Robert Killian's Years of Posing as a Neo-Nazi Biker Cost Him Dearly

Heidi Beirich and Laurie Wood
August 25, 2012

For seven years, Robert Killian posed as a neo-Nazi biker named "Doc," working his way slowly into the inner sanctum of violent white supremacists as part of a wide-ranging undercover investigation in central Florida.

For seven years, Robert Killian posed as a neo-Nazi biker named "Doc," working his way slowly into the inner sanctum of violent white supremacists as part of a wide-ranging undercover investigation in central Florida.

This spring, his efforts paid off in a big way.

In March, six people who were either members or associates of the infamous Outlaws motorcycle gang and the 1st SS Kavallerie Brigade — the motorcycle division of the neo-Nazi Aryan Nations — were arrested on charges related to drug trafficking and explosives. Teams of federal, state, county and local law enforcement officers rounded up the suspects at several residences in central Florida and Chicago.

Killian's role in the operation, dubbed "Primitive Affliction," was crucial. Among other things, he introduced two other agents into the secretive fold of the white supremacist bikers.

Killian, 52, never intended to go undercover when he joined the intelligence division of the Orange County Sheriff's Office in 2003 after eight years with the office and 16 years with other agencies. He had joined the unit as an investigator to monitor the area's white supremacist groups and criminal motorcycle gangs after the former specialist retired.

He also never imagined that the danger, the strain of maintaining a racist alter ego, and the changes required in his lifestyle would destroy his personal life and ultimately contribute to the end of his marriage and loss of his family.

**Making New Friends**



Robert Killian

So, equipped with a Harley he loved to ride and a familiarity with biker culture, Killian set out to meet and become friends with local Outlaws in Orlando as he perfected his biker persona. He had earned his nickname years earlier as a young paramedic, but it became even more appropriate later when he received a doctorate in cultural anthropology.

Killian's first step was simply to "hang out where they hang out," he told the Intelligence Report in an interview about his experience. "I began to just be close to them, to listen a lot and not say much. Shoot some pool, talk some motorcycles and let them get used to me."

His patience bore fruit. Eventually, he was invited to "open houses" where both "civilians" and "non-one percenter" motorcycle clubs were welcome. (Outlaw bikers are often called "one percenters" because, as the story goes, 99% of motorcyclists are law-abiding citizens, while the remaining 1% live outside society's norms as "outlaws," often engaging in criminal activity.) After about a year, Killian was invited to more-exclusive, weekly open houses.

"That's another level of trust, because that says they're actually looking at you as ... being a member at some point," Killian said.

At the same time, Killian was making contact with other extremists through social media. That's how he met August Kreis, a "pastor" in the racist, anti-Semitic Christian Identity religion who headed up a splinter faction of the Aryan Nations, the granddaddy of most contemporary neo-Nazi groups.

After several online exchanges with Kreis, who had recently moved from Florida to South Carolina, the Aryan Nations leader asked "Doc" to join the group. Killian sent in his application, though it unnerved him. "It was like my undercover identity was hardly backstopped at all. It was full of holes. I really thought this wasn't going anywhere, [that] he would realize that someone was trying to infiltrate. But I got a call from him welcoming me to their Aryan Nations."

EXHIBIT F(f)(i)

Killian's fears about his cover escalated one night when Kreis told him to expect a phone call from the Aryan Nations' deputy director. "I don't want you to be nervous if you hear a police radio in the background," Kreis told him. "He's a cop." That night, Killian received a call from James Elkins, an officer in Fruitland Park, Fla., just northwest of Orlando.

"This is not what I wanted to hear," Killian said, "because here's a guy that probably has access to many of the same databases I do." The conversation went well, though, and his identity wasn't compromised. (Later, in fact, it was Elkins' affiliation that was revealed. After leaving the Aryan Nations, he joined several Klan groups and was discovered leaving racist leaflets at homes in nearby Bushnell. He resigned in 2009.)

By 2007, Killian was a bona fide member of the Aryan Nations faction led by Kreis. He also became an active member of the 1st SS Kavallerie Brigade, an Aryan Nations motorcycle division formed in part by members of the Outlaws who joined the neo-Nazi group in an unusual alliance.

But even as his undercover work was soaring, so was the pressure. Every time he walked out of the office, Killian had to transform himself into "Doc," the racist biker. The strain of being two people at once ate away at Killian, though it wasn't always apparent to him how much of a toll the work was taking. While he was procuring evidence that eventually helped lead to the 2012 arrests, his personal life was slowly collapsing.

"I didn't feel like I changed my personality for the role, [but] maybe the role was starting to change my personality a little bit," Killian said.

He was forced to learn new, unseemly behaviors — like laughing at the racist jokes told frequently by his new pals. He saw and heard details of crimes already committed and violence, even murder, being planned.

Killian's family noticed the changes more than his colleagues. "[I] became more secretive, less trustful of everybody, including my chain of command and co-workers. Those relationships [were] getting distant in slow increments. And it wasn't something I was prepared for."

As he burrowed deeper and deeper into the world of extremism, something unexpected happened. Killian began to see his new "friends" as real people, not just as potential criminals or domestic terrorists — and with that came a certain amount of empathy. "I don't know how to describe it other than [that] you start to know these bad guys at a level that you don't normally see them. You're starting to see how they interact with their children. You're starting to see how they handle the loss of a family member. They're treating you like a very close friend and even sometimes like a family member. But this is a bad guy who I'm eventually going to have to put in jail."

**Crossing Paths**

The feelings Killian experienced are, in fact, not uncommon among undercover officers.

"People have no idea of the stress that person is under twenty-four-seven," Charlie Fuller, executive director of the International Association of Undercover Officers (IAUO) told the Intelligence Report. "Most [officers] are not equipped to deal with that. The real stressor is not just the two lives you're leading. It's the bad things you see and the betrayal you do. They've

been your friends, and now you have to betray them. It eats at you while you're doing it and it eats at you after you do it. It haunts you. You think ... it will never go away as long as I live."



At the height of his undercover work, Robert Killian (right) joined the 1st SS Kavallerie Brigade, a neo-Nazi motorcyle gang headed by August Kreis (center). Another member was Brian "Dozier" Klose, who was arrested this March.

Sometimes, his wife would be with him. "It was like, OK, give her a nickname and don't ever mention her real name and get out of there as soon as I can without arousing too much suspicion. But it was really starting to impact my day-to-day life."

His wife was affected as well. "On the face of it, she handled it pretty well. I don't think she really analyzed it too much until it really, really started to bother her," Killian said. "She was the kind of person that saw the good in everybody, and as this progressed she started seeing people as bad and dangerous. And that really hurt her."

As the investigation became more intense, the pressure was ratcheting up. Killian became short-tempered and even more distant from his family. To combat this slide, he came up with techniques to separate himself more cleanly from "Doc" when he was off duty.

"If I was wearing my biker vest and all this Nazi jewelry, I would take all that off before I would come into the house. And in my mind, I was telling myself this is how I was turning it off. Now, I'm going to be the 'good guy' and try to be the best stepfather and husband I can be."

But it wasn't so easy to turn it off in the evening and on again the next morning. The extremists didn't keep regular hours. "Even when I was home and off, I would get a phone call from the Outlaws and Aryan Nations people and have to immediately go into the role. I'm sitting at the table playing Scrabble with my step-kids, and all of a sudden you have to run into the bedroom to talk to the national director of the Aryan Nations or some Outlaw calling you. It was the constant flicking of the switch, off and on, and it was starting to wear me down."

The situation became difficult enough that by 2009 that Killian, with the help of his colleagues, began inventing excuses so "Doc" could slowly take leave of his Outlaws and Aryan Nations families. He faked a cancer diagnosis, giving him a reason to disappear for a few weeks at a time. Meanwhile, he was helping two other undercover officers he had introduced into this racist world solidify their investigations.

Unfortunately, a life-altering event forced Killian to rethink his undercover work. His wife left him and filed for divorce — something Fuller of the IAUO says happens all too frequently when officers go undercover for long periods.

**The Extraction**

Though Killian wanted to orchestrate his own exit from the racist scene, he couldn't. Problems with security began to mount in 2010, so Killian and another agent scaled back, leaving only one agent undercover to finish the operation. Though Killian retired from the sheriff's office in March 2011, he still had to be ready to become "Doc" at a moment's notice to protect the remaining undercover agent. About five months after retiring, an Outlaw approached Killian's ex-wife at a club and told her they were looking for "Doc" because he had introduced an undercover cop into the group.

Killian's former supervisors and his FBI handler were concerned enough to videotape his statement to a Florida state prosecutor. "When it came down to it, it was like 'here one day and gone the other.' And at the same time I'm still running into these guys. They knew I was still in town."

After the first arrests, in March, Killian knew no excuses would work if he ran into his former "brothers" at the local grocery store. His real identity had, in fact, been spelled out in the charging documents that were presented to the men who once considered him their friend. His days of dancing on the edge, walking that thin line, were finally over. And that led to a new kind of stress.

Said Fuller of the IAUO, "When [the operation] is over, you're asking, 'What do I do now? Where is my identity?' Then you have to go back to shuffling papers at your desk. You can't just turn that off."

Retired, Killian is on his own. He keeps a low profile and stays on constant alert. "All I can do is be very careful with my surroundings and aware of who's around me. I try to vary my routine as much as possible and just try to keep out of their sight."

Killian hopes other officers who plan to go undercover don't make the same mistakes he did. He advises, "Prepare yourself emotionally and mentally, and with your family. Have some kind of backup you can talk to and deal with the issues."

Was it worth it?

"No," Killian says matter-of-factly. "The price was too high. When I was doing [the] operation, I saw it as 'oh, this is going to be huge.' You know, we are going to eviscerate the whole Outlaws motorcycle club, or so I thought at the time — [and] just eliminate Aryan Nations forever as an important factor."

That, perhaps, was an overestimation of what the investigation would yield. But the arrests did dismantle the 1st SS Kavallerie Brigade, which was being viewed within the Aryan Nations and Outlaws as a model of cooperation that could be adopted nationwide. And, as part of the broader operation, agents, including ones from Killian's agency, the Orange County Sheriff's Office, arrested 14 members of the American Front, a violent, neo-Nazi skinhead group that was allegedly planning violence and engaging in paramilitary training on a heavily fortified compound in neighboring Osceola County.

While the arrests were major accomplishments in the fight against racial extremism and domestic terrorism, Killian paid a hefty price. He gave up his wife, his family, his sense of security and a 32-year-old career in law enforcement. On some days, it doesn't seem like much of a win at all to him.



Orange County Sheriff's Office Professional Standards Division

# Employee History for
## 455 - ROBERT KILLIAN

This report may contain information on open, active internal investigations. Unedited copies of this report should not be made public information.

Tracking Number(s): 2010-22553; 2010-V22553
Date Occurred: 6/14/2010   Date Received: 7/14/2010   Date Closed: 11/2/2010

Synopsis: The accused employee has allegedly interfered with an ongoing criminal investigation.

| Violation | Disposition | Discipline | Date Served-Disciplining Authority |
|---|---|---|---|
| Unbecoming Conduct | Sustained | Forty (40) hours suspension without pay. | 10/6/2010 - Captain Mike McKinley (LRM) |

Tracking Number(s): 2003-001179; 2003-LC000147
Date Occurred: 6/19/2003   Date Received: 10/9/2003   Date Closed: 11/5/2003

Synopsis: Loss Control form only. Damage to vehicle.

| Violation | Disposition | Discipline | Date Served-Disciplining Authority |
|---|---|---|---|
| Operating Vehicles | Sustained | Discipline handled at the sector level. | 11/3/2003 - A/Sgt. Gerald Neely |

Violation Number: 341.32   Date Discipline Served: 11/5/1995   Discipline Awarded:   VERBAL REPRIMAND

Details: THE LOSS CONTROL REVIEW BOARD HAS FOUND YOU IN VIOLATION OF THE ABOVE CHARGE FOR A VEHICLE ACCIDENT YOU HAD ON AUGUST 19, 1995.

EXHIBIT F(f)(ii)

Employee History                    Page 1 of 1

Case 3:16-cv-00948-JPG   Document 25-5   Filed 07/17/17   Page 36 of 38   Page ID #412

K ISSIMMEE — The state's star witness in Central Florida's largest domestic-terrorism case couldn't remember anything particularly violent or damaging about accused American Front leader Marcus Faella during opening testimony Wednesday.

Asked if Faella and his followers planned to shoot up a rival's home, paid FBI informant Jason Hall said, "I wouldn't say it was set in stone — it was a possibility."

Faella, 41, is charged with conspiring to shoot into a building, two counts of teaching paramilitary training and possession of a firearm by a convicted felon, according to court records.

Paid $40,000 by the FBI, Hall spent almost two years hanging out at Faella's rural Holopaw home, shooting guns, eating barbecue and taking undercover video, according to his testimony in the Osceola County Courthouse.

Those videos featured guffawing, sexual banter, a cookout and lots of shooting of AK-47s but without indications the 14 members were practicing tactics to be used in a race war they were accused of preparing to fight.

Questioned by prosecutor Sarah Hatch if the American Front members planned to start a riot on May Day 2012 by attacking a socialist group in Melbourne, Hall responded the intention was "to raise public awareness against socialism."

And he later testified he couldn't remember Faella saying anything like violence might be necessary to preserve the white race.

Orange-Osceola State Attorney Jeff Ashton attended Wednesday's opening arguments and part of Hall's testimony. The trial recessed shortly after 5 p.m. and resumes at 9:30 a.m. Thursday.

The innocence or guilt of the avowed white supremacist will be determined by a jury of his peers, including African-Americans, a Jewish woman and a white man who says he abhors racism. The six jurors and two alternates were picked shortly before noon Wednesday after final questioning of the 62-member jury pool.

Faella's lawyer Ronald Ecker II told the jury, "You are going to see it was much ado about nothing ... not a single bit of corroborating evidence."

The trial started Tuesday more than two years after the feds arrested him and 13 other American Front members accused of training for a race war.

"Faella has stated his intent during the race war is to kill Jews, immigrants and other minorities," a member of the FBI Joint Terrorism Task wrote in arrest papers.

The American Front is one of the oldest continually active U.S. skinhead groups, according to the Anti-Defamation League.

Their arrests in May 2012 by the FBI Joint Terrorism Task Force drew international attention to Holopaw, a small community where American Front members were accused of conducting firearms training on a fortified plot of land owned by Faella.

A search of Faella's land and buildings confiscated about 20 firearms, including AK-47s and a sniper rifle with a night-vision telescopic sight, records show.

Before jury selection began Tuesday morning, the Orange-Osceola State Attorney's Office offered Faella a deal to plead guilty to a single count of possession of a firearm by a convicted felon.

Faella rejected the plea deal.

So far, only three of the 13 other American Front members in the case have been convicted. Christopher Brooks was sentenced to three years in prison for possession of a firearm by a convicted felon; Luke Leger and Kent McLellan were both sentenced to four years of probation after pleading no contest to participating in paramilitary training.

EXHIBIT F(g)(i)

# Documents reveal more details on alleged white supremacist group

Updated: Oct 5, 2012 - 6:35 AM



Video: Info released on American Front

00:42 / 01:48

0    Tweet

**OSCEOLA COUNTY, Fla.** - Documents were released in the investigation of an alleged white supremacist group known as the American Front Friday.

The group is accused of training for a race war on a compound in Osceola County, and 13 people are facing charges.

In a documented deposition, an FBI informant described what he saw happening on the compound.

inside the alleged white supremacist group to train for what the American Front leaders thought would be their chance to start a race war.

Undercover video shot by the informant shows group members firing a gun on the property owned by the alleged ringleaders, Mark and Patricia Faella.

In the deposition, Hall said the ringleaders would make group members train with weapons to see who could break down an AK-47 the fastest.

Hall also said they were shown how to disguise a sharpened staff as a flag pole.

Hall said the FBI had paid him $40,000 for information over four years, and $15,000 of it was to relocate him because of the case.

Investigators said the group planned to show up at what they believed was a communist event in Melbourne last May and provoke an attack.

Leading up to that incident, Hall says he was forced to flee the group as they began to suspect he was an informant.

Soon after Hall fled the group, 14 alleged members of the American Front were arrested, including the Faellas.

0    Tweet

## FROM THE WEB

Sponsored Links

**What Morgan Fairchild Looks Like Now Is Crazy**
Sportlingz

**Handmade Gifts for the Entire Family in Virginia Beach**
Visit Virginia Beach

**Easy-to-Use Job Search Tools as Impressive as Your Resume**
Monster

**Surprising Way to Look Up Birth Records**
Ancestry

**12 of the Most Extreme Modern Motorcycles on the Planet**

EXHIBIT F(g)(ii)

SECTIONS                          ARTICLES                    Sign in                              91°

Email     Facebook    15    Twitter    G+1    0            Resize Text    A-      A+
News

# American Front leader has 2 charges dropped



GEORGE SKENE, ORLANDO SENTINEL

Orlando Signature Magazine Faella, reputed head of the American Front white-supremacist group in the Osceola County Courthouse before Judge Jon Morgan on Sept. 9, 2014.

By Henry Pierson Curtis, Orlando Sentinel
9:42 pm, September 11, 2014
Classified

KISSIMMEE -- Closing arguments are expected to begin today in the trial of a white-supremacy group leader in Central Florida's largest domestic-terrorism case.

As the trial of American Front leader Marcus Faella comes to a close, two of the four charges against him were dropped Thursday.

Faella, 41, was charged with conspiring to shoot into a building, two counts of teaching paramilitary training and possession of a firearm by a convicted felon, according to court records.

The remainder of the charges against Faella of conspiring to shoot into a building and possession of a firearm by a convicted felon were dismissed Thursday afternoon.

The trial started Tuesday more than two years after the feds arrested Faella and 13 other American Front members accused of training for a race war. The American Front is one of the oldest continually active U.S. skinhead groups, according to the Anti-Defamation League.

Earlier in the day, an informant for the FBI testified that he never saw members of the American Front express any prejudice during his infiltration of the white-supremacist group.

Jason Hall's statements contradicted much of the case developed by the FBI Joint Terrorism Task against Faella. Hall worked undercover as a member of the neo-Nazi group in eastern Osceola County for a year.

The arrests in May 2012 by the FBI Joint Terrorism Task Force drew international attention to Holopaw, a small community where American Front members were accused of conducting firearms training on a fortified plot of land owned by Faella.

A search of Faella's land and buildings confiscated about 20 firearms, including AK-47s and a sniper rifle with a night-vision telescopic sight, records show.

But Hall testified he never saw anyone targeted for ethnicity, race, religion, national origin, sexual orientation, homelessness, mental status or age. Hall also said he'd never seen Faella provide a firearm to a convicted felon -- one of the charges that was later dropped.

So far, only three of the 13 other American Front members in the case have been convicted. Christopher Brooks was sentenced to three years in prison for possession of a firearm by a convicted felon; Luke Leger and Kent McLellan were both sentenced to four years of probation after pleading no contest to participating in paramilitary training.

Closing arguments will begin at 9:30 a.m. before the case goes to the jury.

hcurtis@orlandosentinel.com or 407-420-5257

## Related Content

American Front trial

Feds rest case against Neo-Nazi death-threat suspect

Reinvent your career with the company that's reinventing pharmacy. jobs.cvshealth.com

EXHIBIT F(g)(iii)