UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

WILLIAM A. WHITE,

    Plaintiff,

    v.

DEPARTMENT OF JUSTICE, et al.,

    Defendants.

No. 3:16-cv-948-JPG-DGW

DECLARATION OF ERIKA FENSTERMAKER

I, Erika Fenstermaker, do hereby declare and state as follows:

1.    I am employed by the United States Department of Justice, Federal Bureau of Prisons [hereinafter "BOP"] as a Government Information Specialist for the North Central Regional Office [hereinafter "NCRO"] located in Kansas City, Kansas. I have been assigned to the NCRO since September 2014. Prior to that time, I served as a Legal Assistant at USP Canaan since January 2011.

2.    I am familiar with the Complaint filed on August 25, 2016, by the above-captioned plaintiff, William White, Register Number 13888-084, seeking disclosure of the records he sought through Freedom of Information Act [hereinafter "FOIA"] requests to the BOP, as well as his most recent Third Motion for Summary Judgment filed on March 19, 2018. *See* August 25, 2016 Complaint, Doc. 1 & March 19, 2018 Third Motion for Summary Judgment, Doc. 90.

3.    Inmate White is currently serving an aggregate sentence of 349-months, 8-days imprisonment and 3-years supervised release based on numerous convictions. Specifically, inmate White was convicted in the Western District of Virginia for violation of supervised release imposed as part of his sentence for two counts of interstate

communication of a threat to injure in violation of 18 U.S.C. 875(c), and tampering with a witness in violation of 18 U.S.C. 1512(b)(1).    Inmate White has also received convictions for solicitation to commit a crime of violence and influencing a juror in violation of 18 U.S.C. §§ 373 & 1503 in the Northern District of Illinois; extortion by interstate communication and threat by interstate communication in violation of 18 U.S.C. §§ 875 (b) & 875 (c) in the Western District of Virginia; and extortion by interstate communication in violation of 18 U.S.C. § 875 (b) in the Middle District of Florida.    Inmate White currently has a projected release date of September 22, 2037, via Good Conduct Time.    A true and correct copy of the Public Information Inmate Data for inmate William White, Federal Register No. 13888-084, is attached as Exhibit A to this declaration.

4.    Inmate White is currently serving his sentence at the United States Penitentiary located in Marion, Illinois [hereinafter "USP Marion"], and is housed in the Communications Management Unit [hereinafter "CMU"].    *See* Exhibit A.    A CMU is a self-contained unit that houses inmates who, due to their offense of conviction, offense conduct, or other verified information, including illicit activities within prison, require increased monitoring of their communications with persons in the community in order to protect the safety, security, and orderly operation of Bureau facilities, and protect the public.    *See* 28 C.F.R. § 540.201.    CMUs are designed to "enable[e] [prison] staff to more effectively monitor communication between inmates in CMUs and persons in the community."    28 C.F.R. § 540.200(c).

5.    The statements I make hereinafter are made on the basis of my review of the official files and records of the Bureau of Prisons, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.    Due to the

nature of my official duties as a FOIA/PA Technician for the NCRO, I am familiar with the procedures followed by Central Office and the NCRO of the BOP in responding to requests made pursuant to the Freedom of Information Act. Requests for BOP records are governed by the Department of Justice's FOIA regulations, *see* 28 C.F.R. Part 16, the BOP's FOIA regulations, *see* 28 C.F.R. Part 513, and BOP Program Statement 1351.05, *Release of Information.*[1]

6.  Under 28 C.F.R. § 513.60, FOIA requests must be made in writing and addressed to the Director, Federal Bureau of Prisons, 320 First Street N.W., Washington, D.C. 20534. These requests may be submitted via mail or electronically. All FOIA requests are received by the FOIA/Privacy Act Section of the Office of General Counsel in the Central Office of the BOP.

7.  Once submitted, a Central Office FOIA Technician will review the request to determine the likely location of the records sought. If the records are likely to be located in Central Office, such as policy-development or contracting records, the request will be assigned to Central Office FOIA processors. Central Office FOIA staff will scan the request, upload it into the FOIA database—FOIAXpress, assign the request a FOIA number and issue a notification letter to the requester advising him that his request was received.

8.  However, if a majority of the records are likely to be located in one of the six regional offices or at an institution, such as records regarding an individual inmate, the Central Office FOIA Technician will scan the request into a PDF format and e-mail it to FOIA staff located in the appropriate regional office. *See* 28 C.F.R. § 513.64(a). Within the NCR, NCRO FOIA staff will log the new FOIA requests e-mailed by the Central Office

---

[1] All Bureau of Prisons' Program Statements referenced in this declaration are available at the Bureau's public website, www.bop.gov.

FOIA Technician into the Bureau's FOIA database and assign the request a FOIA number. NCRO FOIA staff will send a notification letter to the requester advising him that a request was received by the BOP. *See* 28 C.F.R. § 513.64(b).

9.    Once NCRO FOIA staff determine where the records requested are likely to be located, a search for responsive records is initiated at the appropriate location. If the records are located in the Regional Office, NCRO FOIA staff will coordinate the search with appropriate staff assigned to the NCRO. However, if the records are located at an institution, NCRO FOIA staff will forward the request to the institution's FOIA point of contact, often either a legal assistant or legal liaison, who will then coordinate the search for records at that site.

10.    Responsive records will be provided to the FOIA Paralegal Specialist or Government Information Specialist [hereinafter "GIS"], who will review the records to determine whether any portion of the records are exempt from disclosure under FOIA. If the records contain exempt information, any reasonably segregable portions of the record will be disclosed after redaction of the exempt information. The requester will be advised in writing of any denial of information, whether in part or in whole, and the reasons for the denial. The requester will also be advised that he may appeal the denial of information to the Office of Information Policy [hereinafter "OIP"].

11.    In his Amended Complaint filed on July 17, 2017, inmate White alleged that he had not received a response to BOP FOIA Request Nos. 2016-07558 and 2017-01269. *See* July 17, 2017 Amended Complaint, Doc. 25 at pp. 4-5. However, in his Response and Motion for Partial Summary Judgment, Plaintiff states "the BOP has responded to the claim of FAC para 4, BOP FOIA # 2017-01269, and, I voluntarily dismiss said claim." *See* Response and Motion for Partial Summary Judgment, Doc. 43, p. 11 at ¶ 40.    In its

January 19, 2018 order, this Court granted Defendants' motion for summary judgment

regarding FOIA Request No. 2017-01269.  *See* January 19, 2018 Memorandum and

Order, Doc. 59 at p. 12.  Accordingly, this declaration will only address FOIA Request

No. 2016-07558.

## FOIA REQUEST NO. 2016-07558

12.    On August 12, 2016, the NCRO received a FOIA request from inmate White seeking "1)

regarding [inmate White]: a) all medical records; b) all psychological records; c) all

requests for administrative remedy, and tort claims; d) all disciplinary records; e) all

SENTRY records; f) all Prison Security, and, Intelligence Record System

[JUSTICE/BOP-0010] records; g) all communications between Bureau of Prisons

personnel, and, between Bureau of Prisons personnel, and, other law enforcement

agencies, any US Attorney's Office, or, any agency of the Attorney General, including

the US Department of Justice Civil Rights Division; 2) All maintenance records related to

the 11th floor Special Housing Unit of the Metropolitan Correctional Center Chicago

between October 17, 2008, and, December 29, 2008, particularly, but, not limited to,

records related to heating problems, insect infestations, and, the flooding of cells with

human fecal material. 3) The green SHU log books from the Metropolitan Correctional

Center's 11th floor for the period October 17, 2008, to December 29, 2008."  A true and

correct copy of the FOIA Request date stamped as received by the NCRO on August 12

2016, is attached as Exhibit B to this declaration.

13.    On August 15, 2016, I sent inmate White a letter explaining that a request for information

directed at the BOP is not deemed properly filed until it is received at the address of the

component specified in Appendix I, as noted in 28 C.F.R. §16.3 or §16.41, and meets the

required elements of a request under the statute and regulations.  Inmate White was

specifically instructed that pursuant 28 C.F.R. §513.60, a request for Bureau records must be made in writing and addressed to the Director, Federal Bureau of Prisons, 320 First Street, N.W., Washington, DC 20534 and that he should clearly mark on the face of the letter and the envelope "FREEDOM OF INFORMATION REQUEST." A true and correct copy of the August 15, 2016 letter is attached as Exhibit C to this declaration.[2]

14.    On September 15, 2016, twenty-one (21) days after he filed his original Complaint, Central Office received the August 15, 2016 letter, along with the FOIA request originally submitted to the NCRO. *See* Exhibit B. Accordingly, inmate White's FOIA request was not properly filed until after he filed his initial Complaint in this matter.

15.    Central Office assigned the request to the NCRO for processing. The NCRO FOIA Technician assigned FOIA Request No. 2016-07558 to this request, and on September 26, 2016, sent an acknowledgment letter to inmate White. A true and correct copy of the Letter, dated September 26, 2016, is attached as Exhibit D to this declaration.

16.    In the acknowledgment letter, inmate White was informed that FOIA requests are processed on a first-in, first-out basis in relation to other requests in the same track. *Id.* He was also informed that it was determined exceptional circumstances exist regarding his request thereby extending the time limit for response, and that the request had been assigned to a complex track and placed in chronological order based on the date of receipt. *Id.* Inmate White was informed that processing complex requests may take up to nine months, but that he may narrow or modify his request in an effort to reduce the processing time. *Id.*

## SEARCH & PRODUCTION FOR FOIA REQUEST NO. 2016-07558

---

[2] Although the August 15, 2016 letter states that inmate White's correspondence was received on July 27, 2016, this was merely a typographical error as the FOIA request was date stamped received by the NCRO on August 12, 2016.

17.   I was assigned FOIA Request No. 2016-07558.  For all FOIA requests assigned to me, I personally conduct and/or supervise searches for agency records. I track the collection of documents and send reminders to staff in the field regarding outstanding searches to be conducted.  I also interview staff members concerning the existence of records and the contents of the systems of records that they curate and search in the course of their official duties.  Once the search is completed and all responsive records are provided to the NCRO, I process the records and issue the response to the requestor.

18.   By letter dated February 9, 2018, I informed inmate White of the release determination and the nature of the exemptions applied for FOIA Request No. 2016-07558.  Attached to this declaration as Exhibit E is a true and correct copy of the February 9, 2018 letter to William White.   However, upon further review, I discovered the initial search for administrative remedies and administrative claims was not complete.  Accordingly, a supplemental search was conducted for responsive remedies and administrative claims, which were addressed in the supplemental release issued on March 20, 2018.   Attached to this declaration as Exhibit F is a true and correct copy of the March 20, 2018 letter to William White.

19.   In the March 20, 2018 response letter, I informed inmate White of the supplemental release determination and the nature of the exemptions applied.  *See* Exhibit F.   The supplemental release includes both the original February 9, 2018 release, as well as the supplemental documents, and consists of one-thousand-six-hundred-forty (1,640) pages. The supplemental release is consecutively numbered with Bates stamping, with the supplemental documents for administrative remedies and administrative claims consisting of Bates pages 1277 through 1640. As part of this release, I provided inmate White six-hundred-two (602) pages, in full, and four-hundred-sixty-eight (468) pages, which were

redacted in part. Five-hundred-seventy (570) pages were withheld in their entirety and were replaced by a deleted page sheet identifying the reason and/or the applicable FOIA exemptions relied upon to withhold the pages in full, as well as Bates numbers for the withheld pages.

20.    Upon further review of the March 20, 2018 release, I determined pages from the SHU Daily log book from December 15 through December 29, 2018, were inadvertently left out of the March 20, 2018 production of documents. Accordingly, on May 30, 2018, an additional search was conducted to locate these records, and, on June 6, 2018, all twenty-seven (27) pages of responsive records were provided to inmate White with redactions. I also re-released page 1290 from the March 20, 2018 production, with redactions, as it was determined the taxpayer identification number previously redacted belongs to inmate White. Attached to this declaration as Exhibit G is a true and correct copy of the June 6, 2018 letter to William White.

21.    I processed all documents responsive to inmate White's request to achieve maximum disclosure consistent with the access provisions of the FOIA and the FOIA statutory exemptions. Every effort was made to provide inmate White with all reasonably segregable nonexempt information in the responsive records. No reasonably segregable nonexempt portions have been withheld from inmate White. Further description of the information withheld, beyond what is described in this declaration, could identify the actual exempt information the BOP has protected.

22.    Exempt information was excised from the pages disclosed in part and the appropriate exemption was cited. All withheld material is supported by a statutory exemption or multiple exemptions. The BOP's withholding of information from the release in response

to FOIA Request No. 2016-07558 will be addressed specifically in greater detail below, along with a description of the search.

23.    I also prepared a *Vaughn* Index describing with specificity the documents withheld in response to inmate White's FOIA request. In the Index, I identified the total number of pages in the document, followed by the number of pages redacted. I also describe with specificity what pages of the document were affected by the withholdings in order to provide context for the withholdings. A true and correct copy of the *Vaughn* Index for FOIA Request No. 2016-07558 is attached as Exhibit H to this declaration.

**Parts 1(a) & (b) (Medical and Psychology Records)**

24.    Part 1(a) & (b) seeks "all medical records" and "all psychological records." *See* Exhibit B. The BOP maintains a "Medical Record" for each inmate in its custody in the Bureau Electronic Medical Record ("BEMR")—an online electronic database containing inmates' medical records. *See* Program Statement 6090.04, *Health Information Management* at p. 3. The BOP also maintains psychology records on inmates in the Psychology Data System, or PDS. *See* Program Statement 5310.17, *Psychology Services Manual* at p. 5. The inmate's BEMR records and PDS notes regarding professional contacts are retrievable by Health Services staff where the inmate is currently confined. Therefore, this portion of inmate White's request was forwarded to the legal liaison at USP Marion, who coordinated the search for responsive documents.

25.    The legal liaison assigned the request for medical records to a USP Marion Medical Records Technician, who has access to BEMR. The Medical Records Technician conducted a search for inmate White's medical records by his register number on June 23, 2017, and located four-hundred-thirty-five (435) pages that were responsive to his request. Since BEMR contains inmate White's complete medical record, it was

determined that a search of other systems of records would only produce duplicative documents.

26.   The legal liaison assigned the request for psychology records to a USP Marion Psychologist, who has access to the PDS. The Psychologist conducted a search for inmate White's psychology records by his register number on August 28, 2017, and located thirty-two (32) pages that were responsive to Plaintiff's request. Since the PDS contained inmate White's complete psychology record, it was determined that a search of other systems of records would only produce duplicative documents.

27.   In total, the USP Marion legal liaison provided the NCRO four-hundred-sixty-seven (467) pages of records responsive to inmate White's request for all medical and psychology records.

28.   After I had processed inmate White's medical and psychology records, which were provided in both the February 9, 2018 and March 20, 2018 release of records, I released three-hundred-eighty-four (384) pages of medical records in full and withheld fifty-one (51) pages in part.   *See* Medical Records, Bates Numbers 1-435.   Regarding his psychology records, I released twenty-six (26) pages in full and withheld six (6) pages in part. *See* Psychology Records, Bates Numbers 436-467. For all fifty-seven (57) pages of medical and psychology records withheld in part, I withheld information pursuant to FOIA Exemption 5 U.S.C. § 552(b)(7)(F).

**Parts 1(c) (Requests for Administrative Remedy and Tort Claims)**

**Administrative Remedies**

29.   The Bureau has a three-tiered administrative procedure for inmate grievances, which is codified at 28 C.F.R. § 542.10 *et seq*. The first step is the filing of a formal Request for Administrative Remedy (also known as a "BP-9") at the institution in which the inmate is

incarcerated.  28 C.F.R. § 542.14.  If the inmate feels the response to his BP-9 is not

satisfactory, the inmate may then appeal the complaint to the Regional Director, by filing

a Regional Office Administrative Remedy Appeal (also known as a "BP-10").  *See* 28

C.F.R. § 542.15(a).  If dissatisfied with the Regional Director's response, the inmate may

appeal to the Director, National Inmate Appeals, in the Office of the General Counsel in

Washington D.C, by filing a Central Office Administrative Remedy Appeal (also known

as a "BP-11").  *Id.*

30.    Because Central Office is responsible for making available its index of administrative

appeals filed at its level, as well as the indexes of all institution and regional offices (*see*

28 C.F.R. § 542.19), I sent FOIA request No. 2016-07558 seeking "all requests for

administrative remedy" to the Office of General Counsel, Administrative Remedy

Section, located in Central Office.

31.    The Central Office Administrative Remedy Section maintains eight (8) Administrative

Remedy Specialists who, among other duties, are responsible for responding to FOIA

requests for the Administrative Remedy Section due to their specialized training

regarding the Administrative Remedy Program and application.

32.    On September 27, 2017, an Administrative Remedy Specialist searched the electronic

database known as SENTRY— the BOP's online, computerized database used by BOP

staff to monitor and track various information concerning inmates—for administrative

remedies and appeals filed by inmate White. The specialist conducted the electronic

search using inmate White's register number, along with the appropriate SENTRY code.

33.    The Administrative Remedy Specialist used the information provided by SENTRY to

locate the hard copies of the administrative remedies located in the Administrative

Remedy Office, which are organized by year and then sequentially by administrative

remedy number.

34.    Pursuant to the Records and Information Disposition Schedule, all administrative

remedies and appeals, regardless of the level at which they are filed, are maintained for

three (3) years from the date of filing. A true and correct copy of Disposition Authority

N1-129-83-7 is attached as Exhibit H to this declaration.  Therefore, at the time of the

search, the Administrative Remedy Specialist searched for all remedies filed at Central

Office after 2014—the last year for which remedies were maintained at that time. The

Administrative Remedy Specialist provided NCRO seventy-three (73) pages in response

to inmate White's request.[3]

35.    After I had processed the records provided by Central Office, which were provided in

both the February 9, 2018 and March 20, 2018 release of records, I released Forty-eight

(48) pages of records in full, withheld two (2) pages in full and withheld twenty-three

(23) pages in part.  *See* Administrative Remedy Records, Bates Numbers 621-693.

36.    Upon further review of the administrative remedy records provided as part of the initial

release of documents on February 9, 2018, I discovered that the release was not complete.

Specifically, the release did not include inmate White's administrative remedy requests

associated with administrative remedies 809800-F1, 22379-F1 and 858331-F1, which

were filed at the institution level while inmate White was housed at FCI Loretto, USP

Marion and MCC Chicago, respectively.  To ensure inmate White received all responsive

records, I sent a request to each of these respective institutions to conduct a search for

each of the listed remedies.

---

[3] Although inmate White sought all of his *requests* for administrative remedy, the specialist identified and provided the entire packet for each remedy to include the request, the investigation and response for each of inmate White's administrative remedy requests and appeals located at Central Office.

37.   The legal liaisons at these institutions conducted a search for these specific remedies by hand searching their administrative remedy files, which are maintained by year, and then sequentially by administrative remedy number, for the remedy identification numbers provided. In response, FCI Loretto, USP Marion and MCC Chicago each provided me with four (4) pages of documents equaling twelve (12) pages in total.[4]

38.   After I had processed the additional twelve (12) pages of records, which were provided in the March 20, 2018 release of records, I released six (6) pages of records in full and withheld six (6) pages, in part. *See* Administrative Remedy Records, Bates Numbers 1629-1640.

**Administrative Tort Claims**

39.   Upon further review of the administrative tort claim records provided as part of the initial release of documents on February 9, 2018, I discovered that due to administrative error, the release was not complete. Accordingly, to ensure inmate White received all responsive records, I reinitiated the search for records responsive to this component of his FOIA request.

40.   Pursuant to Bureau policy, administrative claims are to be filed in the regional office in the region where the claim occurred, and regional counsel staff are responsible for tracking all properly filed claims. *See* Program Statement 1320.06, *Federal Tort Claims Act*, at pp. 3-4. Accordingly, I sent inmate White's FOIA request seeking "all requests for . . . tort claims" to a paralegal with the North Central Regional Office, which oversees USP Marion, for a renewed search for responsive documents.

---

[4] Similar to Central Office, FCI Loretto, USP Marion and MCC Chicago provided the entire remedy packet, rather than just the remedy *request* sought by inmate White in his FOIA request.

41.   The BOP maintains records related to administrative claims filed under the FTCA as well as other claims (Small Claims Act, Bureau of Prisons Compensation Act, and Civilian Employee Compensation Act) in an electronic database commonly referred to as Content Manager – Administrative Torts [hereinafter referred to as "Content Manager"]. The NCRO has utilized Content Manager for tracking of administrative claims under the FTCA since 2007.

42.   Content Manager can be searched using a federal register number, first and last name, or last name only, to identify if any administrative claims have been filed. The search will reveal if any administrative claims have been received by any location within the BOP. The paralegal searched Content Manager on March 4, 2018, by inmate White's register number, and determined he had filed six (6) administrative claims.

43.   The paralegal searched each claim by clicking on the claim number, and then printing the case details page for each claim.  She then clicked on the case documents tab for each claim, and printed all documents under this tab.[5]  The paralegal located three-hundred-fifty-two (352) pages, all of which were then provided to me for processing.[6]  Since Content Manager has served as the official filing system for administrative claims since 2007, and inmate White was incarcerated with the BOP in 2008, it was determined that

---

[5] Like his administrative remedy requests, inmate White only sought his tort claim *requests*. *See* Exhibit B. Nevertheless, the NCRO paralegal provided the NCRO GIS with all documents maintained in each claim's administrative claim file.

[6] In the February 9, 2018 Release, one-hundred-fifty-three (153) pages were provided for processing in response to Plaintiff's request for "all requests for . . . tort claims." *See* Exhibit E.  This original release of one-hundred-fifty-three (153) pages was also provided in the supplemental response (Bates pages 468-620). *See* Exhibit F.  Since it appeared some pages were missing from the initial release, I reinitiated the search for "all requests for . . . tort claims," and, after processing, released the responsive documents with the appropriate exemptions applied in the March 20, 2018 Release (Bates pages 1277-1628). *See* Exhibit F.  Since the one-hundred-fifty-three (153) pages from the February 9, 2018 Release (Bates pages 468-620) were also included in the March 20, 2018 Release (Bates pages 1277-1628), this declaration only addresses Bates pages 1277-1628 of the March 20, 2018 Release to avoid duplication.

an additional search of other systems of records would only produce duplicative documents.

44. After I had processed inmate White's Administrative Tort Claim records, I withheld three-hundred (300) pages in full, and two (2) pages, in part, and released fifty (50) pages of records in their entirety. *See* Administrative Tort Claim Records, Bates Numbers 1277-1628.

**Part 1(d) (Disciplinary Records)**

45. An inmate's discipline record is included in Section Four of his Central File, which is maintained at his current institution. *See* P.S. 5800.17, *Inmate Central File, Privacy Folder, and Parole Mini-Files*, at p. 17. The Central File maintains the official record for all incident reports, as well as Unit Discipline Committee and Discipline Hearing Officer Reports. *See id.* at pp. 17-18. However, when an incident report is expunged, unit staff must ensure the incident report and/or related documents are removed from the inmate's Central File. *See* Program Statement 5270.09, *Inmate Discipline Program*, at p. 34. Pursuant to the BOP Records and Information Disposal Schedule, research copies of incident reports and DHO reports maintained outside the Central File are not kept beyond one year. A true and correct copy of Disposition Authority N1-129-94-1 is attached as Exhibit J to this declaration.

46. Since the Central File is maintained at the inmate's current institution, I sent inmate White's request for "all disciplinary records" to the legal liaison at USP Marion. The legal liaison assigned the request to a case manager, who conducted a hand search of Section Four of inmate White's Central File on August 23, 2017. The case manager located the discipline section, which consisted of thirty-one (31) pages of records, which were provided to me for processing.

47.  To ensure I obtained all available records, I also sent the request for all disciplinary records to MCC Chicago and FCI Beckley to conduct an additional search for records, since inmate White received discipline at each of these institutions.

48.  The GIS located at FCI Beckley conducted a search of the computer drive of the current and previous Discipline Hearing Officer assigned to FCI Beckley by inmate White's name and register number on August 24, 2017.  On September 5, 2017, the Case Management Coordinator [hereinafter "CMC"] likewise conducted a search of the DHO drive at MCC Chicago.  The GIS located eight (8) pages of responsive documents, while the CMC located fifteen (15) pages, all of which were provided to me for processing.

49.  After I had processed inmate White's Discipline records, I released seven (7) pages in their entirety, withheld three (3) pages in full, and withheld forty-four (44) pages in part. *See* Discipline Records, Bates Numbers 694-747.

**Part 1(e) (SENTRY Records)**

50.  As previously explained, SENTRY is the BOP's online, computerized database used by BOP staff to monitor and track various information concerning inmates.  SENTRY maintains a wealth of data that may be searched using various SENTRY transactions.

51.  When an inmate requests SENTRY records without indicating the type of information he is seeking, a standard set of SENTRY transactions is provided.  This information includes the requesting inmate's discipline and incident report history; intake screening information; central inmate monitoring, security designation, and custody classification data; inmate load data; profile information; name and number history; assignment history; and the inmate's administrative remedy, sentence monitoring and financial responsibility data.

52.    To conduct a search for data stored in SENTRY, staff log into the shared SENTRY

database, enter the relevant transactional code and then conduct a search by the inmate's

register number.    Unlike other SENTRY transactions, inmate intake screening

information must be obtained from the inmate's Central File.  Intake Screening Forms are

printed from SENTRY, filled out by the Unit Team, and then maintained in Section

Three of the inmate's Central File, which is kept at the institution where the inmate is

housed.  *See* Program Statement 5800.17, *Inmate Central File, Privacy Folder, and*

*Parole Mini-Files*, at p. 17.

53.    Since inmate White is located at USP Marion, his request for all SENTRY records was

sent to USP Marion to initiate the search for the responsive records.  The request was

assigned to the Unit Manager, who conducted a search of Section Three of inmate

White's Central File on August 22, 2017, to obtain a copy of his intake screening

information.  The Unit Manager also conducted a search of SENTRY by inmate White's

register number.  The Unit Manager located fifty-four (54) pages of responsive records

that were provided to me for processing.  Since the Unit Manager was unable to fully

complete the search for SENTRY records due to other institutional duties, the request for

SENTRY records was also provided to the St. Louis CLC attorney overseeing USP

Marion who completed the search for the above-noted transactions.  The CLC attorney

produced sixty-nine (69) pages of responsive records, which were also provided to me for

processing.

54.    After processing one-hundred-twenty (120) pages of the one-hundred-twenty-three (123)

pages of records provided,[7] I determined to release eighty-two (82) pages in full, and

withheld thirty-eight (38) pages, in part.

**Part 1(f) & (1)(g) (Intelligence and Communications Records)**

**Intelligence Records**

55.    In part (1)(f) of inmate White's FOIA request, he seeks "all Prison Security, and,

Intelligence Record System [JUSTICE/BOP-001] records." *See* Exhibit B.  The BOP's

practice is to interpret a request for "intelligence" records as a request for records

maintained by Special Investigative Services [hereinafter "SIS"], which is responsible for

investigating inmate and staff misconduct within the institution, gathering intelligence on

criminal activities, and investigating threats to the safety of inmates and staff.

56.    When SIS records are requested, unless the requestor provides specific details regarding

the records, such as a time period, institution, or incident, the BOP will interpret the

general request as one for the SIS records of the inmate's current institution of

confinement if he is currently in custody, or his last institution of confinement if he is no

longer in custody.

57.    SIS is a component of the Correctional Services Department and is responsible for

assisting in the investigation of criminal acts, tracking inmates and training staff on

intelligence gathering issues, among other duties.   SIS maintains SIS files related to its

duties in a shared, nation-wide BOP database known as TRUINTEL.  Prison intelligence

staff, including SIS staff, may enter information in the database, which can only be

retrieved by authorized intelligence personnel throughout the BOP.   The records are

---

[7] Three (3) of the one-hundred-twenty-three (123) pages of SENTRY records provided were not processed because they consisted simply of blank sheets of paper.

retrievable by institution, date, type of incident, inmate name, and/or register number.

58.    Since inmate White is also assigned to the CMU at USP Marion, I determined that the
       Counter Terrorism Unit [hereinafter "CTU"] for the Bureau may also have records
       responsive to inmate White's request for intelligence records.

59.    The CTU is part of the Intelligence and Counter Terrorism Branch, under the
       Correctional Programs Division.    The CTU employs standardized and specialized
       analysis of issues relating to heightened correctional management and monitoring of
       inmates classified as international and domestic terrorist offenders and inmates who have
       used authorized means of communication to carry out criminal activities from prison
       thereby heightening the need for monitoring their communications.

60.    As part of its mission, the CTU provides oversight and guidance as subject matter experts
       for the BOP regarding the management of these inmates designated to a CMU, who
       require increased monitoring. In addition to the information stored in TRUINTEL,
       information that is deemed intelligence worthy or is relevant to the CTU's mission is
       maintained in the CTU network drive, which may only be accessed by CTU personnel.

**Communication Records**

61.    In part 1(g) of his FOIA request, inmate White also seeks "all communications between
       BOP personnel, and, between Bureau of Prisons personnel, and, other law enforcement
       agencies, any US Attorney's Office, or, any agency of the Attorney General, including
       the US Department of Justice Civil Rights Division." *See* Exhibit B. Since inmate White
       did not provide any details regarding the type of communications, timeframes associated
       with the request or the names or titles of any specific BOP persons for whom he was
       seeking the communications, I interpreted this portion of inmate White's FOIA request as
       seeking communications maintained by SIS and the CTU regarding inmate White.

19

62.  I sent the request for both intelligence and communication records under parts (1)(f) and (1)(g) of inmate White's FOIA request to his current institution of confinement, USP Marion, as well as to the then Deputy Chief of the CTU for a search for responsive records.  At USP Marion, the request was assigned to a Lieutenant who conducted a search of TRUINTEL by inmate White's register number on June 23, 2017.  The Lieutenant located one-hundred (100) pages of responsive records, which were provided to me for processing.

63.  Since the Lieutenant had already searched TRUINTEL, the CTU Deputy Chief limited his search to the CTU network drive, which can only be searched by CTU staff.  The Deputy Chief conducted the search using inmate White's register number on August 23, 2017, and located sixteen (16) pages of responsive records, which were also provided to me for processing.

64.  Of the one-hundred-sixteen (116) pages provided, I withheld six (6) pages in part, and withheld one-hundred-ten (110) pages in full.

**Part 2 (MCC Chicago SHU Maintenance Records)**

65.  Part 2 of inmate White's FOIA request sought all SHU maintenance records from MCC Chicago from October 17, 2008 through December 29, 2008.  Since maintenance records at a specific institution are maintained at that institution, I sent this component of inmate White's FOIA request to MCC Chicago to conduct a search for responsive documents.

66.  The FOIA request was assigned to the MCC Chicago Facilities Manager, since he oversees maintenance issues at the institution. Maintenance records are typically maintained in the Total Maintenance System [hereinafter "TMS"]—a computer program used to track, among other items, all work orders and other maintenance issues.  The TMS program has been used by the BOP since 1985.

67.   In response to the request, the Facilities Manager reported that he had no records responsive to the request due to the timeframe of the records requested. According to the Facilities Manger, the TMS program was re-vamped in 2014, and all records maintained in TMS prior to that date are irretrievable. Further, pursuant to the BOP Records and Information Disposal Schedule, maintenance records generated from the TMS program are not kept beyond seven years. A true and correct copy of Disposition Authority N1-129-05-001 is attached as Exhibit K to this declaration.

**Part 3 (MCC Chicago SHU Log Books)**

68.   Part 3 of inmate White's FOIA request seeks "[t]he green SHU log books from the Metropolitan Correctional Center's 11th floor for the period October 17, 2008, to December 29, 2008." *See* Exhibit B. Since institution log books are maintained at the institution to which they pertain, I sent this request to MCC Chicago to conduct a search for responsive records.

69.   The request was assigned to a legal extern at MCC Chicago. Since the log books requested were from 2008, the legal extern searched the archives room where the institution maintains its closed log books. The legal extern located three responsive log books for the SHU located on the 11th floor at MCC Chicago, and provided the portions of the log books pertaining to the requested date range.

70.   The extern provided me with two-hundred-ninety-three (293) pages of responsive documents, consisting of the Unit 11 Irregular 30-Minute Rounds Log from September 29, 2008 through January 3, 2009 (Bates pages 984-1133), the SHU Daily Log from October 16, 2008 through December 13, 2008 (Bates pages 1134-1237), and the SHU Sign-In Log from April 24, 2008 through April 27, 2009 (Bates pages 1238-1276).

71.   After processing the records, I released two (2) pages in full, and withheld the remaining two-hundred-ninety-one (291) pages in part.

72.   Upon further review, I determined the SHU Daily log book records were missing pages from December 14, 2008 through December 29, 2008. Accordingly, a renewed search for these missing pages was sent to the MCC Chicago Legal Department.

73.   The search was assigned to an MCC Chicago Lieutenant, who conducted a search of the Archives room where closed log books are maintained on May 30, 2018. The Lieutenant hand-searched for the 2008 Daily log book and then identified pages from the log book recording activities from December 15 through December 29, 2008. The Lieutenant provided me with twenty-seven (27) pages of responsive records. After processing the pages, I released all twenty-seven (27) pages in part on June 6, 2018.

## APPLICATION OF EXEMPTIONS

### Justification for Non-Disclosure under FOIA Exemption 5 U.S.C. § 552(b)(6)

74.   Exemption (b)(6) provides for the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

75.   Exemption (b)6 was applied to withhold, in part, information included in records provided in response to Parts 1(c) (Administrative Remedies & Administrative Torts); 1(d) (Disciplinary Records); 1(e) (SENTRY records); 1(f) (Intelligence Records); 1(g) (Communication Records); and Part 3 (MCC SHU Log Books) of inmate White's FOIA request.

76.   Exemption (b)(6) was applied to withhold staff names, signatures, initials and/or BOP identification numbers on the following Bates pages:

Part 1(c) **(Administrative Remedies)**: Bates pages 623, 624, 636-638, 645, 649, 651, 653, 656, 657, 660, 664, 677, 678, 681, 688, 1631, 1635-1637, 1639 and 1640;

Part 1(c) **(Administrative Torts)**: Bates pages 1278, 1279, 1281, 1282, 1288, 1290, 1302, 1305, 1312, 1314, 1316-1323, 1326, 1327-1337, 1342, 1345, 1373, 1377, 1604, 1605, 1610 and 1612-1614;

Part 1(d) **(Disciplinary Records)**: Bates pages 694-718, 720-729, 731-732, 734-737 and 739-740, and 742-744;

Part 1(e) **(SENTRY Records)**: Bates pages 760-762, 764-773, 778-793, 806-808, and 815;

Part 1(f) & (g) **(Intelligence & Communication Records)**: Bates pages 870-871, 874, 902-905, 907-910, 913, 918-919, 921, 929, 959, 977, and 982-983;

Part 3 **(SHU Log Books)**: Bates pages 985-1133, 1134-1237, 1239-1276 and the additional twenty-seven pages released on June 6, 2018.

77. Release of this information withheld pursuant to Exemption (b)(6) would constitute an unwarranted invasion into the personal privacy of staff, and inmate White has not identified any public interest that outweighs this privacy interest. Specifically, disclosure would reveal identifying information of Bureau staff who are employed in a sensitive occupation, many of whom work inside the institution and are responsible for the safety and security of the institution, staff, inmates and the public. The mission and nature of the work of staff members working with inmates make them vulnerable to harassment, threats or attack. Further, disclosure of this information could permit the targeting of individual employees and their families outside the workplace. This threat is pronounced in this case considering inmate White's history of convictions for multiple counts of interstate communication of a threat to injure, tampering with a witness, solicitation to commit a crime of violence, influencing a juror, and extortion by interstate communication—all across multiple jurisdictions. *See* Exhibit A.

78.    Every effort has been made to release all segregable information without invading the
privacy interests of the third-party staff members. I determined that there was no public
interest in the release of the information withheld pursuant to Exemption (b)(6) that
would shed light on the agency's performance of its statutory duties, or on the operations
and activities of the government that would counterbalance the individuals' privacy in the
information withheld.

79.    The information exempt under Exemption (b)(6) has also been determined to be exempt
under Exemptions (b)(7)(C) and (b)(7)(F).[8] Further, for Bates pages 1279, 1281, 1282,
1288 1302, 1304, 1305, 1312, 1314, 1316-1323, 1326-1337, 1342, 1345, 1373, 1377,
1604, 1605, 1610, and 1612-1614, this information was inextricably intertwined with
information that was withheld under Exemption (b)(5), and therefore, could not be
segregated at this time.  Similarly, the information exempted under (b)(6) on Bates pages
722-724, 775-776, 902-905, 907-910, 913, 918-919, 921, 929, 959-962, 977, and 982-
983 was inextricably intertwined with information that was exempt under Exemptions
(b)(7)(E) and/or (b)(7)(F), and therefore, could not be segregated at this time.[9]

80.    Exemption (b)(6) was also applied to withhold the direct phone numbers and/or email
addresses of BOP staff on the following Bates pages:

---

[8] While Exemption (b)(7)(F) was applied to exempt the name of staff on Bates page 1278 and the name and direct
phone number of staff on Bates page 1290, the exemption was inadvertently not applied in the remaining March 20,
2018 production to exempt the identities and personal contact information of staff and third parties for Bates pages
provided under Part 1(c), Administrative Torts.  This omission was due to administrative error, and is now being
asserted along with Exemptions (b)(6) and (b)(7)(C) to withhold personal information of third parties. Besides Bates
pages 1278 and 1290, each of these pages are also exempt, in their entirety, pursuant to Exemption (b)(5).

[9] For Bates pages 985-1135, Exemptions (b)(6), (b)(7)(C), (b)(7)(E) and (b)(7)(F) were used to withhold both the
"status" and "staff" columns.  On these pages, (b)(6), (b)(7)(C) and (b)(7)(F) were used to withhold names included
in the "staff" column, while Exemptions (b)(7)(E) and (b)(7)(F) were used to withhold the status of the unit.
Similarly, for Bates pages 1239-1276, Exemptions (b)(6), (b)(7)(C), (b)(7)(E) and (b)(7)(F) were used to withhold
both the "Reason" and "Staff Signature" columns.  On these pages, (b)(6), (b)(7)(C) and (b)(7)(F) were used to
withhold names included in the "Staff Signature" column, while Exemptions (b)(7)(E) and (b)(7)(F) were used to
withhold the reason for entry into the unit.

Fenstermaker Declaration for BOP         Attachment 5:  Page 24 of 59

**Part 1(c) (Administrative Torts):** Bates pages 1288, 1290, 1314, 1327, and 1604;

**Part 1(d) (Disciplinary Records):** Bates page 723;

**Part 1(e) (SENTRY Records):** Bates pages 778, 806-808 and 815;

**Part 1(f) & (g) (Intelligence & Communication Records):** Bates pages 902-905, 907-910, 913, 921, 977, and 982.

81. Release of this direct-contact information withheld pursuant to Exemption (b)(6) would constitute an unwarranted invasion into the personal privacy of staff, and inmate White has not identified a public interest that outweighs this privacy interest. Disclosure of this information would provide an avenue to directly contact staff members, rather than using a general number or mailbox. These staff members are employed in a sensitive occupation, and many of them work inside the institution and are responsible for the safety and security of the institution, staff, inmates and the public. As previously explained, the mission and nature of the work of staff members working with inmates make them vulnerable to harassment, threats or attack. Disclosure of this information could permit the targeting of individual employees and their families using employees' direct phone numbers or emails. Further, inmates or their supporters could use this information to determine whether staff are at work in order to plan criminal activity against staff or their families.

82. Every effort has been made to release all segregable information without invading the privacy interests of the third-party staff members. I determined that there was no public interest in the release of the information exempted pursuant to Exemption (6)(b) that would shed light on the agency's performance of its statutory duties, or on the operations and activities of the government against which to counterbalance the individuals' privacy interest in the information withheld.

83.  The information exempt under (b)(6) has also been determined to be exempt under Exemptions (b)(7)(C) and (b)(7)(F).  Further, for Bates pages 1288, 1314, 1327, and 1604, this information was inextricably intertwined with information that was exempt under Exemption (b)(5), and therefore, could not be segregated at this time.  Similarly, the information exempted under (b)(6) on Bates pages 723, 724, 902-905, 907-910, 913, 921, 977, and 982, was inextricably intertwined with information that was exempt under Exemptions (b)(7)(E) and/or (b)(7)(F), and therefore, could not be segregated at this time.

84.  Exemption (b)(6) was also applied to withhold the names, register numbers, classification information and/or release information of third-party inmate separatees on the following Bates pages:

**Part 1(d) (Disciplinary Records):** Bates pages 699, 700, 702, 703, 710, 717 and 721-724; and

**Part 1(e) (SENTRY Records):** Bates pages 775-776.

85.  Release of this information withheld pursuant to Exemption (b)(6) would constitute an unwarranted invasion into the personal privacy of third-party inmates who have been classified as separatees from inmate White. The BOP uses six different broad Central Inmate Monitoring [hereinafter "CIM"] assignments, one of which includes an inmate's separation status indicating other specified individuals with whom physical contact should be prevented for various reasons.  These third-party inmates have a privacy interest in this classification and management information, as well as their names, register numbers, and release information.  Disclosure of this information could subject these inmates to threats or assault by inmate White, his followers or other inmates.  Inmate White has not identified a public interest against which to weigh this privacy interest.

Further, disclosure would undermine the BOP's ability to manage and protect these inmate-separatees.

86. Every effort has been made to release all segregable information without invading the privacy interests of the third-party inmates. I determined that there was no public interest in the release of the information withheld pursuant to Exemption (6)(b) that would shed light on the agency's performance of its statutory duties or on the operations and activities of the government against which to balance the individuals' privacy interest in the information withheld.

87. The information withheld under Exemption (b)(6) was also withheld under Exemptions (b)(7)(C) and (b)(7)(F). Further, for Bates pages 721-724, this information was inextricably intertwined with information that was exempt under Exemptions (b)(7)(E) and/or (b)(7)(F), and therefore, could not be segregated at this time.

88. Exemption (b)(6) was applied to withhold the names, register numbers, housing assignments, addresses, medical status, classification assignments and statements of other third-party inmates on the following Bates pages:

**Part 1(c) (Administrative Torts):** Bates page 1420;

**Part 1(d) (Disciplinary Records):** Bates pages 740-744;

**Part 1(f) & (g) (Intelligence & Communication Records):** Bates pages Bates pages 868-874, 878-900, 902-904, 907-909, 912, 917, 922-927, 929, 959, 969, 970-976, and 981;

**Part 3 (SHU Log Books):** Bates pages 996, 1007-1008, 1105, 1134-1135, 1137-1148, 1150, 1152-1159, 1162, 1165, 1167-1173, 1176-1177, 1179-1181, 1183-1184, 1188-1192, 1194-1204, 1206-1210, 1212, 1214-1219, 1221-1222, 1224, 1226, 1230, 1232-1234, 1236-1237, and the additional twenty-seven (27) pages released on June 6, 2018.

89. Release of this personal information withheld pursuant to Exemption (b)(6) would constitute an unwarranted invasion into the privacy of these third-party inmates, and

Fenstermaker Declaration for BOP          Attachment 5:  Page 27 of 59

inmate White has not identified a public interest that outweighs these privacy interests. Third-party inmates have a privacy interest in their name and register number, as well as medical information, BOP classification assignments, and instances identifying inmates' housing status. Third-party inmates likewise have a privacy interest in their own statements made during BOP disciplinary proceedings. Release of this information can be used to manipulate or threaten the inmates identified in these documents and may subject them to retaliation or assault.

90. I determined that there was no public interest in the release of the information exempted pursuant to Exemption (6)(b) that would shed light on the agency's performance of its statutory duties, or on the operations and activities of the government against which to counterbalance the individuals' privacy intersest in the information withheld. Further, every effort has been made to release all segregable information without invading the privacy interests of the third-party inmates.

91. The information exempt under (b)(6) has also been determined to be exempt under Exemptions (b)(7)(C) and (b)(7)(F). Further, for Bates page 1420, this information was inextricably intertwined with information that was exempt under Exemption (b)(5), and therefore, could not be segregated at this time. Similarly, the information exempted under (b)(6) on Bates pages 878-900, 902-904, 907-909, 912, 917, 922-927, 929, 959, 969, 970-976, 981, 996, 1007-1008 and 1105, was inextricably intertwined with information that was exempt under Exemptions (b)(7)(E) and/or (b)(7)(F), and therefore, could not be segregated at this time.

92. Exemption (b)(6) was applied to withhold the names, addresses, phone numbers and emails of third parties who are neither inmates nor BOP staff on the following Bates pages:

**Part 1(d) (Disciplinary Records:** Bates pages 722-724; and

**Part 1(f) & (g) (Intelligence & Communication Records):** Bates pages 878, 879, 885, 887-889, 891, 892, 894, 895, 897 and 921.

93.    Release of the names and direct-contact information withheld pursuant to Exemption (b)(6) would constitute an unwarranted invasion into the personal privacy of these third-party individuals and inmate White has not identified a public interest that outweighs this privacy interest.

94.    Bates page 722 contains the direct work phone number and name of the Assistant United States Attorney [hereinafter "AUSA"] associated with a request for production of inmate White for prosecution.  Bates pages 723 and 724 consist of emails sharing sensitive investigatory information among BOP staff and other Department of Justice agency staff. Revealing the names, email addresses and direct phone numbers of these third parties would provide an avenue for inmates or others to directly target staff or determine their whereabouts by calling these staff members on their direct phone line.  Revealing the identities of these individuals would also subject them to threats or assault, especially since Bates pages 723 and 724 consist of emails sharing sensitive investigatory information.  Disclosure would also reveal the names of the specific individuals involved in gathering and/or providing this sensitive information, allowing inmate White or others to target these employees or their families.

95.    Bates pages 878, 879, 885, 887-889, 891, 892, 894, 895 and 897 contain the names and contact information for third parties who are associated with other third-party inmates. These individuals have a privacy interest in their personal contact information, especially since other inmates could use this information to threaten or harass these individuals directly or to relay threats to other third parties, including other inmates.

96. Bates page 921 contains the names and direct contact information of staff employed by law enforcement agencies with whom sensitive investigatory information is shared. These individuals have a privacy interest in their identities and direct contact information because disclosure would reveal that they are involved in sharing investigatory information, which may place them in the position of being targeted by inmate White or others. Providing their direct contact information would also allow these individuals to be specifically targeted for threats or harassment or even to determine if they are in the office, or elsewhere which may assist in planning an attack against these individuals or their families.

97. I determined that there was no public interest in the release of the information exempted pursuant to Exemption (6)(b) in any of these categories that would shed light on the agency's performance of its statutory duties, or on the operations and activities of the government, which would counterbalance the individuals' privacy in the information withheld. Specifically, inmate White failed to submit a public interest along with his FOIA request to counterbalance the privacy interests of the third-party individuals identified in the documents. Moreover, inmate White's claims now raised in litigation that the personal privacy of third parties is outweighed by the needs of his personal litigation or to attack his conviction do not create a public interest, and even if it did, he has not articulated how the actual names, contact information, or other personal information of third parties shed light on the Bureau's operations.

98. Every effort has been made to release all segregable information without invading the privacy interests of these third parties. The information withheld under (b)(6) has also been determined to be exempt under Exemptions (b)(7)(C) and (b)(7)(F). The information exempted under (b)(6) on Bates pages 722-724, 878, 879, 885, 887-889, 891,

892, 894, 895, 897 and 921 was inextricably intertwined with information that was

exempt under Exemptions (b)(7)(E) and/or (b)(7)(F), and therefore, could not be

segregated at this time.

## Justification for Threshold Requirement for Exemptions under 5 U.S.C. § 552(b)(7)

99.    As a threshold to applying Exemption 7, an agency has to demonstrate that the "records

or information [were] compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7).

100.   The BOP is a law enforcement agency. The term "law enforcement officer" is defined as

"an employee of the Bureau of Prisons or Federal Prison Industries, Inc." *See, e.g.*, 5

U.S.C. § 8401(17)(D)(i).    Furthermore, BOP employees perform law enforcement

functions. They possess the authority to make arrests, 18 U.S.C. § 3050; seize evidence,

18 U.S.C. § 4012; and execute searches on inmates and visitors to the institution, 28

C.F.R. §§ 511.10-511.12, 552.10-552.14.    Additionally, the BOP is tasked with the law

enforcement mission of protecting inmates, staff, and the community. *See* 18 U.S.C.

§ 4042(a)(1)-(3) ("The Bureau of Prisons, under the direction of the Attorney General,

shall (1) have charge of the management and regulation of all Federal penal and

correctional institutions; (2) provide suitable quarters and provide for the safekeeping,

care, and subsistence of all persons charged with or convicted of offenses against the

United States, or held as witnesses or otherwise; (3) provide for the protection,

instruction, and discipline of all persons charged with or convicted of offenses against the

United States . . . .").

101.   The records and materials at issue in this FOIA request meet the law enforcement

threshold of Exemption 7.    Specifically, this exemption was applied to withhold

documents contained in inmate White's official BOP records, which were compiled as

31

part of inmate White's incarceration with the BOP pursuant to its law enforcement mission of protecting inmates, staff, and the community.

**Justification for Non-Disclosure Under FOIA Exemption 5 U.S.C. § 552(b)(7)(C)**

102.   Exemption 7(C) protects from mandatory disclosure records or information compiled for law enforcement purposes to the extent that disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

103.   Exemption 7(C) was applied to withhold in part the same information described *supra* under Exemption (b)(6) and for the same privacy reasons identified under that section. Specifically, the information withheld consists of the names, register numbers, sentence information, medical status, housing status, classification assignments, and release information of third-party inmates, as well as addresses, emails, phone numbers and names of third parties and personally identifying and direct-contact information of staff.

104.   Release of this information would constitute an unwarranted invasion into the personal privacy of third-parties and could subject the individuals or their families to threats, harassment, assault or other criminal activity.  The BOP determined that there was no public interest in the release of the requested information that would shed light on the agency's performance of its statutory duties, or on the operations and activities of the government against which to weigh these individuals' privacy interest in the information.

105.   The segregability analysis applied for the application of Exemption (b)(6), *supra*, was also applied regarding information withheld pursuant to Exemption 7(C).

**Justification for Non-Disclosure Under FOIA Exemption 5 U.S.C. § 552(b)(7)(F)**

106.   Exemption 7(F) provides for the withholding of information or records compiled for law enforcement purposes, the release of which could endanger the life or physical safety of any individual.  See 5 U.S.C. § 552(b)(7)(F).

**Personal Privacy Information**

107.  Exemption 7(F) was applied to withhold the same information described *supra* for Exemption (b)(6) and for the same safety reasons identified in that section.[10]

108.  Specifically, disclosure of identifying and direct-contact information for staff, as well as third parties, would reveal information that may be used by inmates or their followers to target the individuals identified in these documents for retaliation, threats or assault. Inmate White's history of convictions for conveying threats and attempting to influence individuals substantiates the profound danger associated with releasing this personal information. *See* Exhibit A.   Most of the third parties identified in these documents are either incarcerated or work inside the institution and are responsible for the safety and security of the institution, staff, inmates and the public.  As described previously, the mission and nature of the work of employees working with inmates make them vulnerable to harassment, threats or attack.  Those working outside the institution have access to sensitive information and are also vulnerable to threats or attack.

109.  The segregability analysis applied for the application of Exemption (b)(6), *supra*, addressing the withholding of information pursuant to Exemption 6, was also applied regarding information withheld pursuant to Exemption 7(F).

**Medical Records**

110.  Exemption 7(F) was also applied to withhold information on Bates pages 1, 6, 21, 30, 44, 50, 53, 65, 70, 74, 78, 95, 110, 135, 140, 152, 153, 158, 162, 168, 173, 194, 203, 217, 222, 225, 230, 233, 238, 243, 258, 280, 289, 302, 304, 306, 309, 311, 316, 321, 327, 337,

---

[10] As noted previously, while Exemption (b)(7)(F) was not applied in the March 20, 2015 production for the information also exempted under Exemptions (b)(6) and (b)(7)(C) for Part 1(c), Administrative Torts, the failure to include this exemption was due to administrative error and is being asserted herein as an additional basis for exemption. These pages are also exempt, in their entirety, pursuant to Exemption (b)(5).

346, 361, 377, 398, 400, 409, 420, 424 and 431 of inmate White's Medical Records provided in response to Part 1(a) of his FOIA request, as well as page 1619 of the Administrative Tort Claim Records provided in response to Part 1(c) of the request.

111.  For these pages, Exemption 7(F) was applied to withhold information regarding whether inmate White has Acquired Immune Deficiency Syndrome [hereinafter "AIDS"] or tested positive for the Human Immunodeficiency Virus [hereinafter "HIV"]. Due to misconceptions associated with how HIV is contracted, including associating such inmates with drug use or homosexual activity, inmates may be pressured to provide their HIV test results to other inmates.  If the inmate refuses to provide this medical information, he may be threatened and/or assaulted; if he provides the test results, the information could also lead to his being threatened or assaulted.  Although inmate White is seeking his own medical records, the release of this information while inmate White remains incarcerated is nonetheless likely to endanger his life or physical safety if known by other individuals.

112.  Pursuant to Bureau policy, inmate White may review his HIV testing lab results locally by submitting a request to a staff member.  *See* Program Statement 1351.05, *Release of Information* [hereinafter "P.S. 1351.05"] at pp. 18-19.   And while he may not retain the results of his HIV testing while incarcerated, he may request a copy of the test results be provided to a third party outside the institution, provided the inmate gives written authorization for the disclosure.  *Id.*

113.  Every effort has been made to release all segregable information without revealing the HIV information determined to be exempt under Exemption 7(F).

**Psychology Records**

114.  Exemption 7(F) was also applied to withhold information on Bates pages 436, 437, 438, 441, 443 and 446 of inmate White's Psychology Records.

115.  For these pages, Exemption 7(F) was applied to withhold the title of a staff member who provided psychology services to inmate White on Bates pages 436, 437 and 438. The staff member's title indicates that she provides services to a class of inmates who are historically targeted for threats or assault in the correctional environment. While the staff member may provide a wide range of services unassociated with the group of inmates indicated in the position title, if inmate White retains these documents with this information included in the correctional environment, he may be subject to threats or assaults by the inmate population based on the belief that he falls within this targeted group.

116.  Exemption 7(F) was also applied to withhold information regarding whether inmate White has a sexual offense conviction or history of sexual predation in a correctional setting on Bates pages 441, 443, and 446. Similar to his HIV status in his medical records, an inmate may be pressured to provide documentation of this information. If the inmate refuses to provide this information, he may be threatened and/or assaulted; if he provides the documents, the information could also lead to his being threatened or assaulted. Although inmate White is seeking his own psychology records, the release of this information while inmate White remains incarcerated is nonetheless likely to endanger his life or physical safety if known by other individuals.

117.  Pursuant to Bureau policy, inmate White may review his psychology records locally by submitting a request to Psychology Services. *See* Program Statement 5310.07, *Psychology Services Manual* [hereinafter "P.S. 5310.07"] at p. 27.

118.   Every effort has been made to release all segregable information without revealing the information determined to be exempt under Exemption 7(F).

**Administrative Tort Claims**

119.   In addition to the application of Exemption 5 as detailed below, Exemption 7(F) was also applied to medical records relied upon by investigators and attorneys in the adjudication of inmate White's administrative claims for Bates pages 1380, 1382, 1413, 1416, 1433, 1441, 1453, 1458, 1468, 1476, 1479, 1481, 1486, 1494, 1496, 1498, 1506, 1516, 1520, 1524, 1527, 1530, 1543-1544, 1550, 1559-1560, 1566, 1569, 1575-1576, 1583, 1593, 1597 and 1619.   Exemption 7(F) was used to exclude information regarding inmate White's HIV status for the same reasons explained in Paragraphs 107-110 *supra*, addressing the application of Exemption 7(F) to inmate White's medical records.

120.   Exemption 7(F) was also applied, in addition to Exemption 5, to Bates pages 1351-1352 to withhold, in full, two pages of publications that were rejected as incoming mail for inmate White. These pages were exempted because they contain information that would indicate inmate White is affiliated with groups that may subject him to harassment, threats or assault by other inmates.  Further, these pages are race-based and incendiary in nature.  One page includes names and addresses of other inmates, and can be used to pass messages or target these inmates.  Since these publication pages were rejected and would be considered contraband in a correctional environment, permitting inmate White to obtain such materials through FOIA would jeopardize the safety and security of the institution.

121.   Every effort has been made to release all segregable information without revealing the information withheld pursuant to Exemption 7(F), however, the information was

inextricably intertwined with information that was exempt under Exemption 5, and therefore, could not be segregated at this time.

### Disciplinary Records

122.    Exemption 7(F) was also applied to Bates pages 740 through 744 in part, consisting of the DHO report for Incident Report 2062541, charging inmate White with fighting with another inmate.   In addition to the personal and identifying information and statements of third-party inmates being exempted due to threats, harassment or assault, Exemption 7(F) was also used to exempt information regarding inmate White's potential basis for administrative detention status on Bates pages 741 and 744.  The status indicates whether an inmate is in administrative detention for investigatory, administrative or safety reasons.  Since this information is included in inmate White's discipline, even if it is not true, the status could subject inmate White to threats, harassment or assault by other inmates.

123.    Bates page 722 was withheld in its entirety pursuant to Exemption 7(F).   Page 722 consists of a request for the production of inmate White by the United States Attorney's Office in a criminal matter.   These types of documents may contain information regarding whether an inmate has agreed to testify as a witness or is appearing for prosecution.  Similar to Statements of Reasons and Presentence Investigation Reports, these documents are routinely withheld because an inmate is likely to be pressured to provide the document to other inmates so they can learn whether he cooperated with the government.  If the inmate refuses to provide the document, he is likely to be threatened or assaulted; if he provides the document, the information it contains could also lead to his being threatened or assaulted.   *See* Program Statement 1351.05, *Release of Information*, at p. 15-16.

Fenstermaker Declaration for BOP          Attachment 5:  Page 37 of 59

124.    Every effort has been made to release all segregable information without disclosing the exempt information on these pages. The information withheld under Exemption 7(F) on Bates page 722 was inextricably intertwined with information withheld for other reasons, and therefore could not be segregated.   Accordingly, this page was withheld in full.

**Justification for Non-Disclosure Under FOIA Exemption 5 U.S.C. § 552(b)(7)(E)**

125.    Exemption 7(E) protects from mandatory disclosure records or information compiled for law enforcement purposes to the extent that disclosure "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

**Administrative Remedy Records**

126.    Exemptions 7(E) and 7(F) were applied to withhold information in part on Bates pages 624, 625, 637, 663, 668, 671, 673, 690, 1629, 1630, 1631, 1635, and 1636, and to withhold Bates pages 675 and 692 in full.

127.    Bates pages 624 and 637 consist of inmate profile data for inmate White, while Bates page 625 consists of inmate White's security designation data.

128.    As explained earlier, the BOP uses six different broad CIM assignments with various specific assignments under each of these six broad categories. Inmates who receive a CIM assignment are advised of their broad assignment but are not provided information concerning the specific assignment. The other internal assignments for classification and monitoring used by the BOP are not disclosed to inmates. Together, these classification and monitoring assignments are utilized within the BOP to identify inmates who have a verified need for enhanced monitoring or protection from other inmates for various reasons, including gang/disruptive group affiliations, cooperation issues, etc.

129.    The BOP will use an inmate's assignments to develop specific procedures for managing the inmate. These assignments are also utilized by the BOP to manage the inmate population to ensure one disruptive group is not overpopulated at any given institution, which could jeopardize the safety and security of that institution. Disclosure of the classification and monitoring criteria, or the assignments themselves, would reveal what types of information have been deemed relevant for monitoring and would assist criminals in evading the monitoring techniques employed by the BOP, leading to threats to the safety and security of the BOP's institutions and/or undetected criminal activity.

130.    Monitoring and classification information was exempted pursuant to (b)(7)(E) and (b)(7)(F) on Bates pages 624, 625 and 637, consisting of SENTRY printouts included in the response to inmate White's request for Administrative Remedy requests. This information is used to manage the inmate population. Disclosure would reveal what types of information have been deemed relevant for monitoring and would assist criminals in evading the monitoring techniques employed by the BOP, leading to threats to the safety and security of the BOP's institutions and/or undetected criminal activity.

131.    Bates pages 663 and 668 consist of inmate White's appeals to Central Office and the Regional Office, while Bates page 671 consists of his administrative remedy filed with the institution, all related to Remedy Number 899101. Bates pages 1631 and 1629 consist of inmate White's informal resolution form and institution remedy request related to Remedy Number 809800, while page 1630 is the Warden's response to his request. Bates Pages 1636 and 1635 consist of his informal resolution form and institution remedy request related to Remedy Number 822379.

132.    Exemptions (b)(7)(E) and (b)(7)(F) were applied to exempt information on each of these pages related to inmate White's classification, and references to information related to the

monitoring and tracking of certain information by the BOP. Disclosure of this information may reveal to the inmate population the type of information the BOP monitors and tracks, enabling inmates to avoid detection thereby endangering staff, other inmates and the public. Moreover, disclosing this information to inmate White in an institution environment may also subject him to threats, harassment or assault by other inmates based on his affiliations.

133.    Bates pages 673 and 690 consist of notices of rejection addressed to the publishers of publications that have been deemed inappropriate for entry into the institution. Information related to the basis for the rejections were withheld under Exemption (b)(7)(F) because this information may subject inmate White to threats or assault by other inmates based on the affiliations identified within the letter. Exemption (b)(7)(E) was also applied to exempt the information on Bates page 673 because it includes information used to monitor and track inmates and disclosure may be used by other inmates to avoid detection thereby endangering other inmates, the public and staff.

134.    Bates pages 675 and 692 consist of pages of a publication. These pages are inappropriate for entry into the institution based on their content and were withheld in full. Bates page 675 was withheld pursuant to Exemptions (b)(7)(E) and (b)(7)(F), while Bates page 692 was withheld under Exemption (b)(7)(F).

135.    The BOP asserted Exemption (b)(7)(E) to exempt Bates page 675 in full because it contains information used for monitoring and tracking by the BOP and to make custody and classification determinations as part of its law enforcement mandate of protecting inmates, staff, and the community. Further, disclosure of this information would inform inmate White about the sources of information as well as the types of information that

have been deemed relevant for monitoring and could assist inmate White in evading BOP's monitoring techniques used to detect and thwart criminal activity.

136.   Bates pages 675 and 692 were both withheld in full pursuant to Exemption (b)(7)(F) because they contain race-based information that would indicate inmate White is affiliated with certain groups that may subject him to harassment, threats or assault by other inmates.  Further, these publication pages are incendiary in nature and would be considered contraband in a correctional environment.  Accordingly, permitting inmate White to obtain such materials through FOIA would jeopardize the safety and security of the institution.

137.   Every effort has been made to release all segregable information without disclosing the exempt information withheld pursuant to Exemptions 7(E) and 7(F) on these pages. However, due to the nature of the publications on Bates pages 675 and 692, which depict violence and contain messages from other confined inmates, these pages were withheld in full.

**Discipline Records**

138.   Exemptions 7(E) and 7(F) were applied to withhold information in part on Bates pages 698, 699, 705, 706, 710, 711, 713, 721, 723 and 724.

139.   Bates pages 698, 705, 706, 711, 713 consists of Administrative Detention Orders. Information regarding the basis for the inmate's placement in administrative detention and the method by which this information was ascertained has been exempted on these pages pursuant to Exemptions (b)(7)(E) and (b)(7)(F). While inmates may be placed in administrative detention for various reasons, including investigation or even as a temporary holding location during transfer, inmates may also be placed in administrative detention for protective custody, indicating the inmate believes he is subject to threats or

assault by other inmates. This information has been withheld because, if revealed, inmates would be pressured to produce this information to verify whether they are in protective custody status. Inmates who are placed in administrative detention due to reporting a threat to their safety may be regarded as a "snitch" and subject to harassment or assault. The information has also been exempted because it reveals how staff ascertain the basis of threats to inmate safety, if any, and steps taken to verify such threats.

140.   Monitoring and tracking information regarding inmate White has also been exempted from some of these Administrative Detention Orders pursuant to Exemptions (b)(7)(E) and (b)(7)(F) on Bates pages 705, 706 and 711. Disclosure of this information would reveal the types of information the BOP monitors and tracks for inmate classification and custody determinations, thereby allowing inmates to avoid detection resulting in danger to other inmates, the public, and staff. Disclosure may also subject inmate White to threats, harassment or assault by other inmates.

141.   Exemptions (b)(7)(E) and (b)(7)(F) were also used to exempt information regarding inmate White's separation status included in his Special Housing Unit records on Bates pages 699 and 710. This information is exempt under (b)(7)(E) because disclosure of this information used to make custody and classification determinations would reveal a law enforcement technique or procedure used by staff as part of its law enforcement mandate of protecting inmates, staff, and the community. Further, disclosure of this information would inform inmate White about the sources of information as well as the types of conduct that have been deemed relevant for monitoring and could assist inmate White in evading BOP's monitoring techniques, thereby endangering other inmates, the public and staff. The information is also exempt under (b)(7)(F) because disclosure may

subject inmate White to threats, harassment or assault by his separatees and inmates with whom they affiliate.

142.  Bates page 721 consists of a CIM Request for Activity Clearance, which was withheld in part. This form is used to determine whether the inmate is cleared for the requested activity based on information the BOP tracks and monitors. Exemptions (b)(7)(E) and (b)(7)(F) were used to exempt the specific information used for monitoring and tracking inmates. This information is exempt under (b)(7)(E) because the BOP relies on this information for purposes of making management decisions about inmate White as part of its law enforcement mandate of protecting inmates, staff, and the community. Disclosure would inform inmate White about the sources of information as well as the types of conduct that have been deemed relevant for monitoring and could assist inmate White in evading BOP's monitoring techniques, thereby endangering other inmates, the public and staff. The information is also exempt under (b)(7)(F) because disclosure may subject inmate White to threats, harassment or assault based on his assignments.

143.  Exemptions (b)(7)(E) and (b)(7)(F) were also used to exempt information on Bates page 721 to withhold sensitive investigatory information concerning inmate White, which the BOP deemed relevant for tracking and monitoring purposes. Revealing this information would inform inmate White about the types of information the BOP finds important for monitoring and could assist inmate White in evading BOP monitoring techniques, thereby endangering other inmates, the public and staff.

144.  Bates pages 723 and 724 consist of emails sharing sensitive investigatory information among BOP staff and other staff employed by Department of Justice agencies. Information was withheld on these pages pursuant to Exemptions (b)(7)(E) and (b)(7)(F) because disclosure would reveal the types of information shared between agencies that is

deemed relevant for tracking and monitoring purposes. Disclosure would also assist inmate White, as well as other inmates, in evading monitoring techniques, thereby endangering other inmates, the public and staff. Finally, as noted under Exemption (b)(6), revealing identifying information and direct contact information for these staff members would subject them to threats, harassment or assault, especially in light of their activity of sharing sensitive information.

145. Every effort has been made to release all segregable information on these Bates pages without revealing the information withheld pursuant to Exemptions 7(E) and 7(F). The information exempt on Bates pages 723 and 724 was inextricably intertwined with information withheld pursuant to other exemptions leaving no useful, segregable information behind. Accordingly, these pages were withheld in full.

## SENTRY RECORDS

146. Exemptions 7(E) and 7(F) were also applied to withhold information in part on Bates pages 778, 779-793, 799, 800, 807, 808, and 814.

147. Bates page 778 consists of inmate White's profile information. Information used for monitoring and tracking inmates was exempted on this page pursuant to Exemptions (b)(7)(E) and (b)(7)(F). Disclosure of this information would reveal law enforcement techniques used to monitor and track inmates and could reasonably be expected to endanger the life or physical safety of the inmate and third-party individuals if disclosed because the information could subject the inmate to threats, assault or harassment, as well as endanger other inmates, the public and staff if known by the inmate because he could use the information to avoid detection.

148. Bates pages 779 through 793 consist of inmate White's intake screening forms. These forms are printed from SENTRY and then completed by BOP staff based on an interview

with the inmate. These intake forms assist BOP staff in identifying risks to the inmate, as well as other inmates, and to make determinations regarding whether placement in general population is appropriate. Exemptions (b)(7)(E) and (b)(7)(F) were used to exempt the responses to sensitive questions included on these forms, including reasons why the inmate should not be placed in general population, whether he has assisted law enforcement agents, is subject to CIMs, has testified against anyone, is a member of a gang, has ever been sexually assaulted or has a history of sexually abusive behavior.

149.   The responses to these questions are exempted because, if disclosed, inmates may be pressured to provide the intake screening forms to verify whether they have engaged in these activities and, if they refuse, they may be subject to threats or assault. On the other hand, if the inmates provide the forms, the information could also lead to them being threatened or assaulted. Accordingly, this information is consistently redacted pursuant to Exemption (b)(7)(F) to ensure inmate safety. This information was also exempted pursuant to (b)(7)(E) because the way the information is recorded would reveal a law enforcement monitoring technique, which, if disclosed, could reasonably be expected to risk circumvention of the law by allowing inmates to pressure other inmates to disclose the form.

150.   Exemption (b)(7)(F) was also used to exempt inmate White's monitoring and tracking information on page 782 as well as other information tracked for the inmate's safety in the interviewer's comments box on pages 788, 792 and 793 because disclosure of this information could subject inmate White to threats, harassment or assault by others.

151.   Bates pages 799 and 800 consist of inmate White's Security and Designation data, while Bates pages 807, 808 and 814 consist of Assignment History Reports. Information used for monitoring and tracking inmates by the BOP was withheld on these pages pursuant to

Exemptions (b)(7)(E) and (b)(7)(F).  This information is exempt under (b)(7)(E) because the BOP relies on information contained in this record for purposes of making management decisions about inmate White as part of its law enforcement mandate of protecting inmates, staff, and the community.  Further, disclosure of this information would inform inmate White about the sources of information as well as the types of conduct that have been deemed relevant for monitoring and could assist inmate White in evading BOP's monitoring techniques.  The information is exempt under (b)(7)(F) because disclosure would allow inmates to use the information to avoid detection thereby endangering other inmates, the public and staff.  Disclosure may also subject inmate White to threats or assault.

152.   Every effort has been made to release all segregable information within these documents without revealing the information withheld pursuant to Exemptions 7(E) and 7(F).

**Intelligence and Communication Records**

153.   Exemptions 7(E) and 7(F) were also applied to withhold information in part for Bates pages 869-874, and to withhold in full Bates pages 868, 875-900, 902-905, 907-910, 912-913, 915, 917-929, 959, 969-977 & 981-983 included in the records provided in response to Parts 1(f) & 1(g) seeking Intelligence and Communication Records.

154.   Bates pages 869 through 874 are Form 583 Reports of Incident involving an inmate-on-inmate fight and were withheld in part.  Exemptions 7(E) and 7(F) were used to exempt classification assignments, as well as tracking and monitoring information regarding inmate White and third-party inmates. If disclosed, this information would reveal the types of information the BOP deems important for tracking and monitoring.  Disclosure would also allow inmates to use this information to avoid detection, thereby endangering other inmates, the public and staff.  This information could also subject inmate White and

the third-party inmates to threats or harassment due to their involvement with the fight either as a suspect or witness or based on their classification information.

155.    Bates pages 868, and 878-983 were withheld in full pursuant to Exemptions 7(E) and 7(F). Bates page 868 consists of an undated page of investigative notes. This page was withheld because disclosure would reveal a law-enforcement technique used to ascertain information for monitoring and tracking purposes, as well as the type of information the BOP finds important to track. Inmates may use this information to avoid detection, thereby endangering other inmates, the public and staff. Disclosure would also subject the third parties who are referenced in the page of notes, as well as inmate White, to harassment, threats or assault by other inmates based on the content of the notes.

156.    Bates pages 875-877; 930-932; 933-944; 945-956; 957-958; and 963-965 consist of pages from various print and on-line sources used for monitoring and tracking purposes. These pages have been withheld, in full, pursuant to Exemptions 7(E) and 7(F). These records have been withheld pursuant to Exemption 7(E) because disclosure would reveal law enforcement techniques and procedures, including the type of information the BOP monitors and tracks in order to make custody and classification determinations for an inmate. If revealed, inmates may use this information to avoid detection, thereby endangering other inmates, the public and staff.

157.    These publication pages were also withheld pursuant to Exemption 7(F) because disclosure could subject the subjects identified in the publications to harassment, threats or assault based on their affiliations with certain groups. Bates pages 933-944; 945-956; 957-958; and 963-965 were also be withheld under Exemption 7(F) because these publication pages advocate race-based divisions and violence, are incendiary in nature and would therefore be considered contraband in a correctional environment.

Accordingly, permitting inmate White to obtain such materials through FOIA would jeopardize the safety and security of the institution and endanger inmates and staff committed to their protection and safety.

158.    Bates pages 901-917 and 968-981 consist of sensitive investigative information shared among law enforcement entities.  These pages have been withheld in full pursuant to Exemptions 7(E) and 7(F) because these pages consist of a monitoring and tracking technique used by law enforcement for custody and classification purposes, as well as to a means to detect threats within the correctional environment and against the community as a whole.  Disclosure of this information would reveal the type of information tracked by law enforcement and the means by which it is obtained, allowing inmates to avoid detection thereby endangering other inmates, the public and staff.  If revealed, this information would expose not only the subjects of the information to threats, harassment or assault, but also the investigators and others involved in gathering the information.  Any further description of these records would reveal the very information exempted from disclosure.

159.    Bates pages 878 through 900 consists of an internal BOP report that contains sensitive monitoring and tracking information used by the BOP to detect criminal activity and to make custody and classification determinations.  This information was withheld in its entirety pursuant to Exemptions 7(E) and 7(F).  Disclosure of this report would not only reveal the sensitive investigatory information gathered, but also the method by which the information was obtained and the specific use of the information.  If disclosed, inmates would be able to use the information to avoid detection, which could reasonably place other inmates, staff and the community as a whole in danger of criminal activity, threats or assault. Any further description of these records would reveal the very information

exempted from disclosure.

160.    Bates pages 918 through 920 is an internal BOP report of sensitive investigative information used by law enforcement as a tracking and monitoring tool to make classification and custody determinations, as well as to detect criminal activity. This information was withheld in its entirety pursuant to Exemptions 7(E) and 7(F). Disclosure of this report would not only reveal the sensitive investigatory information gathered, but also the method by which the information was obtained and the specific use of the information. If revealed, inmates would be able to use the information to avoid detection, thereby endangering other inmates, the public and staff. Disclosure would also subject inmate White to threats, harassment or assault. Any further description of these records would reveal the very information exempted from disclosure.

161.    Bates pages 921 through 928 consist of sensitive investigative information shared among law enforcement entities. These pages have been withheld in full pursuant to Exemptions 7(E) and 7(F) because this information is a monitoring and tracking technique used by law enforcement for custody and classification purposes, as well as a means to detect threats within the correctional environment and against the community as a whole. Disclosure of this information would reveal the type of information tracked by law enforcement and the means by which it is obtained allowing inmates to avoid detection, thereby endangering other inmates, the public and staff. If revealed, this information would also likely result in threats or assault against the subjects of the information, as well as the investigators and others involved in gathering or reporting the information. Any further description of these records would reveal the very information exempted from disclosure.

162.    Bates pages 929, 959 and 961 consist of memoranda between BOP staff. Bates page 929

is a memorandum from the CTU Deputy Chief to the CTU Chief, Bates page 959 is a memorandum from an SIS Technician to the Warden, while Bates page 961 is a memorandum from the SIS Technician to the Warden. These memoranda contain sensitive investigative information and were withheld in full pursuant to Exemptions 7(E) and 7(F) because they describe monitoring and tracking techniques and the information gathered from those techniques. Disclosure of this information would reveal the types of information tracked and monitored by law enforcement staff, which would allow inmates to avoid detection, thereby endangering other inmates, the public and staff. If revealed, this information could also subject inmate White to threats, harassment or assault.

163.    Bates page 960 consists of a law enforcement technique used to assist in the monitoring and tracking of inmates, while Bates page 962 is a memorandum between BOP staff discussing the technique and whether it should be applied to specific individuals. Both of these pages were withheld in full pursuant to Exemptions 7(E) and 7(F). Disclosure of this information would reveal the type of information tracked and monitored by law enforcement staff, which would allow inmates to avoid detection, thereby endangering other inmates, the public and staff. If disclosed, the individuals identified in the documents would also likely be subject to threats, harassment or assault. Any further description of these records would reveal the very information exempted from disclosure.

164.    Bates pages 966 through 967 consist of a letter between an AUSA and BOP staff regarding sensitive investigative information concerning potential criminal activity. These pages were withheld pursuant to Exemptions (b)(7)(E) and (b)(7)(F). These pages identify law enforcement investigative techniques and contain sensitive investigative information regarding inmate White. If disclosed, the AUSA and staff, as well as inmate White, could be subject to threats, harassment or assault based on the content of the

information and inmate White would be able to use the information to avoid detection, thereby endangering other inmates, staff and the public.

165.    Bates page 982 consists of an email between BOP staff sharing sensitive investigatory information in the attempt to avoid a crime of violence. This page was withheld in full pursuant to Exemptions 7(E) and 7(F). If disclosed, inmate White would be able to identify how the information was ascertained and the steps taken in response to this information. As such, disclosure would allow inmate White and other inmates to avoid detection thereby endangering inmates, staff and the public. Disclosure may also subject the staff members indentified in the emails, as well as inmate White, to threats, harassment or assault based on the content of the email.

166.    Bates page 983 also consists of an email among BOP staff regarding sensitive information regarding inmate White that was withheld, in full, pursuant to Exemptions 7(E) and 7(F). This information was relied upon by BOP staff to make custody and classification determinations for inmate White. If disclosed, inmate White would likely be subject to threats, harassment or assault by other inmates due to his affiliations. Inmate White may also use the information to avoid detection, thereby placing other inmates and the community in danger.

167.    Every effort has been made to release all segregable information without revealing the information withheld pursuant to Exemptions 7(E) and 7(F). While Bates pages 869-874 were withheld in part, the remaining Bates pages were withheld in full. Except for Bates pages 915 and 928, which were withheld in their entirety pursuant to Exemptions 7(E) and 7(F), the remaining Bates pages withheld in full were inextricably intertwined with information withheld pursuant to other exemptions leaving no useful, segregable information to disclose. No further description of these records could be provided

without revealing the information exempted from disclosure.

**MCC Chicago SHU Log Books**

168.   Exemptions 7(E) and 7(F) were also applied to withhold information in part for Bates

pages 985-1133, 1134-1237 and 1239-1276, included in the records provided in response

to Part 3 seeking MCC Chicago SHU Log Books.

169.   For Bates pages 985 through 1133, consisting of the Irregular 30-Minute Rounds Log, I

withheld the findings/status section indicating the status of the unit and documenting any

disruptions in the unit pursuant to Exemptions 7(E) and 7(F).   Disclosure of this

information would provide inmates with information regarding the frequency of

disruptions in the unit, patterns of disruptions, the types of activities staff consider

disruptive and how that information is reported.   This information was withheld under

Exemption 7(E) because it would reveal a law enforcement technique or procedure

regarding the detection and reporting of disruptive activities.   This information could be

used by inmates to avoid detection or plan escapes, assaults, or other criminal activities,

thereby endangering other inmates and staff committed to the protection and safety of the

inmates. This information was also withheld under Exemption 7(F) because it may

subject the inmates or staff identified in the log to threats or assault, especially if the

individuals are associated with a disruption.

170.   For the SHU Daily log, consisting of Bates pages 1134 through 1237, as well as the

additional twenty-seven (27) pages released in part with the June 6, 2017 release, I

withheld times activities occurred, information regarding the type and status of law

enforcement equipment passed to oncoming staff and equipment testing information

pursuant to Exemptions 7(E) and 7(F).     Disclosure of this information would reveal

staffing levels at various times of the day and patterns of activity by staff, to include

when count and general rounds take place, as well as turn-over of staff and testing of equipment. Disclosure would also reveal equipment-testing procedures and identify specific key assignments to particular areas of the institution. This information could be used by inmates to plan an escape, assault or other criminal activity, which would endanger other inmates, the public, and staff committed to the protection of the inmates and the public and security of the institution. Personal identifying information was also withheld under Exemption 7(F) because it may subject the inmates or staff identified in the log to threats or assault, especially when revealed along with specific information regarding access to keys, movement in the SHU, and other activities.

171.    Regarding the SHU sign-in log, consisting of Bates pages 1239-1276, I redacted the reason recorded for staff entering the SHU pursuant to Exemptions 7(E) and 7(F). While the reasons include benign items such as pill line, legal mail, or escort, it also includes reasons such as rounds, interviews, key testing for specific doors, lock checks, and suicide watch. Disclosure of this information would reveal patterns of activity by staff, to include when and how often specific locking mechanisms are checked, when rounds are made, and other activities. It may also be used by inmates to verify whether inmates were cooperating with staff, especially if the inmates were in the unit at that time. This information could be used by inmates to plan an escape, assault or other criminal activity, which would endanger other inmates, the public, and staff committed to the protection of the inmates and the public and security of the institution. Personal identifying information was also withheld under Exemption 7(F) because it would reveal specific duties by specific staff members, thereby subjecting them to threats, harassment or assault, especially if it is correlated with their activities in the SHU, such as conducting investigations or interviews.

172.    Every effort has been made to release all segregable information without revealing the information withheld pursuant to Exemptions 7(E) and 7(F).

**Justification for Non-Disclosure Under FOIA Exemption 5 U.S.C. § 552(b)(5)**

173.    Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *See* 5 U.S.C. § 552(b)(5).  This language has been construed to exempt documents that are normally privileged in the civil discovery context.  Of the litigation privileges generally available to the BOP, the attorney work-product privilege and deliberative process privilege are applicable to inmate White's FOIA request.

174.    Regarding Part 1(c) of inmate White's request seeking Administrative Tort Claims, the "inter-agency or intra-agency" threshold is met as the withheld documents consist of memoranda, email and supporting documentation between BOP attorneys, and other BOP staff members.  All of these individuals are within the Department of Justice, and therefore, the intra-agency threshold is satisfied.

Attorney Work Product Privilege

175.    To qualify for the work product privilege, a document must have been created by or at the direction of an attorney in anticipation of litigation.  The litigation anticipated need not be imminent, as long as the motivating factor behind the creation of the document was to aid in possible future litigation.  The work product doctrine shields materials "prepared in anticipation of litigation or for trial by or for [a] party or by or for that . . . party's representative (including the . . . party's attorney, consultant, . . . or agent)." Fed. R. Civ. P. 26(b)(3).

176.    The BOP invoked exemption 5 and the attorney-work product privilege to withhold staff memoranda containing the recommendations for each tort claim adjudication, and the tort

claim investigations containing the investigators' notes, interviews, supporting documentation and recommendations in connection with the adjudication of inmate White's administrative claims, all of which were requested at the direction of BOP legal counsel. These documents are requested by BOP counsel in anticipation of litigation because filing an administrative claim with the relevant federal agency and having that claim denied in writing is a jurisdictional prerequisite to suit under the Federal Tort Claims Act. *See* 28 U.S.C. §2675(a).

177.    Documents addressing the investigation and recommendation for administrative claims TRT-NCR-2009-04854; TRT-NCR-2016-02696; TRT-NCR-2016-05547; TRT-NCR-2017-00878; TRT-NCR-2017-01631; and TRT-NCR-2017-06769 consists of Bates pages 1279-1291; 1292-1307; 1308-1338; 1339-1553; 1354-1605; and 1606-1628, respectively. Of these Bates pages, the attorney work product privilege, through Exemption 5, was applied to withhold, in full, Bates pages 1277; 1279; 1281-1288; 1292; 1302; 1304-1306; 1308; 1312; 1314-1337; 1339; 1342; 1344-1352; 1354; 1373; 1375-1576; 1578-1588; 1590-1602; 1604-1606; 1610; 1612-1627.

Deliberative Process Privilege

178.    The deliberative process privilege is applied if the communication was pre-decisional and deliberative. This privilege exists to prevent injury to the quality of agency decisions. For a document to be covered by the deliberative process privilege, two requirements must be satisfied. First, it must be pre-decisional. Second, the document must be deliberative in nature—that is, it must be a direct part of the deliberative process in that it makes recommendations or express opinions on legal or policy matters. The exemption covers recommendations, draft documents, proposals, analyses, suggestions, discussions, and other subjective documents that reflect the give-and-take of the consultative process.

179.   The investigative documents, comprised of staff memos, emails and documents ultimately provided to BOP legal counsel for adjudication of inmate White's tort claims and were redacted pursuant to Exemption 5 because release of the information would inhibit the open and frank communications between government employees, which is speculative or part of the deliberative process, and is not discoverable in litigation proceedings.

180.   The deliberative process privilege, through Exemption 5, was applied to withhold, in full, Bates pages 1281, 1282; 1323-1325; 1344-1346; 1375; 1377-1378; 1604-1605; and 1612-1614.

Description of Documents Withheld under these Privileges

181.   Bates pages 1277, 1292, 1308, 1339, 1354 and 1606 were withheld under the attorney work-product privilege. These documents consist of the Case Details page for each of the administrative claims, which includes information regarding the classification of the claim, a description of the claim and tracking information, as well as information regarding the resolution of the claim, to include the type of resolution (i.e., settlement or denial), the reason for the resolution, and, if applicable the type of relief offered.

182.   Bates pages 1279, 1302, 1312, 1342, 1373, and 1610 were withheld under the attorney work-product privilege and consist of memoranda in each of the administrative claims from the BOP regional counsel to the responsible CLC attorney identifying the claim, seeking an investigation and identifying the criteria and factors to consider as a part of the investigation.

183.   Bates page 1288 was withheld under the attorney work-product privilege and consists of a memorandum from the responsible CLC attorney to the Captain requesting an investigation into the claim and describing the scope and criteria of the investigation

requested.  Bates pages 1282, 1305-1306 and 1323-1325 were withheld under the attorney work-product and deliberative process privileges and consist of memoranda from Bureau staff to the responsible CLC attorney outlining inmate White's claims, the method of investigation, the results of the investigation and the recommendation from investigating staff to the attorney regarding the disposition of the claim based on the investigation.

184.  Bates page 1281, was withheld under the attorney work-product and deliberative process privileges and consists of a memorandum from the CLC attorney to the Warden recommending the disposition of the claim and analyzing the issues and contours of the claim, the results of the investigation, and the materials upon which the investigation and attorney relied.

185.  Bates pages 1314-1315 were withheld under the attorney work-product privilege and consist of emails between the CLC attorney and BOP staff in which the CLC attorney adjudicating inmate White's administrative claim is seeking additional information regarding certain facts associated with inmate White's claim.  Bates pages 1326-1327 was also withheld under the attorney work-product privilege and consist of emails between BOP staff seeking additional information as part of the investigation of inmate White's administrative claim.

186.  Bates pages 1604 and 1605 were withheld under the attorney work-product and deliberative process privileges.  Bates page 1604 consists of an email between the CLC attorney and a regional office paralegal discussing a legal theory regarding the claim, while page 1605 is an email from the CLC paralegal to the regional paralegal also referencing the legal theory to consider in determining the claim. The attorney work-product and deliberative process privileges were also applied to withhold Bates pages

1613 and 1614, which consist of emails between BOP staff discussing ideas regarding the resolution of the claim, as well as providing information requested as part of the investigation of inmate White's administrative claim.

187.    The following Bates pages were withheld under the attorney work-product privilege and consist of documentary evidence included in the investigations conducted by BOP staff at the direction of the CLC attorney and used as a basis in forming the recommendation regarding the determination of the claims: 1316-1322 (authorization and property sheet forms); 1328-1330 (UPS tracking information); 1332-1337 (property sheets); 1347-1348 (letters from the Warden to publishers); 1349-1350 (administrative remedy responses); 1351-1352 (publications); and 1376, 1379-1576, 1578-1588, 1590-1602; and 1615-1627 (medical records).

188.    Bates pages 1331, 1345-1346, 1377-1378, and 1612 were withheld under the attorney work-product privilege, while pages 1345-1346, 1377-1378, and 1612 were also withheld under the deliberative process privilege.   These pages consist of memoranda between BOP staff in response to the CLC attorney's request for investigation and for ultimate submission to the CLC attorney providing information pertaining to inmate White's claims.   Bates pages 1345-1346, 1377-1378, and 1612 also include recommendations regarding adjudication of inmate White's claims based on those investigations.

189.    Bates pages 1344, 1375 were withheld under the attorney work-product and deliberative process privileges and consist of memoranda from the Warden to the Regional Counsel recommending the disposition of the administrative claims based on the investigation.

190.    While a general description of the categorization of these documents has been provided, further detail regarding these documents would provide insight into the specific information relied upon and found important by the CLC attorney when investigating the

claims, analyzing applicable law and in making his or her final determinations regarding inmate White's claims or into the recommendations provided regarding the disposition of these claims.  Moreover, the information withheld under Exemption 5 was inextricably intertwined with information that was withheld pursuant to other exemptions and therefore, could not be segregated at this time.

I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this _11th_ day of June 2018.


Erika Fenstermaker
FOIA/PA Technician
North Central Regional Office
Kansas City, Kansas

59