UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

WILLIAM A. WHITE,

              Plaintiff,

      v.

DEPARTMENT OF JUSTICE, FEDERAL
BUREAU OF INVESTIGATION, UNITED
STATES MARSHALS SERVICE,
FEDERAL BUREAU OF PRISONS and
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

          Defendants.

Case No. 16-cv-948-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on plaintiff William A. White's Consolidated Third Motion for Summary Judgment (Doc. 90) and defendant Department of Justice's ("DOJ") Cross Motion for Summary Judgment (Doc. 98).   The parties have responded to each other's motions (Docs. 95 & 108), and White has replied to the DOJ's response (Doc. 113).

**I.**    **Background**

White brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.[1]   He alleges that the Federal Bureau of Investigations ("FBI"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the United States Marshals Service ("USMS"), and the Federal Bureau of Prisons ("BOP") did not respond properly to some of his requests for information under the FOIA.   Specifically, White's claims fall into three categories:

---

[1]  White also cites the Privacy Act, 5 U.S.C. § 552a, which grants individuals a right of access to information about themselves.   In incorporates some FOIA requirements by providing that federal agencies may not disclose records except pursuant to written request or consent of the person to whom the record pertains unless one of several listed conditions are met, one of which is that the FOIA requires disclosure.   5 U.S.C. § 552a(b)(2).

- the agencies "administratively defaulted" because they failed to respond to his requests at all, failed to respond within the time periods set forth in the FOIA, or exceeded the permitted requests for clarification from the requesting party;

- the agency incorrectly denied having responsive records; and

- the agency improperly withheld responsive records pursuant to two statutory exemptions—Exemptions 6 and 7(C)—regarding invasion of personal privacy.

Am. Compl. (Doc. 25 at 9-10).   The Court granted summary judgment for the DOJ on White's claims involving two requests; all of his other claims remain pending and are the subject of the pending cross motions for summary judgment.

## II.   Legal Standards

### A.   <u>Summary Judgment Standard</u>

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).   The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

The initial summary judgment burden of production is on the moving party to show the Court that there is no reason to have a trial.   *Celotex*, 477 U.S. at 323; *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).   Where the non-moving party carries the burden of proof at trial, the moving party may satisfy its burden of production in one of two ways.   It may present evidence that affirmatively negates an essential element of the non-moving party's case, *see* Fed. R. Civ. P. 56(c)(1)(A), or it may point to an absence of evidence to support an essential

element of the non-moving party's case without actually submitting any evidence, *see* Fed. R.

Civ. P. 56(c)(1)(B).   *Celotex*, 477 U.S. at 322-25; *Modrowski*, 712 F.3d at 1169.   Where the

moving party fails to meet its strict burden, a court cannot enter summary judgment for the

moving party even if the opposing party fails to present relevant evidence in response to the

motion.   *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest

upon the allegations contained in the pleadings but must present specific facts to show that a

genuine issue of material fact exists.   *Celotex*, 477 U.S. at 322-26; *Anderson*, 477 U.S. at 256-

57; *Modrowski*, 712 F.3d at 1168.   A genuine issue of material fact is not demonstrated by the

mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247,

or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 (1986).   Rather, a genuine issue of material fact exists only if

"a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented."

*Anderson,* 477 U.S. at 252.

     B.    <u>The FOIA</u>

         1.    <u>Purpose</u>

The Seventh Circuit Court of Appeals has described the FOIA generally:

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the
functioning of a democratic society, needed to check against corruption and to
hold the governors accountable to the governed."   *NLRB v. Robbins Tire &
Rubber Co.,* 437 U.S. 214, 242, 98 S. Ct. 2311, 57 L.Ed.2d 159 (1978).   Toward
that end, FOIA provides that agencies "shall make ... records promptly available
to any person" who submits a request that "(i) reasonably describes such records
and (ii) is made in accordance with [the agency's] published rules."   5 U.S.C.
§ 552(a)(3)(A).   The Act is "broadly conceived," and its "basic policy" is in
favor of disclosure.   *Robbins Tire,* 437 U.S. at 220, 98 S. Ct. 2311.   Agencies
are, however, permitted to withhold records under nine statutory exemptions and
three special exclusions for law-enforcement records.   *See* 5 U.S.C. § 552(b)-(c).

*Rubman v. U.S. Citizenship & Immigration Servs.*, 800 F.3d 381, 386 (7th Cir. 2015).

In creating the exemptions to FOIA disclosure, "Congress sought 'to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess., 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423).   "But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act."   *Dep't of the Air Force v. Rose,* 425 U.S. 352, 361 (1976).   Therefore, the Court must narrowly construe the exemptions, *id.*, and the agency bears the burden of showing they apply, 5 U.S.C. § 552(a)(4)(B).   *John Doe Agency*, 493 U.S. at 152.   In reaching its decision, the Court should take a practical approach to achieving the balance sought by Congress.   *Id.* at 158.

### 2.   FOIA Request

To establish a cause of action under the FOIA, a plaintiff must show that, in response to a valid FOIA request, "an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'" *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150 (1980) (quoting 5 U.S.C. § 552(a)(4)(B)).   A valid FOIA request reasonably describes the records if the agency can determine exactly what records are being requested.   5 U.S.C. § 552(a)(3)(A); *Kowalczyk v. DOJ*, 73 F.3d 386, 388 (D.C. Cir. 1996).   "A reasonable description of records is one that would allow an agency employee to locate the records 'with a reasonable amount of effort.'" *Moore v. FBI*, 283 F. App'x 397, 398 (7th Cir. 2008) (quoting *Marks v. USDOJ,* 578 F.2d 261, 263 (9th Cir. 1978)).   A request seeking all records relating to a subject may not satisfy this standard and therefore may not trigger the agency's obligation to search for records.   *See*

4

*Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 61-62 (D.D.C. 2013).   The request

must also be made in compliance with the agency's rules on the time, place, fees, and procedures

for making such a request.   5 U.S.C. § 552(a)(3)(A).

### 3.   Search for Records

Agency records may be found to be improperly withheld if the agency failed to make "a

good faith effort to conduct a search for the requested records, using methods which can be

reasonably expected to produce the information requested."   *Rubman v. U.S. Citizenship &*

*Immigration Servs.*, 800 F.3d 381, 387 (7th Cir. 2015) (internal quotations omitted); *accord*

*Stimac v. USDOJ*, 991 F.2d 800, 1993 WL 127980, at *1 (7th Cir. 1993) (Table) (search must be

"reasonably calculated to uncover all relevant documents"); *In re Wade*, 969 F.2d 241, 249 n. 11

(7th Cir. 1992) (question is whether search was "reasonably calculated to uncover all relevant

documents").   The agency need not search all of its record systems, but only systems where

responsive information is likely to be found, although it should explain why it believes such

limits are reasonable.   *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

"Good faith is presumed . . ., and it can be bolstered by evidence of the agency's efforts to satisfy

the request."   *Rubman*, 800 F.3d at 387 (internal citation omitted).

At the summary judgment stage, such information normally comes in the form of a

"reasonably detailed nonconclusory affidavits submitted in good faith."   *In re Wade*, 969 F.2d

at 249 n. 11.   The plaintiff may overcome the presumption of good faith by presenting

"countervailing evidence as to the adequacy of the agency's search."   *Rubman*, 800 F.3d at 387

(internal quotations omitted); *see Carney v. USDOJ*, 19 F.3d 807, 813 (2d Cir. 1994) (bare

allegations and speculation insufficient to overcome presumption).   Importantly, "[t]he issue is

*not* whether other documents may exist, but rather whether the search for undisclosed documents

was adequate."   *In re Wade*, 969 F.2d at 249 n. 11 (emphasis in original); *accord Rubman*, 800

F.3d at 387.   Furthermore, "speculation that other documents might exist that are possibly

responsive to the request is insufficient to overcome summary judgment."   *Ferranti v. ATF*, 177

F Supp. 2d. 41, 48 (D.D.C. 2001), *aff'd*, No. 01-5451, 2002 WL 31189766 (D.C. Cir. Oct. 2,

2002).

4.   <u>Exemptions</u>

Records may also be found to have been improperly withheld if the agency misapplies a

statutory exemption.   *See, generally, Solar Sources, Inc. v. United States*, 142 F.3d 1033 (7th

Cir. 1998) (reviewing the application of certain exemptions).   As with the question of the

adequacy of a search, to satisfy its burden of showing an exemption applies, the agency must

"provide detailed justification for its claim of exemption, addressing the requested documents

specifically and in a manner allowing for adequate adversary testing."   *Antonelli v. DEA*, 739

F.2d 302, 303 (7th Cir. 1984).   "[T]he agency has the initial burden of demonstrating why it

should not disclose the information."   *Antonelli v. FBI*, 721 F.2d 615, 617 (7th Cir. 1983) (citing

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974)).   If the

agency meets its burden and there is a public interest in disclosure, the Court will balance the

agency's reasons for withholding documents against that public interest.   *Antonelli v. FBI*, 721

F.2d at 617.

The statutory exemptions relevant to this lawsuit are commonly known as Exemptions 6

and 7(C).[2]   Those provisions exempt the following from disclosure:

(6) personnel and medical files and similar files the disclosure of which would constitute

---

[2]   These are the only two exemptions to which White objects in the Amended Complaint and are
therefore the only two exemptions within the scope of this case.   Am. Compl. (Doc. 25 at 9).
However, because both parties have cited other exemptions, the Court will also address other
exemptions in the appropriate sections of this order.

a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . .

5 U.S.C. § 552(b).

As for Exemption 6, the Supreme Court has construed it as not limited "to a narrow class of files containing only a discrete kind of personal information.   Rather, '[t]he exemption [was] intended to cover detailed Government records on an individual which can be identified as applying to that individual.'"   *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982) (quoting H.R. Rep. 89-1497, at 11 (1966), 1966 U.S.C.C.A.N. 2428).   When an individual can be identified, the Court must ask whether disclosure of that information would constitute a clearly unwarranted invasion of personal privacy.   *Washington Post*, 456 U.S. at 602.   The Court then balances the privacy interest against any public interest in the disclosure of the requested records.   *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991).   Courts have found the exemption to apply to agent names and other file classification information.   *Shapiro v. USDOJ*, 293 F. Supp. 3d 99, 118 (D.D.C. 2018) (file classification information could be used to "uncover certain private information, such as the existence of an individual's employment status or investigation, the type and nature of employment or investigation, the geographical area of the matter, and potentially the extent of someone's career with the FBI or amount of information obtained by the FBI"), *rev'd on other grounds in part, vacated in part*, 944 F.3d 940 (D.C. Cir. 2019).

Exemption 7(C) similarly protects personal information from disclosure and is often asserted along with Exemption 6.   The "reasonably be expected" language in Exemption 7(C) potentially reaches more broadly than Exemption 6, which speaks of disclosure that "would

7

constitute" a privacy invasion.    Under Exemption 7(C), the Court also balances an individual's privacy interest with the public's interest in disclosure.    *Higgs v. U.S. Park Police*, 933 F.3d 897, 904 (7th Cir. 2019).    Once the agency shows a protected privacy interest, the person seeking the disclosure bears the burden of demonstrating a significant public interest.    *Id.*

     5.    *Glomar* Response

In the event even acknowledging whether responsive records exist would jeopardize the interests sought to be protected by FOIA exemptions, the agency may respond with a "Glomar response."[3]   *See Bassiouni v. CIA*, 392 F.3d 244, 246-47 (7th Cir. 2004); *Antonelli v. FBI*, 721 F.2d at 617.    For example, where a requester asks for documents concerning a law enforcement confidential source, an agency's confirming that a file on the individual exists and that it is exempt under the exemption for information that could expose the identity of a confidential source, 5 U.S.C. § 552(b)(7)(D), could lead the requester to deduce that the individual is a confidential source.    *Antonelli v. FBI*, 721 F.2d at 618.    Similarly, "revealing that a third party has been the subject of FBI investigations is likely to constitute an invasion of that person's privacy that implicates the protections of Exemptions 6 and 7," and it could jeopardize valuable FBI investigations by identifying FBI informants and ongoing investigations.    *Id.*    Indeed, the Supreme Court has held "as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy."    *USDOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 780 (1980).

A Glomar response neither confirms nor denies that responsive records exist.    *Bassouni*,

---

[3]  So named after "the *Hughes Glomar Explorer,* a ship built (we now know) to recover a sunken Soviet submarine, but disguised as a private vessel for mining manganese nodules from the ocean floor.   See *Phillippi v. CIA,* 546 F.2d 1009 (D.C. Cir. 1976)."  *Bassouni v. CIA*, 392 F.3d 244, 246 (7th Cir. 2004).

392 F.3d at 246-47; *Antonelli v. FBI*, 721 F.2d at 617-18.   However, when the interest to be protected is an individual's privacy interest, the agency may not use a Glomar response if the requester provides a waiver from the individual, proof that the individual is dead, or a showing that the public interest outweighs the individual's privacy interest.   *See, e.g., Donato v. Exec. Office for U.S. Attys.*, 308 F. Supp. 3d 294, 306 (D.D.C. 2018) (acknowledging FBI policy not to issue Glomar response to FOIA request seeking third party information where "the requester submits a privacy waiver or proof of death, or demonstrates an overriding public interest in disclosure.").

"[T]he plaintiff can overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect."   *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013); *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007).   This rule applies where the FBI has officially acknowledged a connection between the individual and the FBI such as, for example, when the individual was called as a government witness at trial and identified as an FBI informant.   5 U.S.C. § 552(c)(2) (criminal informant records not subject to FOIA unless informant has been "officially confirmed"); *see Pickard v. DOJ*, 653 F.3d 782, 786 (9th Cir. 2011); *Boyd v. Criminal Div. of USDOJ*, 475 F.3d 381, 388 (D.C. Cir. 2007).   Where the existence of a relationship between the FBI and the individual—and logically the existence of records regarding the individual—has been officially recognized—the FBI can no longer rely on a *Glomar* response.   *Pickard*, 653 F.3d at 786.

Three things are required to establish official acknowledgement by an agency:   "First, the information requested must be as specific as the information previously released.   Second, the information requested must match the information previously disclosed. . . .   Third, . . . the

information requested must already have been made public through an official and documented disclosure." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990); *accord Wolf*, 473 F.3d at 378. Further, a prior disclosure by a *different* agency does not waive the right of a responding agency to make a *Glomar* response, although it may bear on the merits of asserting such a response. *Florez v. CIA*, 829 F.3d 178, 186 (2d Cir. 2016).

6.    Summary Judgment in FOIA Cases

An agency can carry its burden on summary judgment by submitting affidavits that "(1) describe[s] the withheld documents and the justifications for non-disclosure with reasonably specific detail, (2) demonstrate[s] that the information withheld falls logically within the claimed exemption, and (3) are not controverted by either contrary evidence in the record or by evidence of agency bad faith." *Kimberlin v. Dep't of Treasury*, 774 F.2d 204, 210 (7th Cir. 1985) (internal quotations omitted); *accord ACLU v. USDOD*, 628 F.3d 612, 619 (D.C. Cir. 2011). The agency is entitled to a presumption of good faith which cannot be rebutted by mere speculation. *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see In re Wade*, 969 F.2d 241, 246 (7th Cir. 1992). Courts must give substantial weight to an agency's affidavit. *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013). The Court has discretion to review documents or an index of withheld documents (a "*Vaughn* index") *in camera* but is not required to do so where the agency has submitted a sufficient affidavit. *Kimberlin*, 774 F.2d at 210; *Antonelli v. DEA*, 739 F.2d 302, 303-04 (7th Cir. 1984). "Ultimately, an agency's justification for invoking a FOIA exemption, whether directly or in the form of a *Glomar* response, is sufficient if it appears logical or plausible." *ACLU v. CIA*, 710 F.3d at 427 (internal quotations omitted).

7.     Judicial Relief

If an agency has improperly withheld agency records, the Court has the power "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."   5 U.S.C. § 552(a)(4)(B).   The Court is not inclined, however, order wholesale production of all documents requested without regard to exemption eligibility.   Such an approach, which appears to be what White seeks, "would eviscerate the many and genuine concerns underlying the FOIA exemptions," *Caifano v. Wampler*, 588 F. Supp. 1392, 1394 (N.D. Ill. 1984), and would utterly fail to achieve the balance between disclosure and privacy Congress intended to achieve through the FOIA.

8.     Costs

The FOIA provides that the Court may assess costs against the United States if the complainant under the act substantially prevails in the action.   *See* 5 U.S.C. § 552(a)(4)(E)(i). A *pro se* plaintiff, however, may only recover costs, not attorney's fees, since he had no attorney. *De Bold v. Stimson*, 735 F.2d 1037, 1042-43 (7th Cir. 1984).   A plaintiff may substantially prevail, and thus be eligible for a fee or cost award, either by a judicial order, enforceable written agreement, or consent decree or by a voluntary or unilateral change in the agency's position if the complainant's claim is not insubstantial.   5 U.S.C. § 552(a)(4)(E)(ii).   In order to be eligible because of a voluntary agency change, the plaintiff's lawsuit must have been a catalyst for—that is, it must have had a "substantial causative effect" on—the voluntary agency change.   *First Amendment Coal. v. USDOJ*, 878 F.3d 1119, 1128 (9th Cir. 2017).   The plaintiff carries the burden of proving he substantially prevailed under the foregoing standard, *Pyramid Lake Paiute Tribe v. USDOJ*, 750 F.2d 117, 119 (D.C. Cir. 1984), and he does not carry this burden simply by showing documents were released after a lawsuit was filed.   *First Amendment Coal.*, 878

11

F.3d at 1128; *Calypso Cargo Ltd. v. U.S. Coast Guard*, 850 F. Supp. 2d 1, 4 (D.D.C. 2011), *aff'd*,

No. 12-5165, 2012 WL 10236551 (D.C. Cir. Nov. 1, 2012).   Even if the plaintiff substantially

prevails, the Court has discretion as to whether he should be awarded fees or costs.   *See Morley*

*v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 2756 (2019).

      C.     Parties' Positions

          1.     Defendant

As a preliminary matter, the DOJ contends White's claims are frivolous because they

seek records White wants in order to support an imagined, non-existent government conspiracy

to prevent individuals from exercising their First Amendment rights.[4]

The Court starts with the DOJ's arguments because it carries the initial burden of

showing its agencies' searches were reasonable and their claims of exclusions justified.   The

Court has stated the arguments in general terms but will discuss the specifics with respect to

White's specific requests.   Additionally, the DOJ asks the Court to disregard portions of

White's declaration (Doc. 90, pp. 8-13) because they are not based on personal knowledge,

contain inadmissible hearsay, or are irrelevant to the issues in the case.

          a.     Proper Request

The DOJ contends that White's requests directed to the ATF, FBI and USMS for

information about certain groups of people are not proper requests.   As noted above, a proper

request must " (i) reasonably describe[] such records and (ii) [be] made in accordance with

---

[4]  The DOJ criticizes the Court for failing to screen White's case for under 28 U.S.C.
§ 1915A(a).   However, although the Court did not expressly mention § 1915A, before it
allowed him to proceed *in forma pauperis* under § 1915(a), it implicitly considered whether
White's pleading was subject to dismissal under § 1915(e)(2)(B) because it was frivolous,
malicious, or failed to state a claim.   The Court concluded it was not subject to dismissal for
those reasons—the same criteria for review under § 1915A(b).

published rules stating the time, place, fees (if any), and procedures to be followed."   5 U.S.C. § 552(a)(3)(A).   Specifically, the DOJ argues the requests do not reasonably describe the records sought because they are overbroad and would require unreasonably burdensome search efforts.   Additionally, some of the requests to the USMS are not described in a way that is compatible with its search mechanisms.[5]

> b.   <u>Adequate Search</u>

The DOJ contends that, with respect to a number of White's requests to the FBI for information about groups, the FBI made good faith, reasonable efforts to locate information but found no responsive records.   It notes White's argument that the searches must have been inadequate because he is sure responsive documents exist, but contends that White's position is based on speculation and/or hearsay.   The FBI further construed a request for information relating to a specific address as implicating privacy interests for which White offered no countervailing public interest in disclosure.

With respect to White's request to the ATF for information about himself, the agency disclosed only one document.   The DOJ notes White's argument that the ATF has targeted him in the past so must have investigative records, but argues that White's belief is speculative, and certainly not enough to outweigh evidence from the agency that it has no other responsive records.

---

[5]  The DOJ notes that White's claim against the ATF complains of its response to a request for information about the American National Socialist Workers Party, but his FOIA request does not request information about this group.   Because there is no genuine issue of material fact about whether the ATF responded appropriately to a request not made, the DOJ is entitled to summary judgment on this claim.

c.   Exemptions

i.   Third Parties

The DOJ argues that White's FOIA requests about third parties are exempt from disclosure because of the privacy interests involved and/or because they are related to law enforcement purposes.   It believes White's assertion of an overriding public interest is pure speculation.   The DOJ also maintains that some information about a number of third parties that appears in various public sources has not been officially acknowledged by the agency.   Some of the agency responses have been *Glomar* responses, which the DOJ believes are justified.   With respect to one individual, David Lynch, the FBI is apparently satisfied that he is deceased and is producing responsive records to White on a rolling basis.

ii.   Law Enforcement

The DOJ argues the FBI's claims of exemption as personnel and law enforcement records are appropriate.   Nevertheless, the agency is reviewing its prior claims of exemptions *de novo* in response to White's complaints about the documents withheld or redacted.   It argues that the preparation of a *Vaughn* index would be premature until the review process is complete and that Court intervention is inappropriate in this ongoing process.

iii.   Other Exemptions

The DOJ offers detailed explanations why the BOP withheld certain information from White under Exemptions 5, 6 and 7.   *See* 5 U.S.C. § 552(b)(5), (6), (7)(C), (7)(E) and (7)(F).

d.   Ongoing Searches

With respect to fourteen requests, the FBI is processing responsive records to White on a schedule of approximately 500 pages per month on a rolling basis.   The DOJ argues that this is a reasonable schedule in light of the fact that there are approximately 100,000 responsive pages

that must be reviewed for exemption and/or redaction before they are released and that the Court should not intervene with the ongoing production.

With respect to White's 2013 request to the USMS for information about himself, the DOJ states that the request fell through the cracks because of a death, a resignation, and the inadvertent failure to reassign the matter.   It is now processing White's request, along with his 2016 request, and, at the time of briefing, it anticipated a response within a month.

The DOJ further contends White is not entitled to a Court order directing expedited processing of his requests.

e.   <u>Summary</u>

In sum, the DOJ asks for summary judgment in its favor based on White's requests to the FBI, ATF and BOP on the grounds that the declarations from the respective agencies show the agencies conducted a thorough search in response to all proper requests that was reasonably calculated to uncover responsive documents and provided a detailed explanation why withheld information falls within one or more exemptions.   With respect to White's requests to the USMS, the DOJ contends it is entitled to summary judgment because an adequate search was done or is ongoing.

2.   <u>Plaintiff</u>

White believes his requests serve the public interest because the DOJ has created and used "a network of notional 'white supremacist extremist' groups in a long running counter-intelligence, and, disruption, operation that targeted both American political dissidents, and, foreign nations."   Pl's Mot. Summ. J. ¶ 1(a).   He believes these operations involved "the commission of violent crimes, and, obstruction of justice," *id.* at ¶ 1(b), and "other wrongful activity," *id.* at ¶ 1(c), and resulted in framing him for the crimes of which he was convicted, *id.*

15

at ¶ 1(d).    White contends that the DOJ's denial of any public interest in disclosing the records he seeks is faulty in light of this theory of government malfeasance.    The public, he contends, has an interest in knowing about this misconduct, as evidenced by various attachments to his motion containing books, internet pages, and print articles mentioning the subjects of his requests.

With respect to searches for which no records were found, White argues that information in the public domain—such as, for example, information appearing in news publications—provides evidence that those searches performed were inadequate for failing to identify responsive records.    He also believes that some responsive information has been officially disclosed and preserved in a public record, so the agencies can no longer withhold information on the basis of a FOIA exemption or give a *Glomar* response.    Finally, he points to the public's demonstrated interest in the subjects of his requests to establish a public interest in disclosure.

He further contends that the DOJ has waived any justification for refusing to disclose records where the agency did not assert the currently claimed exemptions in its answer, which essentially incorporates the agency's response at the administrative level, or in its earlier motions for summary judgment.

White argues he has substantially prevailed in this litigation because, even before the Court issues its final ruling, this lawsuit is a catalyst to relief, that is, it caused the agencies to disclose records to him which they were not previously inclined to disclose.    He points to several "no records" responses that an agency revisited when White provided further information or asked for a different kind of search, only to find numerous responsive records.    He further contends he is entitled to costs as a prevailing party because the agencies have behaved in bad faith by failing to promptly process his requests and by withholding records from him without a

16

valid legal basis.   He also contends he is a member of the media so the processing fees for his requests should be waived.

As for the agencies' responses to the requests themselves, White makes the following challenges in his summary judgment motion:

- the FBI's schedule for releasing documents for which searches are ongoing is too protracted;

- the ATF and FBI wrongfully failed to identify responsive records White believes must exist;

- the USMS wrongfully failed to disclose any records about White after identifying responsive records;

- the USMS wrongfully failed to locate any records about groups;

- the ATF unjustifiably asserted that White's requests did not reasonably describe the records he seeks;

- the agencies wrongfully made *Glomar* responses to requests for records about individuals where information had been publicly disclosed or officially acknowledged; and

- the BOP unjustifiably claimed certain exemptions.

**III.    Analysis**

A.    <u>Procedural Issues</u>

The Court first addresses general arguments made by the parties.   It then addresses White's requests by agency, setting forth in each subsection the substance of the request, the agency's response, White's objection to that response, and the Court's analysis of the response.

1.    <u>Frivolity</u>

The DOJ argues that White's requests are frivolous because his allegations of nefarious government activities are fanciful and that this lawsuit is sanctionable.   The Court does not disagree that some of White's beliefs underlying his contention that there is a public interest in

17

the release of certain records are fanciful.   However, White is entitled, as is any other citizen, to request records under the FOIA.   As set forth below, to the extent those requests are unduly burdensome, they need not lead to searches or releases of records.   To the extent an agency has prioritized the release of responsive records on a timetable reflective of the frivolity of the asserted underlying public interest, the Court will not disturb that release schedule.   That being said, White is warned that if he bases any future FOIA requests on a public interest that has as little evidentiary support as the public interest he asserts in this case, the Court may construe them as frivolous or harassing and will consider summary dismissal and sanctions.   *See Hoskins v. Poelstra*, 320 F.3d 761, 763 (7th Cir. 2003) ("District judges have ample authority to dismiss frivolous or transparently defective suits spontaneously, and thus save everyone time and legal expense.")

> 2.   Three Strikes

The DOJ also asks the Court to dismiss White's lawsuit because he has accumulated three strikes under the Prison Litigation Reform Act, 28 U.S.C. § 1915(g).   That statute states that a prisoner may not bring a civil action without prepaying the filing fee if he has, "on 3 or more *prior occasions*, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted. . . ." (emphasis added).   As stated in the statute, the three dismissals must have occurred *before* the filing of the lawsuit potentially subject to dismissal under § 1915(g).   *See Coleman v. Tollefson*, 575 U.S. 532, 135 S. Ct. 1759, 1763 (2015) (finding "prior occasion" refers to something that the plaintiff had "already experienced" when he filed suit).

White had not accumulated three strikes before filing the instant lawsuit.   The cases the

DOJ points to include only one strike before White filed this lawsuit in August 2016, before he tendered the Amended Complaint in February 2017, or before it was actually filed on July 17, 2017—the 2010 dismissal of *White v. Secor, Inc.*, No. 7:10-cv-428-JCT-mfu (W.D. Va. Nov. 5, 2010).   The other alleged "strikes" occurred after July 17, 2017, so could not count as "prior occasions"—*White v. Office of the Federal Defender for the Middle District of Florida*, No. 3:16-cv-971-JPG-DGW, (S.D. Ill. July 27, 2017) (dismissing case as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)), and the dismissal of the appeal of that decision, *White v. Office of the Federal Defender for the Middle District of Florida*, No. 17-2832, 2018 WL 1215569 (7th Cir. Jan. 26, 2018) (dismissing appeal at White's request pursuant to Federal Rule of Appellate Procedure 42(b)).[6]   Without three prior occasions of filing lawsuits or appeals that were dismissed as frivolous, malicious or failing to state a claim, this lawsuit is not subject to dismissal under § 1915(g).

### 3.   White's Declaration

The DOJ asks the Court to disregard assertions in White's sworn declaration he has submitted in support of summary judgment on the grounds that he has no personal knowledge of many of the things to which he testifies, the statements are hearsay, and the statements are irrelevant to the issues in this case.   In ruling on a motion for summary judgment, the Court considers only evidence that would be admissible at trial, although it need not be presented at the summary judgment stage in a form that would be admissible at trial.   *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010); *see Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).   Inadmissible hearsay cannot be used to

---

[6] It is unclear whether the voluntary dismissal of this appeal pursuant to White's request would even count as a strike where the voluntary dismissal occurred in the face of likely involuntary dismissal.

19

oppose a motion for summary judgment.    *Cairel*, 821 F.3d at 830; *Gunville*, 583 F.3d at 985.

Likewise, sworn statements that are not based on the declarant's personal knowledge may not be

considered on summary judgment.    Fed. R. Civ. P. 56(c)(4).

White has not established a valid basis for his personal knowledge of many statements in

his declaration.    In addition, some statements are irrelevant and/or hearsay.    The Court has

therefore disregarded those inadmissible statements in its consideration of the pending summary

judgment motions.

### 4.   Waiver of Exemptions

White argues that the DOJ has waived the right to assert certain exemptions because it

did not specifically assert them all at once in its answer (Doc. 40) or its original motions for

summary judgment (Docs. 38 & 50).

It is true that under the piecemeal litigation doctrine, an agency generally must assert all

the FOIA exemptions it claims in the original proceedings in the district court and cannot assert

new exemptions in later stages.    *Citizens for Responsibility & Ethics in Washington ("CREW")*

*v. USDOJ*, 854 F.3d 675, 679 (D.C. Cir. 2017) (citing *Maydak v. USDOJ*, 218 F.3d 760, 764

(D.C. Cir. 2000)).    *CREW*, however, was in a different procedural posture than this case.

There, the case had been before the district court, appealed, and then remanded to the district

court for a second round, then appealed again.    *CREW*, 854 F.3d at 679-80.   The Court of

Appeals for the District of Columbia Circuit held that the FBI's failure to assert Exemption 5 in

the original district court proceeding precluded it from asserting it in the second district court

round.    *Id.* at 680-81.

The case at bar is before this Court for the first time, so the principle described in *CREW*

does not limit the exemptions that the DOJ may assert.    This *is* the "first time around" where the

*CREW* court found all arguments should be presented.   *Id.* at 680.   The DOJ has therefore not waived the assertion of any exemption.

### 5.   Incorporation of Briefing

Finally, White complains that the DOJ has incorporated its summary judgment response by reference into its summary judgment motion.    He cites a case in which the Court of Appeals for the Seventh Circuit exercised its discretion not to consider a brief from the trial court level that was incorporated by reference into an appellate brief.   *DeSilva v. DiLeonardi*, 181 F.3d 865, 866 (7th Cir. 1999).   The Court of Appeals noted that allowing incorporation would defeat the page limitation on appellate briefs and would be an imposition on the Court's time by requiring it to excavate briefing from another court's docket.

In this case, however, all the pertinent briefing is before the Court in support of or opposition to pending cross-motions that are all under consideration at the same time.    In order to minimize the already voluminous briefing and avoid repetitive arguments, the Court exercises its discretion to allow both parties to incorporate freely all of their briefs, either in support or in opposition to summary judgment.   The Court will consider all arguments, wherever they occur, and the admissible evidence cited with particularity in support of those arguments, to reach a just resolution.

### B.   Substantive Issues

#### 1.   FBI

##### a.   FBI Records Systems

A brief overview of the FBI's records system is a good first step in analyzing its response to White's FOIA requests.    The DOJ has submitted the declaration of David M. Hardy, the Section Chief of the FBI's Records/Information Dissemination System of the Records

21

Management Division to describe the FBI's record-keeping systems.   Second Hardy Decl. ("Hardy Decl.") (Doc. 95-1).   White has produced no evidence to contradict Hardy's declaration, so the Court accepts it as true for summary judgment purposes.

The FBI maintains the Central Records System ("CRS") for the entire FBI, including its headquarters, field offices and legal attaché offices worldwide.   The CRS consists of "applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions."   Hardy Decl. ¶ 346.   The files in the CRS are organized by subject categories, referred to as "classifications," that include "types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters."   *Id.* at ¶ 347.[7]

Files in the CRS are indexed by subject matter, including "by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery)."   *Id.* at ¶ 349.   This general index includes "main entries," that is, the main subject of a file such as an individual, organization, or other subject matter.   *Id.* at ¶ 348.   The index also includes "reference entries" or "cross-references," indicating that an individual, organization, or subject matter is mentioned or referenced in a "main file" about another subject matter.   *Id.*   Because the FBI indexes only information it considers relevant and necessary for

---

[7] Each classification corresponds to a numerical code.   When a particular case file is opened, it is assigned a three-component code, the first indicating the classification number, the second indicating which FBI office initiated the file, and the third indicating the unique case file number within the subject matter.   *Id.*   Within each case file, each document is numbered.   *Id.*

its future retrieval, not all names or subject matters in a file are recorded in the index.   *Id.* at ¶ 349.

In 1995, the FBI began using Automated Case Support ("ACS"), an electronic document management system.   *Id.* at ¶ 350.   More than 105 million CRS records were converted and incorporated into ACS when it was first activated.   *Id.*   An ACS feature called the Universal Index ("UNI") allows searching of the CRS index in ACS.   *Id.* at ¶ 351.   Because the ACS includes indices that predate its activation in 1995, a UNI search in ACS can locate FBI records that were indexed even before 1995 as well as entries that have been added since ACS began, although some old records are not indexed and must be manually searched in a card index.   *Id.* UNI currently can search approximately 119.7 million records.   *Id.*

In 2012, the FBI began using Sentinel, a newer, web-based document management system which is also indexed to facilitate document retrieval.   *Id.* at ¶ 352.   When a record is created in Sentinel, its information is also placed into ACS.   *Id.*

When the FBI needs to locate records in CRS in response to a FOIA request, it searches the ACS index using UNI and, if a record was possibly prepared after Sentinel was activated in 2012, it also searches the Sentinel index.   The FBI believes that these index searches "are reasonably expected to locate responsive material within the vast CRS" because all information the agency believed was pertinent and necessary to be retrievable for its own agency functions was indexed in a way that it could retrieve.   *Id.* at ¶ 353.

When the FBI gets a FOIA request, it conducts a search in ACS, and possibly Sentinel, using the exact subject used by the requester and similar permutations of the subject.   *See id.* at ¶ 354 *et seq*.   If it locates a main file record, that is, a file where the requested subject is indexed as the main subject of the file, it reviews the records in the file for responsiveness and for FOIA

23

disclosure exemption.   *See, e.g., id.* at ¶ 58.   If it is unable to locate a main file record where the requested subject is the main subject of the file but was able to locate potential cross-reference entries, it does not review the cross-reference files unless the requester specifically asks for cross-references because such review is unlikely to produce enlightening information about the subject of the request and would likely increase the requester's duplication fees, the agency's response time, and the administrative burden on the FBI.   *See id.* at ¶¶ 26 & 354.   It informs the requester of the potential increase in page count, charges and response time, in the event the requester asks for review of the files in which the cross-references appear.   *See ,e.g., id.* at ¶ 354.   It does not interpret a request for "all records" as including records in cross-reference files.

> b.   <u>White's FOIA Requests</u>

White submitted numerous letters to the FBI seeking various records.   Those letters are dated:[8]

- August 9, 2013, Hardy Decl. Ex. M (Doc. 95-2 at 43);

- August 19, 2016, Hardy Decl. Ex. A (Doc. 95-2 at 2-3);

- August 24, 2016, Hardy Decl. Ex. P (Doc. 95-2 at 51);

- September 12, 2016, Hardy Decl. Ex. F (Doc. 95-2 at 18-20);

- November 20, 2016, Hardy Decl. Ex. H (Doc. 95-2 at 26-27); and

- December 1, 2016, Hardy Decl. Ex. EE (Doc. 95-2 at 104-06).

Some letters contain requests concerning multiple subjects.   Often the FBI gave each separate

---

[8]  White claims to have sent the FBI a FOIA request letter dated July 18, 2016.   The DOJ has provided sworn testimony that the FBI never received the letter, and White has not provided a contrary affidavit or a copy of the letter.   There is no evidence from which a reasonable jury could find the FBI received a FOIA request from White dated July 18, 2016.

subject request its own Freedom of Information Act/Privacy Act ("FOIPA") request number.

### c. Propriety of Requests

Of the FOIA requests contained in those letters, the FBI indicated two were not proper requests because they did not reasonably describe the records sought or give enough information to allow the FBI to determine whether responsive records existed:

| Date of Letter | FOIPA Number | Requested Information |
|---|---|---|
| 12/1/16 | 1365412-000 | Green Star |
| 12/1/16 | NFP-65643 | Any person, or entity in Lexington, SC, claiming affiliation with the government of North Korea; Any person, or, entity, in Lexington, SC, claiming affiliation with al-Qaeda or, any related group; Any person, or, entity, in Boston, MA, New York, or, Lexington, SC, claiming affiliation with Alexander Dugin, The Donetsk People's Republic, or, the Luhansk People's Republic; a sting operation run out of the Pahlevi Building in New York, NY, by informants claiming to be "the General", supposedly the Iranian Major General Khosrowdad (deceased 1979), the "twin brother of the Shah of Iran", "Princess Ashraf of Iran", and, "Iranian terrorists."· Time frame is at least 2008 to present; FBI-JTTF infiltration of Korean language classes in the New York City Area. |

*Green Star*

On December 1, 2018, White requested "all records relating to" a group called "Green Star."   The FBI asked White for additional information because the request did not contain enough identifying information about the group for the FBI to be able to locate responsive records.   White did not provide any, so the request was closed.

On summary judgment, the DOJ maintains that a request for "all records relating to . . . Green Star" does not describe the information sought with the reasonably specific detail required by § 552(a)(3)(A).   It argues that, without information about what the group is, where it may be located, what other groups or individuals it may be associated with, why it would be of interest to the FBI, or the time frame for which records may exist, a search would be overly burdensome. White does not attempt to counter these assertions in his summary judgment briefs.

The Court agrees that White's request was overbroad and did not trigger the FBI's duty

to search for records.    Unlike some of White's other requests for information about certain

groups, it is not self-apparent from the name "Green Star" what White is seeking.    Indeed, a

simple Google search for "Green Star" reveals it names a brewery, a home goods store, an art

movement, an astrological phenomenon, an environmental rating system, a waste management

company, a clean-burning fuel manufacturer, and likely much more.    Without further

information from White, which he failed to provide when asked, the request for "all records

relating to . . . Green Star" did not reasonably describe the records sought.    Therefore, the FBI

was not obligated to search for them.

*NFP-65643*

Also on December 1, 2016, White requested "all records related to" a number of ill-

defined subjects with international aspects.    Three of them seek information about subjects

"claiming affiliation" with groups or individuals.[9]    Another requests information about a sting

operation, and another requests information about Korean language classes.    The FBI asked

White for additional information because the requests did not contain enough identifying

information for the FBI to be able to locate responsive records.    White did not provide any.

On summary judgment, the DOJ maintains that a request for all records relating to these

subjects does not describe the information sought with the reasonably specific detail required by

§ 552(a)(3)(A).    It argues that, without more information—for example, names, organizations,

events or specific locations for the "claiming affiliation" requests—a search would be overly

burdensome.    White does not attempt to counter these assertions in his summary judgment

briefs.

---

[9]  White broadened these descriptions in his Amended Complaint to encompass a larger
geographic range than in his December 1, 2016, FOIA request.    The Court considers only the
information sought in White's letter request.

The Court agrees that White's requests were overbroad and did not trigger the FBI's duty to search for records.    With respect to the "claiming affiliation" requests, White suggests no means of detecting "claimed affiliations" that would give the FBI something to search for. Searches for North Korea, al-Qaeda, Dugin (a Russian political philosopher), the Donetsk People's Republic (a Ukrainian independence movement) and the Luhansk People's Republic (another Ukrainian independence movement) promise to produce records too numerous to mention and too burdensome to review for responsiveness to White's vague "claimed affiliation" requests.    Without further information from White, which he failed to provide when asked,[10] the "claiming affiliation" requests did not reasonably describe the records sought.    Therefore, the FBI was not obligated to search for them.

With respect to White's requests for information about an unidentified sting operation and the infiltration of Korean language classes, those requests suggest no viable search terms the FBI could use to retrieve truly responsive documents, and any search of the words White used could produce numerous records with no discernable way of narrowing the scope to records responsive to White's request without an undue amount of effort.    In the face of such requests, without any clarifying information, the requests were not proper, and the FBI was not obligated to conduct a search.

d.    No Responsive Records

For a group of FOIA requests, the FBI indicates it located no responsive records after searching for the key words in the name of the group and various permutations of those words:

---

[10]  White cites to exhibits he claims provide further information, but they either provide further information about a different request or the Court could not locate the exhibit in White's extensive and scattered exhibits submitted in this case.

27

| Date of Letter | FOIPA Number | Requested Information |
|---|---|---|
| 8/19/16 | 1357563-000/1/2 | Outlaw Bikers in Osceola County, FL |
| 8/19/16 | 1357558-000/1 | Soul Survivors Motorcycle Club |
| 8/19/16 | 1357582-000/1/2 | League of the South |
| 9/12/16 | 1359366-000, 1359389-000 | Aryan Strike Force of Salem, Ohio/Buffalo, New York/any other location |
| 9/12/16 | 1359377-000 | Aryan Renaissance Society |
| 9/12/16 | 1359397-000 | Blue Lives Matter of Texas |
| 9/12/16 | 1359403-000 | White Lives Matter |
| 9/12/16 | 1359414-000 | Aryan Nationalist Alliance of Salem, Ohio |
| 9/12/16 | 1359407-000 | Traditional (or, Traditionalist) Workers Party |
| 9/12/16 | 1359374-000 | Golden State Skinheads of Sacramento, California |
| 9/12/16 | 1359390-000 | California Skinheads |
| 9/12/16 | 1359401-000 | Ohio Council of Concerned Citizens |
| 12/1/16 | 1365415-000 | Rural People's Party |
| 12/1/16 | 1365410-000 | New Resistance |
| 12/1/16 | 1365433-000 | Russian Defense League |
| 12/1/16 | 1365418-000 | US Songun Study Group |
| 12/1/16 | 1365425-000 | United Juche Front of North America |
| 12/1/16 | 1365426-000 | Swords of Songun |
| 12/1/16 | 1365431-000 | Manchuoko Temporary Government |
| 12/1/16 | 1365432-000 | US Juche Study Group |
| 12/1/16 | 1365422-000 | New Bihar Mandir Temple |

The FBI states that it found no responsive main file or cross-reference file records with respect to the following groups:   Outlaw Bikers in Osceola County, FL; Aryan Strike Force of Salem, Ohio/Buffalo, New York/any other location; Blue Lives Matter of Texas; White Lives Matter; Aryan Nationalist Alliance of Salem, Ohio; Ohio Council of Concerned Citizens; Rural People's Party; New Resistance; Russian Defense League; US Songun Study Group; United Juche Front of North America; Swords of Songun; Manchuoko Temporary Government; US Juche Study Group; and New Bihar Mandir Temple.   With respect to California Skinheads, the FBI originally notified White that there were 17,750 pages of potentially responsive main file records.   It then realized the search it had conducted was too broad because it returned results for any reference to Skinheads in the state of California and not results for the group specifically named "California Skinheads."   The FBI stated that a search limited to that group yielded no responsive main file or cross-reference file records.

With respect to the following groups, the FBI states that it found no responsive main file records but that it determined there may be responsive cross-reference file records:   Soul Survivors Motorcycle Club; League of the South; Aryan Renaissance Society; Traditional (or, Traditionalist) Workers Party; and Golden State Skinheads of Sacramento, California.   The FBI states that it is in the process of reviewing potentially responsive cross-reference file records for League of the South because White has requested it to do so.   It has not reviewed potentially responsive cross-reference file records for other groups for which no responsive main file records were found because White has not specifically asked it to do so.

As noted above, an agency must conduct a good faith search that is reasonably calculated to uncover all relevant documents.   It must search its record systems where responsive information is likely to be located, *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990), using "methods which can be reasonably expected to produce the information requested," *Rubman v. U.S. Citizenship & Immigration Servs.*, 800 F.3d 381, 387 (7th Cir. 2015) (internal quotations omitted).   Good faith is presumed and can be demonstrated by "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby,* 920 F.2d at 68.   However, the presumption of good faith can be overcome by countervailing evidence that raises substantial doubt that the search was adequate.   *Rubman*, 800 F.3d at 387; *see Carney v. USDOJ*, 19 F.3d 807, 813 (2d Cir. 1994) (bare allegations and speculation insufficient to overcome presumption).   Countervailing evidence can include "positive indications of overlooked materials" in response to well-defined requests.   *Founding Church of Scientology v. NSA,* 610 F.2d 824, 837 (D.C. Cir. 1979).   Importantly, "[t]he issue is *not* whether other documents may exist, but rather whether the search for undisclosed documents

29

was adequate." *In re Wade*, 969 F.2d 241, 249 n. 11 (7th Cir. 1992) (emphasis in original); *accord Rubman*, 800 F.3d at 387.

*No Responsive Main File or Cross-Reference Records*

White believes the FBI's searches yielding no responsive records were faulty because there are "positive indications of overlooked materials," that is, he believes there should be responsive records in FBI files that were not located.    In support of this assertion, he points to media reports and publications that refer to various subject groups and his own assertions of facts he believes show responsive documents must exist within FBI files.

On the other hand, Hardy's declaration states that the CRS contains virtually all FBI records, that they are indexed to be useful for FBI functions, but that that the index is not exhaustive in that topics or references not anticipated to be relevant or necessary for FBI purposes may not be included in the index.    Nevertheless, Hardy states that searches of the CRS index are "reasonably expected to locate responsive material within the vast CRS" as evidenced by the fact that the FBI uses index searches to retrieve information for its own operations. Hardy states that the FBI has searched the CRS index using searches of the overlapping database systems ACS/UNI and Sentinel.    He also describes the specific query terms used for each group and the search methods.    He further notes that, for a number of groups about which White inquired, the agency went back to double check its conclusion that there were no responsive main file or cross-reference file records.

The Court finds the FBI searches of main file and cross-reference files that yielded no responsive records appear to be reasonably calculated to locate responsive records.    The FBI searched all of its files using a variety of terms that appear to be designed to detect records concerning the groups White lists in his requests.    The index search tools are used by the FBI to

30

accomplish its law enforcement and administrative functions and return adequate results for those purposes, so there is no suggestion of rigging the index so that it would fail to find responsive records.   Nor is there any suggestion the FBI has hampered the search by using inappropriate or insufficient queries.   In sum, Hardy's declaration establishes that the FBI looked for responsive records in the places they would be expected to be found and in a way that would be expected to find them.

White's assertions that responsive records exist in FBI files which should have been produced are not enough to overcome the presumption of good faith created by Hardy's declaration.   The media reports and publications to which he points are either irrelevant to proving anything exists in FBI files—a number of the reports do not even mention the FBI— and/or are hearsay and not officially attributable to the FBI.   As for White's own assertions of fact, he has not described his basis for personally knowing the facts he asserts.   Indeed, they appear to be his own speculation, based on hearsay and innuendo, about FBI activities.   Finally, even if responsive records did exist within the FBI files, that fact, by itself, is not enough to demonstrate an inadequate search or bad faith.   The FBI admits that its index is designed to be functional and is therefore not an exhaustive listing of every topic ever mentioned in an FBI file. It is possible there may be a responsive record not locatable through an index search, but that does not mean the search was inadequate so long as it was reasonably calculated to uncover all responsive records.

Specifically with respect to California Skinheads, the FBI has plausibly explained its erroneous initial response that there were 17,750 responsive documents and the revision of that number down to zero.   White has not presented any evidence to cast doubt on this explanation.

*No Responsive Main File Records; Cross-References Not Reviewed*

To the extent the FBI was unable to locate responsive main file records, the reasoning in the previous section applies.   Those searches were reasonably calculated to locate responsive records in main files, and the FBI was reasonable to limit its initial review to main file records, where relevant information was likely to be found.   To the extent there may be responsive cross-reference records, the FBI was reasonable not to automatically search for those records in response to a request for "all records."   Based on the FBI's method of keeping records, such a search is unlikely to yield records revealing meaningful information about the subject searched or the functioning of the Government and threatens to subject the requester to enormous additional fees and delays in disclosure.

The FBI does not refuse to search for cross-reference records, it simply pauses to confirm that the requester indeed wants to incur the cost for the additional records and bear the delay before conducting such a search.   For a number of subjects, White did not provide such confirmation, so the FBI did not complete the additional search.   This does not constitute improperly withholding agency records, so White is not entitled to judgment on those FOIA requests.   However, in this litigation, it has become clear that White indeed wants such a search to be done.   The FBI has indicated that it is now conducting a search of responsive cross-reference files for the following:   Soul Survivors Motorcycle Club; Traditional (or, Traditionalist) Workers Party; and Golden State Skinheads of Sacramento, California.   In light of the briefing in this case, it should also conduct a search of potentially responsive cross-reference files for the Aryan Renaissance Society.   The search shall be done in the regular course of the FBI's work in responding to White's FOIA requests and at the appropriate cost.

e.    *Glomar* Responses

For another group of FOIA requests for information about third parties, the FBI has

provided *Glomar* responses, that is, it has said it will not reveal whether responsive records exist

because to do so would be to unduly sacrifice individuals' privacy interests:

| Date of Letter | FOIPA Number | Requested Information |
|---|---|---|
| 8/19/16 | 1357439-000 | David Gletty, a federal informant in Florida; Gletty's Lover, "Joe" LNU, also informant; Maitland, Florida SA Kevin Farrington; Orange County Sheriff's Deputy, and JTTF Agent, Kelly Boaz of Sanford, Florida; Tom Martin of Florida; John Rock of Florida; Brian Klose of Florida; Deborah Plowman of Florida; Harold "Hippie" Kinlaw of Florida; Carlos "Gino" Dubose of Florida (collectively, the "Gletty group") |
| 8/24/16 | 1358523-000 | Robert Killian, an Orange County, Florida Sheriff who was assigned to the Joint Terrorism Task Force from 2003 to 2010; Jason Hall, an FBI Confidential Informant under JTTF Case Agent Kelly Boaz in 2012 (collectively, the "Killian group") |
| 9/12/16 | 1359387-000 | Matthew Heinbach/Heimbach, involved in [the Traditionalist Worker's Party]; Matthew Parrot, father of Brook Heinbach, and an informant for both your Bureau, and the Indiana State Police; Rick Tyler, congressional candidate in Cleveland, Tennessee; Steve Bowers of the National Socialist Movement of Springfield, Missouri; Rebecca Barnette, phone # [REDACTED], of Buffalo, New York, of the National Socialist Movement; Elisha Strom, an informant with the US Marshals, and possibly your Bureau; An informant in Augusta, Georgia using the name "Christopher Drake"; Erica Hardwick, aka Erica Hoesch, an informant with the US Marshals and possibly your Bureau; Kristy Pryzbylla, aka "Sin", of Kissimmee, Florida; Ronald Cusack of Kissimmee, Florida; Peter James of Chicago Illinois; Harold Turner of Bergen, New Jersey; James Logsdon of Peoria, Illinois; Rick Spring of the Aryan Nations, an informant for the FBI-JTTF (collectively, the "Heimbach group") |
| 11/20/16 | 1362495-000 | Jeff Schoep of the National Socialist Movement; Brian Holland, an informant; Ron Wolf of Toledo, Ohio, likely an ATF informant; FBI SA James Majeski of Florida; FBI SA Michelle Krempa of Florida; FBI SA Thomas David Church of Virginia; Seminole County Sheriff Debra Healy (collectively, the "Schoep group") |
| 12/1/16 | 1365372-000 | Any group affiliated with 480 Sherwood Drive, Lexington, SC |
| 12/1/16 | 1365354-000 | James Porrazzo, likely of Boston, Massachusetts; Joshua Caleb Sutter aka David Woods aka Tyler Moses aka Shree Kaliki-Kaliki Mandir aka Stephen Brown aka Thugee Behram; Jilian Hoy aka Comrade Morrison aka Jayalita Devi Dasi; John Paul Cupp; Jason Adam Tonis of Elizabeth, New Jersey; Kevin Walsh; Zaid Shakar al-Jishi; Emily Rotney; Chris Hayes; Kent McLellan; August Kreis III; Brett Stevens; FBI-JTTF Agent; David Lynch (deceased); and New York City Police Detective Peter Zaleski (collectively, the "Porrazzo group") |

The FBI initially provided a *Glomar* response with respect to these requests.    In other

words, it refused to provide any records about any of the listed third parties—David Gletty, Joe

33

L/N/U, Kevin Farrington, Kelly Boaz, Tom Martin, John Rock, Brian Klose, Deborah Plowman, Harold Kinlaw, Carlos Dubose, Robert Killian, Jason Hall, Matthew Heinbach, Mathew Parrot, Rick Tyler, Steve Bowers, Rebecca Barnette, Elisha Strom, Christopher Drake, Erica Hardwich, Kristy Pryzbylla, Ronald Cusack, Peter James, Harold Turner, James Logsdon, Rick Spring, Jeff Schoep, Brian Holland, Ron Wolf, James Majeski, Michelle Krempa, Thomas David Church, Debra Healy; James Porrazzo, Joshua Caleb Sutter, Jilian Hoy, John Paul Cupp, Jason Adam Tonis, Kevin Walsh, Zaid Shakar al-Jishi, Emily Rotney, Kent McLellan, August Kreis III, Brett Stevens, David Lynch, and Peter Zaleski—and refused to acknowledge even whether it had any responsive records, until White provided (1) written authorization and consent from the individual, (2) proof of the individual's death, or (3) a justification that a significant public interest in disclosure outweighed the individual's personal privacy interests and that disclosure would advance that public interest.   It further stated that if any such records existed, they would be subject to Exemptions 6 and 7(C).   The FBI told White it would close his requests if he did not provide one of the three things requested within thirty days, and it provided him a sample consent form he could copy and provide to individuals about whom he sought records.

With respect to three letter requests regarding the Gletty, Killian, and Schoep groups, White proffered a purported public interest in disclosure of the personal information he requested:   he needed it to expose in the national media alleged unlawful FBI domestic counterintelligence operations aimed at denying Americans' First Amendment rights.   With respect to the letter request regarding the Heimbach group, White proffered a similar public interest justification on appeal.   With respect to the letter request regarding the Porrazzo group, White never attempted to articulate any public interest justification.[11]   For all the letter requests

---

[11]  The FBI became satisfied White had produced information showing that David Lynch, an

except with respect to David Gletty, at the agency level and/or on appeal, the FBI rejected the notion that White had established any public interest that justified the requested disclosures or that the individuals lacked a substantial enough privacy interests because they were alleged to have been government employees or informants at the relevant times.   With respect to Gletty, on appeal the FBI persisted in its *Glomar* response but added the additional justification that the existence or non-existence of records was protected from disclosure by Exemption 7(D) because it would reasonably be expected to disclose the identities of confidential sources and information furnished by such sources.

With respect to White's request for records regarding any group affiliated with 480 Sherwood Drive, Lexington, South Carolina, the FBI recognized that an address could be considered personally identifying information and that release of the requested records could infringe on an individual's personal privacy.   It told White it could not confirm or deny the existence of any responsive records until White provided (1) written authorization and consent from the owners or residents of that address or (2) a justification that the significant public interest in disclosure outweighed the individuals' personal privacy interests and that disclosure would advance that public interest.   It further stated that if any such records existed, they would be subject to Exemptions 6 and 7(C).   The FBI provided him a sample consent form he could copy and provide to the relevant individuals.

White tried to establish the requisite public interest by sending an article from a news organization's website referencing violent white supremacists connected with 480 Sherwood Drive and one white supremacist's speculation that another was an undercover FBI informant

---

individual included in the Porrazzo group of individuals, was deceased.   The FBI renumbered White's claim for records regarding Lynch as FOIPA 1367279-00 and has added responsive records to the list of records to be processed and disclosed.

and was responsible for his wrongful incarceration.   The FBI rejected the notion that White had established any public interest that justified the requested disclosures and administratively closed the request.

*Steve Bowers and Emily Rotney*

In their respective summary judgment motions, White concedes his claims for records relating to Steve Bowers and Emily Rotney (Doc. 90 at 34), and the DOJ requests summary judgment (Doc. 98 at 77).   The Court will grant summary judgment for the DOJ on this portion of White's claims.

*Lynch*

Apparently the FBI is satisfied that Lynch is deceased and is producing responsive records but not as quickly as White would like.   The Court will address the adequacy of that production later in this order.

*Other Individuals*

The DOJ argues that, with the exception of Lynch, White failed to provide the FBI with any of the additional information it needed to assure that disclosure would not reasonably be expected to invade the privacy of the subject individuals or the individuals associated with the subject address, the interest sought to be protected by Exemptions 6 and 7(C).   It notes that, to the extent White claimed the individuals in question were law enforcement officers or government witnesses, they enjoy substantial privacy interests, and White has not demonstrated any public interest outweighing those privacy rights.   Additionally, the DOJ justifies the *Glomar* responses by noting that there is no evidence the FBI officially acknowledged a relationship with any of the individuals, and that White's speculation of such a relationship is not based on any official acknowledgement by the agency.

36

White disagrees.   He argues with respect to a number of individuals that their connection to the FBI has been officially acknowledged so the agency cannot give a *Glomar* response.   He further argues that the public's interest in uncovering governmental wrongdoing outweighs any individual's privacy interest, which he believes are diminished for some subjects because of their positions as public officials or government employees.

As a preliminary matter, it is entirely appropriate for the FBI to issue a *Glomar* response until White could provide a consent for disclosure, proof of death, or a sufficient public interest before disclosing records containing private personal information.   Even identifying whether an individual or an individual's address is either associated with the FBI or a subject on which the FBI maintains a file could be damaging to the third party in ways covered by Exemptions 6 and 7(C).   *Antonelli v. FBI*, 721 F.2d 615, 618 (7th Cir. 1983).   It could reveal that those individuals have been or are the subject of an FBI investigation, FBI informants, or involved in FBI investigations.   Even acknowledged FBI agents have "a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives."   *Lesar v. USDOJ*, 636 F.2d 472, 487 (D.C. Cir. 1980).   Thus, the existence of records and the reasons for not disclosing them could put the individual's safety in jeopardy or compromise law enforcement investigations connected to the individual. Individuals undoubtedly have a privacy interest in not disclosing records in which they are named—or even whether such records exist.

Because White never attempted to offer the FBI consent, proof of death, or a public interest justifying disclosure in connection with his requests for records concerning the remaining third parties in the Porrazzo group—James Porrazzo, Joshua Caleb Sutter, Jilian Hoy, John Paul Cupp, Jason Adam Tonis, Kevin Walsh, Zaid Shakar al-Jishi, Chris Hayes, Kent

37

McLellan, August Kreis III, Brett Stevens, and Peter Zaleski—and because, as explained below, there is no evidence of any public interest outweighing an individual's privacy rights, the Court finds the FBI's response concerning these individuals was proper.

As for many of the others, White argues that a *Glomar* response is not available because the FBI has already disclosed the existence of responsive records by acknowledging a relationship with the subjects.   As noted above, a *Glomar* response is unavailable where the FBI has officially acknowledged a connection between the individual and the FBI such as, for example, when the individual was called as a government witness at trial and identified as an FBI informant.

White points to the following types of documents he believes establish an official acknowledgment of relationship with the FBI[12]:   documents he received from other non-federal government offices referencing alleged activities with federal law enforcement; a book authored by David Gletty and Joe LNU; news articles from the internet; unauthenticated documents allegedly reflecting the substance of phone calls; statements by individuals about their own

---

[12]  Many exhibits submitted by White lack pinpoint citations and are nearly illegible.   Just to provide one example, his Exhibit F(e)(x) (Doc. 91-1 at 26) contains what appears to be a three-page document printed on a single page (one quarter of the page devoted to each original page) in extremely small print with the ink smudged from, it appears, being recopied multiple times. On the first page of his motion for summary judgment, White cites to this document for the proposition that two FBI directors personally authorized a particular FBI operation.   He does not point to any particular place in his three-page illegible document where such evidence exists or where it would be worth the Court's while to squint and decipher the writing.   The Court has spent too many hours reviewing the entirety of many of White's difficult-to-read exhibits—and it assures the parties it has consulted each exhibit cited that it was able to find in the record—only to find they do not include evidence to support the propositions White says they support.   It has had enough.   It is White's burden to point the Court to specific evidence in support of his summary judgment motion, *N.W. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 662-63 (7th Cir. 1994), and to refrain from making evidentiary documents more illegible by printing multiple documents on a page.   The Court will continue to read what it can of White's exhibits, but it will ignore exhibits it cannot.

connection with the FBI; a blog post by a subject individual about his role as an FBI informant; and the appearance of a name on a Government witness list in a criminal case against White. White also presents statements in his own declarations that are either contradicted by court records or are hearsay and/or lack a foundation for his personal knowledge to testify to such matters:   references to material from a case in the Western District of Louisiana that does not appear on that district's docket; alleged testimony from Gletty in the Middle District of Florida that is not reflected on the docket sheet as ever occurring; and a statement from a criminal defendant's counsel that Gletty was an FBI confidential source.   None of these even come close to being an official acknowledgement *by the FBI* of information that there was a connection between the subject and the FBI such that the FBI essentially admitted that a file exists.

Other evidence from White is more probative of an FBI-acknowledged connection between the subject and the agency:   a United States Attorney's unsealed motion for a downward departure for Rock based on his cooperation by providing sensitive information to law enforcement in *United States v. Martin*, No. 6:07-cr-26-GAP-KRS (M.D. Fla.); Strom's testimony as a Government witness in *United States v. Strom*, 3:07-cr-1-NKM-1 (W.D. Va.); and a United States Attorney's acknowledgement in a motion *in limine* in *United States v. Turner*, 1:09-cr-650-DEW-JMA (E.D.N.Y.), that Turner had been at one time an FBI confidential informant.   The Court believes that, to the extent these public acknowledgements by the DOJ of a relationship between federal law enforcement and the subject were made on behalf of and with the authority of the FBI, they may be sufficient to render *Glomar* responses unavailable to the requests for records about those three individuals.   However, the Court declines to order the FBI to respond to White's requests for records about Rock, Strom, and Turner because it is clear that their privacy interests, even if slight, are not outweighed by a public interest in disclosure

39

and thus would prevent disclosure.   *See Boyd v. Criminal Div. of USDOJ*, 475 F.3d 381, 389 (D.C. Cir. 2007) (applying harmless error doctrine where *Glomar* response was improper but records were not subject to disclosure).   As discussed below, White has not made the requisite showing of any public interest in disclosure.

With respect to each request for records concerning an individual or 480 Sherwood Drive, White argues that the public's interest in uncovering FBI wrongdoing targeting American citizens' exercise of First Amendment speech rights outweighs any privacy interests those individuals have.   However, the evidence he presents in support of the asserted public interest does not substantiate White's theory.   First, the nefarious nature of the alleged FBI activities amounts to nothing more than speculative characterizations based on hearsay and innuendo. Second, far from showing an agency's targeting of individuals peacefully exercising First Amendment rights, the hearsay indicates the FBI was conducting lawful counterintelligence activities targeting violent white supremacists or white supremacist hate groups planning to rid the nation of non-white individuals.   The actual evidence White has presented is scant and is certainly not enough to "warrant a belief by a reasonable person that the alleged Government impropriety might have occurred," the standard for establishing a public interest in uncovering public officials' wrongdoing.   *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004).   White has presented nothing that rebuts the presumption of legitimacy afforded government officials' conduct.   *See, id.*   Consequently, the Court finds that disclosure of records revealing FBI activity would not contribute significantly to the public's interest in uncovering governmental wrongdoing but would instead reasonably be expected to constitute an unwarranted invasion of privacy.   Thus, the Court finds minimal public interest in the disclosures White requests.   Balancing this against the privacy interests of the individuals

involved, discussed above, the privacy interests clearly prevail.

To the extent White suggests an alternative public interest in uncovering wrongful FBI activity that led to his wrongful conviction, that interest is purely private.   *Peltier v. FBI*, 563 F.3d 754, 764 (8th Cir. 2009); *Antonelli v. FBI*, 721 F.2d 615, 619 (7th Cir. 1983).   Thus, it cannot justify disclosure of records about individuals with even a minimal privacy interest.

### f.   Records Being Produced

Finally, for another group of requests, the FBI has indicated that there are responsive records and either that they have been produced or that the agency is reviewing the records prior to disclosure and is releasing responsive records at a rate of 500 pages per month by subject in the order White has indicated he would like them to be processed.

| Date of Letter | FOIPA Number | Requested Information |
|---|---|---|
| 8/9/13 | 1224695-000 | William Alexander White |
| 8/19/16 | 1357551-000/1 | The 1st SS Cavalry Brigade, an FBI front group in Lexington, SC, and Florida |
| 8/19/16 | 1357593-000/1/2/3/4 | National Socialist Movement |
| 8/19/16 | 1357585-000/1/2 | Confederate Hammerskins |
| 8/24/16 | 1358511-000 | Operation Primitive Affliction |
| 11/20/16 | 1362454-000/1 | Vinlander Social Club |
| 11/20/16 | 1362474-000 | American National Socialist Workers' Party |
| 12/1/16 | 1365406-000/1 | American Front |
| 12/1/16 | 1367279-00 | David Lynch |
| 12/1/16 | 1365428-000/1 | Aryan Nations, or any related group in Pennsylvania or Lexington, SC |

In addition, the FBI is reviewing cross-reference files for responsive records relating to League of the South, FOIPA number1357582-002, pursuant to White's follow-up request following the failure to locate any responsive main file records.

With respect to White's request for information about himself, he provided a signed consent form.   The FBI informed White it had located approximately 14,537 pages of potentially responsive records.   Because the request was likely to produce over 2,500 pages, the FBI placed the request in the "large track" of its multi-track FOIA response tracking system and

notified White that such placement would significantly delay the response time.    The FBI indicated it would review the responsive records (at that time revised to 14,230 pages) at a rate of 500 pages per month for release of non-exempt portions of those records.    White declined the offer to reduce the size of his request to possibly accelerate its processing.

The FBI notified White it had located approximately 8,500 pages of responsive pages for the 1st SS Cavalry Brigade, but that the records were subject to Exemption 7(A) because they are law enforcement records, there was a pending or prospective law enforcement proceeding relevant to these responsive records, and release of the information could reasonably be expected to interfere with enforcement proceedings.    The FBI has indicated that it will review the files again when the request makes it to first priority on the disclosure priority list White has provided to see if the records are still exempt from production at that time.

With respect to White's request for records about the National Socialist Movement, the FBI produced responsive records in three batches of 63, 58, and 103 pages, respectively, but indicated there may be more potentially responsive records.    The FBI claimed that there were unusual circumstances involved in locating responsive records that would delay those responses. The disclosed records included material withheld pursuant to a number of exemptions, all of which White challenged.    Hardy Ex. X (Doc. 95-2 at 75-79).    He also challenged the adequacy of the release on other grounds such as illegibility and unclean hands.    Hardy Ex. NN, QQ (Doc. 95-2 at 133-37, 146-48).    The FBI has indicated it is continuing to search for responsive records.

With respect to White's request for records about the Confederate Hammerskins, the FBI produced responsive records in two batches of 150 and 441 pages, respectively, but indicated there may be more potentially responsive records.    The disclosed records included material

withheld pursuant to a number of exemptions.    White challenged the same use of the exemptions that he challenged in connection with the National Socialist Movement, as well as other challenges.    Hardy Ex. X, AA (Doc. 95-2 at 75-79, 92-93).    The FBI has indicated it is continuing to search for responsive records and reviewing processed records *de novo*.

With respect to White's request for records about Operation Primitive Affliction, the FBI initially notified White it had located approximately 12,250 pages of potentially responsive records, but later revised that figure to approximately 7,267 pages plus audio and video files.

With respect to White's request for records about the Vinlander Social Club, the FBI was not able to identify any responsive main file records in response to White's original request. After White provided more details about what he was looking for, the FBI renewed its search efforts.

With respect to White's request for records about the American National Socialist Workers' Party, the FBI notified White it had located approximately 2,061 pages of potentially responsive records.

With respect to White's request for records about the American Front, the FBI notified White it had located approximately 47,850 pages of potentially responsive records.    The FBI is continuing to search for responsive main file records.

With respect to White's request for records about Aryan Nations and related groups in Pennsylvania or Lexington, South Carolina, the FBI noted that responsive information was available on the FBI's public website, The Vault.    Because White was an inmate with little access to the internet, the FBI copied the 121 pages of responsive records in The Vault and mailed it to the address to which White had instructed the agency to mail its FOIA responses. The FBI told White he could ask the agency to look for more if the information from The Vault

was not sufficient.   White indicated he wanted more material than was on The Vault, so the FBI is searching for additional responsive records.

Finally, as for White's request for records about David Lynch, for whom White has provided satisfactory evidence of death, the FBI has located approximately 200 pages of potentially responsive records, all of which are awaiting processing.

With respect to all of the foregoing subjects (except Lynch) and others for whom the FBI has begun cross-reference file searches (as noted above), the FBI informed White that it had aggregated the requests because they were related and that it had found collectively approximately 100,000 responsive main file records.   It stated that it would review them, and the request regarding Lynch, at a rate of 500 pages per month for release of non-exempt portions of those records in the order White has requested.[13]   Indeed, except for a brief period in early 2019 during a government shut-down, there is no evidence to indicate the FBI is not producing documents on its anticipated schedule.   The FBI has indicated that after this litigation began, it located potentially responsive cross-reference records and will process them as well as the responsive main file records.

Common themes emerge in White's objections to the foregoing.   The Court addresses them in turn.

*Processing Schedule*

White objects to the FBI's schedule for processing 500 pages per month before releasing

---

[13]   White has requested release of responsive documents in the following order:   William A White; American National Socialist Workers' Party; National Socialist Movement; Traditionalist Workers' Party; League of the South; American Front; Operation Primitive Affliction; 1st SS Cavalry Brigade; Soul Survivors Motorcycle Club; Vinlander Social Club; Golden State Skinheads; Confederate Hammerskins; and Aryan Nations.   *See* Pl.'s Mot. Summ. J. (Doc. 90 at 25-26).   White has not indicated where responsive records regarding David Lynch fit into this list, so the FBI has given this request lowest priority.

them on a rolling basis.   He notes that the FOIA requires records be made "promptly available" and that the FBI even aims to complete its response to every FOIA request within five years of receiving it.   However, at the rate proposed by the FBI, he will not receive all responsive documents for anywhere from sixteen years, for production of all the records identified so far, to forty-five years, if the 270,000 responsive records he expects exist are actually located.   He finds this untenable and outside the spirit of the FOIA, and asks the Court to order the FBI to expedite processing his requests at a faster rate until its responses are complete.

The FBI argues that exceptional circumstances exist that frustrate the FBI's efforts to process White's large requests more quickly.   It further explains that its standard policy is to track requests by the size of the expected number of responsive records and to process requests on a first-in-first-out basis within each track.   For larger requests, the FBI explains that its standard practice of processing 500 pages per month for large requests is rooted in its efforts to produce the most pages for the most FOIA requesters in the most efficient and equitable way. It explains that even urgent, compelling requests are not processed at a faster rate (unless ordered by a court), although they are placed first in line for responses regardless of where they would ordinarily fall in the FIFO line-up.   The FBI argues that if the Court were to order faster processing of White's request, his would receive better treatment than even clearly urgent, compelling requests.

It is true that the FOIA requires a federal agency to make records "promptly available" once a proper request is received in the proper manner.   5 U.S.C. § 552(a)(3)(A), (a)(6)(C)(i). The Court of Appeals for the District of Columbia Circuit has observed that "depending on the circumstances typically would mean within days or a few weeks of a 'determination,' [to comply with a records request,] not months or years."   *Citizens for Responsibility & Ethics in*

*Washington v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013).

However, it is also true that federal agencies are not private investigation agencies or copying factories for individuals seeking mountains of government documents for no articulable public purpose.   It is true that it is improper to inquire into the requester's motive for his request when determining *whether* the agency must respond, but this Court believes it is entirely appropriate to consider it when determining *how* and *when* the agency must respond.   This and other factors should be weighed:   the existence of an articulable public interest in the records, the number of responsive records expected, the diligence of the agency in attempting to respond to the request, and potential disruption to the agency and delays to other FOIA requesters from a tighter production schedule.   By enacting the FOIA, Congress could not have intended to allow a single requester to paralyze a federal agency by submitting thousands of FOIA requests for which there could be hundreds of thousands—even millions—of responsive records and then demanding the entire disclosure be made within a matter of weeks, or even a few years.

In this case, White seeks comprehensive information from the FBI about numerous subjects.   He has refused to narrow his requests to make them more manageable or more likely to produce documents that actually shed light on the functioning of government.   In fact, he has expanded his requests to include every traceable mention of his subjects regardless of relevance to government functioning.   He has also failed to articulate any real public interest in the records he seeks.   Instead, his requests amount to a fishing expedition designed to uncover information about those whom he believes have wronged him and his white supremacist affinity groups.   While he may be entitled to all of the non-excluded or non-exempt records he seeks, he is not entitled to them next week, or even next year.

The Court finds that the FBI's schedule of producing 500 pages per month is reasonable,

in good faith, and in compliance with the FOIA.   It is not unusual for a court to defer to a

federal agency about its records release policies.   *See Negley v. USDOJ*, 305 F. Supp. 3d 36, 46

(D.D.C.) (applying DOJ's 500-page interim release policy because the policy would "promote

efficient responses to a larger number of requesters" and "the Court sees no basis to expedite

release"), *aff'd*, No. 18-5133, 2018 WL 4148608 (D.C. Cir. Aug. 14, 2018).   It is appropriate to

defer to the FBI in this particular case which will require review of over 100,000 documents—as

many as 270,000 if White is correct—balanced against the policy reasons set forth above and in

the absence of any showing of a public interest in disclosure or a need for an expedited schedule.

Indeed, other courts have come to similar conclusions.   *See Nat'l Sec. Counselors v. USDOJ*,

848 F.3d 467, 471-72 (D.C. Cir. 2017) (recognizing FBI's 500-page-per-month policy "serves to

promote efficient responses to a larger number of requesters"); *Freedom Watch v. BLM*, 325 F.

Supp. 3d 139, 142 (D.D.C. 2018) (finding FBI's 500-page-per-month policy was justified where

plaintiff's overall multi-subject request equated to in excess of 100,000 pages); *Middle E. Forum*

*v. USDHS*, 297 F. Supp. 3d 183 (D.D.C. 2018) (finding DHS's 500-page-per-month policy was

appropriate rate of production); *Colbert v. FBI*, No. 16-CV-1790 (DLF), 2018 WL 6299966, at

*3 (D.D.C. Sept. 3, 2018) (refusing to order FBI to adjust its standard processing rate of 500-

pages per month); *Energy Future Coal. v. OMB*, 201 F. Supp. 3d 55 (D.D.C. 2016) ("OMB shall

continue to review 500 documents per month with respect to Plaintiffs' request").[14]

---

[14]   After this order was in its final draft, the DOJ notified the Court that the FBI's 500 page per
month production schedule has been delayed as a result of steps necessary to contain the spread of
the COVID-19 pandemic (Doc. 141).   The releases scheduled for March 2020 and April
2020 have not been made, and future scheduled releases will be delayed as the FBI resumes
limited FOIA processing.   The COVID-19 pandemic presents an unprecedented situation
affecting all Federal Government operations, and litigants as well as agencies must have some
leeway to adjust.   Accordingly, as long as the FBI continues to work diligently on responding to
White's requests and continues to treat them equitably and in the same general manner as other
requests on the large request track, the Court will not interfere.

*Objections to Claimed Exemptions*

The FBI has asserted several exemptions to justify withholding records or redacting certain information from released records.   White objects to the use of certain exemptions, particularly with respect to the National Socialist Movement and the Confederate Hammerskins, arguing that certain records are not personnel records (Exemption 6) or law enforcement records (Exemption 7), that the public interest in uncovering the FBI's unlawful activities outweighs any privacy interests of third parties (Exemptions 6 and 7(C)) or law enforcement interests in preserving the secrecy of its investigative techniques, procedures, or guidelines (Exemption 7(E)).

The DOJ notes that White has not pointed to any specific application of the claimed exemptions, instead relying on blanket assertions of error.   In response to the blanket assertions, the DOJ notes generally that the FBI has redacted or withheld under Exemption 6 agent names as well as case numbers and reference information, which can be used in conjunction with other information to uncover private information about individuals.   It also relies on Exemption 7(C) to withhold agency file numbers as they could reasonably be expected to constitute an unwarranted invasion of personal privacy by being used to reveal private information about individuals.   Finally, it notes that the FBI records on specific individuals are, by virtue of the FBI's function as a law enforcement investigative agency and the kinds of files it keeps, law enforcement records potentially qualifying for Exemption 7.   *See* Hardy Decl. ¶¶376-83 (Doc. 95-1 at 102-06).

Although White mentions other exemptions that the FBI has used to withhold material, the Court focuses on Exemptions 6 and 7(C).   These are the only two exemptions to which White objects in the Amended Complaint and are therefore the only two exemptions within the

48

scope of this case.    Am. Compl. (Doc. 25 at 9).

As explained earlier, Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."   5 U.S.C. § 552(b)(6).   Exemption 7(C) applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy . . . ."   5 U.S.C. § 552(b)(7)(C).   With application of both exemptions, once the agency shows a privacy invasion, the burden is on the FOIA requester to show a public interest in disclosure, which the Court then weighs against the privacy interest involved.   *U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991); *Higgs v. U.S. Park Police*, 933 F.3d 897, 904 (7th Cir. 2019).

The Court has reviewed generally the FBI's redactions of broad categories of information under Exemptions 6 and 7(C) and various other exemptions and finds no evidence the redactions were not logical, plausible, and in good faith.   Furthermore, as the Court has already explained in connection with White's requests for which *Glomar* responses were provided, White has shown no public interest in disclosure of the records he request for the purpose of uncovering some speculative unlawful FBI activity.   To show a public interest, "the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."   *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004); *accord Peltier v. FBI*, 563 F.3d 754, 763 (8th Cir. 2009).   All White points to is speculation and mischaracterization.   For example, White cites an October 3, 2008, memorandum (Exhibit F(s)(ii) (Doc. 113-1 at 7)) as evidence of operations to suppress his First Amendment rights.   He mischaracterizes the memo, which is really just a notice to law

enforcement offices warning that White plans to distribute material that could possibly cause disturbances[15] and asking law enforcement to report any criminal action to a specific FBI office. Other such mischaracterizations to support allegations of unlawful FBI activity abound.   They do not amount to any evidence a reasonable person would believe suggests improper FBI conduct.   Thus, under the Exemption 6 and 7(C) balancing tests, protection from disclosure is warranted.

To the extent the FBI is reexamining its claimed exemptions for portions of records relating to the National Socialist Movement or the Confederate Hammerskins, the Court will not interfere with that ongoing process.

g.   Conclusion

In light of the foregoing, the Court is satisfied that the DOJ has carried its summary judgment burden of showing that, in response to White's proper requests, the FBI has conducted or is conducting reasonable searches of main file records and cross-references designed to uncover responsive records, and is withholding only records or portions of records legitimately falling within FOIA exemptions.   It is reviewing *de novo* certain searches after White questioned the results.   It is processing White's requests at a rate of 500 pages per month and is producing the responsive records in the order White has requested.   The FBI has not improperly withheld agency records.   For these reasons, the Court will grant summary judgment for the DOJ and deny summary judgment for White on his claims based on his FBI FOIA requests.[16]

---

[15] The material includes a magazine with a cover bearing the image of an African-American's head in the crosshairs of a rifle scope with the caption, "KILL THIS N*****?" (without the Court's redactions of the racial epithet).

[16] The Court rejects White's suggestion in the Amended Complaint that the Court should order wholesale production of all documents requested without regard to application of exemptions as a remedy for the FBI's uneven compliance with the FOIA.   Instead, it would, at the most, order the FBI to do what it is already doing.   In such circumstances, there is no more relief the Court

The Court declines to retain jurisdiction over the FBI's ongoing production of records responsive to White's requests.   As White noted, at the rate the FBI is disclosing records, it may not be finished for decades if the volume of documents is as White expects.   The Court is unprepared to provide continuous oversight of the FBI's on-going productions for that entire time.   The FOIA was never intended to make the Court a perpetual supervisor of Executive Branch agencies.   Instead, the Court is satisfied that the FBI is meeting its obligations under the FOIA, and if White has any further complaints about how those obligations are carried out—say, claims of specific exemptions—he should file an administrative appeal and then, after exhausting his administrative remedies, file a new lawsuit.

        2.       <u>ATF</u>

           a.      <u>ATF Records System</u>

Again, the Court starts with a brief overview of the agency's records system.   The DOJ has submitted the declaration of Peter J. Chisholm, the Acting Chief of the ATF's Disclosure Division, to describe the ATF's record-keeping system.   Chisholm Decl. (Doc. 95-3).   White has produced no evidence to contradict Chisholm's declaration, so the Court accepts it as true for summary judgment purposes.

The ATF keeps information in the Criminal Investigation Report System of Records and maintains a case management system called NFORCE to enter data into and to facilitate access to agency information in that database.   Together, they enable the agency to document its investigative activity and information.   NFORCE is designed to support the ATF's law enforcement operations by enabling users to store, utilize, and query investigative information and prepare investigative documents.   NFORCE allows access to uniquely numbered criminal

---

can give.

investigation files that can be searched by an individual's name, date of birth, social security number; by a group's or organization's name; by property or a vehicle associated with an individual; or by a full text search using words found in ATF's reports database.   Case files are marked either closed or open and may be restricted pursuant to Federal Rule of Criminal Procedure 6(e) if they contain information regarding grand jury proceedings.   The ATF uses NFORCE to search for responsive records contained in the agency's database.

### b.   White's FOIA Requests

White submitted one letter to the ATF dated November 27, 2016.   Chisholm Decl. Ex. A (Doc. 95-3 at 9-14).   In it he requests "all records in your possession regarding" himself; thirty-four groups, operations, or organizations; and forty-eight individuals.   The ATF assigned the letter request number 2017-0187.   In sum, in a letter dated May 3, 2017, the ATF produced one redacted page in response to White's request for records about himself; found the requests for groups, operations, or organizations did not reasonably describe the records sought; and declined to disclose records regarding third parties until White obtained their consent, demonstrated that they were deceased, or showed a public interest outweighing the individuals' privacy interests.   Chisholm Decl. Ex. B (Doc. 95-3 at 15-17).   White responded in a letter dated May 8, 2017, disputing the ATF's conclusions and declining to narrow his requests (Doc. 43-1 at 4-5).

### c.   Propriety of Requests

In White's November 27, 2016, letter requested "all records in your possession regarding" the following groups:

> All storefront operations in Toledo, Ohio, since 2004; Any group, or operation associated with 480 Sherwood Dr., in Lexington, South Carolina; American Front; New Resistance; Green Star; Rural People's Party; US Songun Study Group; New Bihar Mandir Temple; United Juche Front of North America; Swords of Songun; The Aryan Nations, or, any related group, in Pennsylvania, or, South

Carolina; Any group claiming affiliation with the government of North Korea in Massachusetts, New York, New Jersey, or, South Carolina; Any group claiming affiliation with Alexander Dugin, or the Donetsk, or, Luhansk, People's Republics in Massachusetts, New York, New Jersey, or, South Carolina; Any group claiming affiliation with al-Qaeda in South Carolina; Manchuoko Temporary Government; US Juche Study Group; Russian Defense League; 1st SS Cavalary Brigade; National Socialist Movement; Confederate Hammerskins; League of the South; Soul Survivors Motorcycle Club; Outlaw Bikers of Osceola County, Florida; Operation Primitive Affliction; Traditional, or, Traditionalist, Workers' Party; Aryan Renaissance Society; Blue Lives Matter; Golden State Skinheads; Aryan National Alliance; Aryan Strike Force; Ohio Council of Concerned Citizens; White Lives Matter; California Skinheads (poss. California State Skinheads); and Vinlander Social Club.[17]

In its May 3, 2017, letter, the ATF found that White's requests for information regarding these thirty-four groups were not proper requests because they were overbroad and did not reasonably describe the records sought.   It informed White that if he was interested in information regarding those topics, he would need to narrow the scope of his request.   It also invited him to contact the agency's FOIA liaisons for assistance or to discuss the requests or to seek special FOIA mediation.   White responded by asserting that his requests were proper and declining to narrow them or explain them.   At some point—it is unclear when—the ATF searched through NFORCE for the thirty-four groups (presumably using the group name or key words used in White's request) and found that none were the subject of an ATF investigation.

On summary judgment, the DOJ makes the same arguments with respect to some of White's requests to the FBI that the FBI found were overbroad:   "all records in your possession regarding" does not describe the information sought with the reasonably specific detail required by § 552(a)(3)(A).   The DOJ argues that, without more information about the groups, the ATF cannot find what White wants.   Indeed, the ATF searched for records regarding the groups using identifying information it gleaned from White's letter request and found no investigation

---

[17]   As noted in an earlier footnote, in the Amended Complaint, White claims the ATF failed to respond to a request about the American National Socialist Workers Party, Am. Compl. ¶ 49 (Doc. 25 at 48), but his November 27, 2016, letter request does not name that group.   The Court considers only the ATF's response to records White actually sought in his letter.

files.   White counters that the ATF did not specify in its letter what additional information it needed from White about the groups as the FBI and USMS had in their responses to requests they found overbroad.

The Court agrees that White's requests were overbroad and did not trigger the ATF's duty to search for records.   A request seeking all records relating to a subject may not satisfy this standard and therefore may not trigger the agency's obligation to search for records.   *See Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013).   Here, it is clear that the information White gave was not sufficient to ATF employees to locate responsive records with reasonable amounts of efforts.

This is especially true for requests that ask for broad, nebulous categories like "all storefront operations" in a large city, or all groups "associated with," "claiming affiliation with," or "related to."   White suggests no means of detecting "claimed affiliations" that would give the ATF something to search for.   As the Court noted with similar FBI requests from White, searches for North Korea, al-Qaeda, Dugin, the Donetsk People's Republic, and the Luhansk People's Republic promise to yield records too numerous to mention and too burdensome to review for responsiveness to White's vague "claiming affiliation" requests.   Without further information from White, which he failed to provide, the "claiming affiliation" requests did not reasonably describe the records sought.

As for White's requests for records regarding specifically named groups, those requests are broadly for all records regarding those groups, which could potentially include any mention of those groups in any file for any ATF investigation.   And while the ATF did not solicit further specific pieces of information from White to narrow his requests like the FBI and the USMS did, it invited him to contact a liaison or to commence mediation to work toward meaningful and

adequate requests.   White cannot now complain that when he failed to pursue opportunities to work with the ATF, instead remaining obdurate in his insistence that the agency was wrong, he had an insufficient opportunity to fix his requests.

Furthermore, other agencies' ability to search for the groups using the same information White gave the ATF has no bearing on whether the information was sufficient for the ATF. Each agency maintains its own record-keeping system organized in unique ways and with different purposes and search requirements.   The FBI's ability to locate responsive records by searching a group's name is irrelevant to whether the ATF can do the same.

And finally, the fact that these requests were overbroad is borne out by the fact that, even after the ATF conducted searches using information from White's requests, it found it had no records of investigations of those groups.   Clearly, if there are responsive records, the ATF needs more details to find them without undue effort.

In sum, without further information from White, which he failed to provide when asked, his request for "all records in your possession regarding" did not reasonably describe the records sought.   Therefore, the ATF was not obligated to search for them.   Even if it had been obligated to search, the only relief the Court would order, the search produced no records using information in the current requests.

d.   Not All Responsive Records Fount

White claims that the single page produced by the ATF in response to his request for records about himself was clearly incomplete.   That document was an event narrative report indicating the ATF never generated a report of an investigation of White.   White believes he was targeted by the ATF on at least three occasions.

As explained several times already earlier in this order, an agency must conduct a good

55

faith search that is reasonably calculated to uncover all relevant documents and is entitled to a presumption of good faith in that search once it explains the search details.   Only countervailing evidence such as "positive indications of overlooked materials" in response to well-defined requests can overcome that presumption.   *Founding Church of Scientology v. NSA,* 610 F.2d 824, 837 (D.C. Cir. 1979).

Chisholm explained in his declaration that the ATF searched NFORCE using White's first and last names and retrieved case file 761040-11-0001.   That information pointed to a field division office, which produced the one-page narrative indicating that no Report of Investigation on White existed.   White claims that there are "positive indications of overlooked materials" based on an FBI report, on information he heard from another individual, and on one of his personal observations.

The Court finds the ATF's search that yielded one responsive record was reasonably calculated to locate responsive records.   The search term—White's name—was appropriate, and the search was done where records concerning White would likely be found if they existed. In sum, Chisholm's declaration establishes that the ATF looked for responsive records in the place they would be expected to be found and in a way that would be expected to find them.

White's assertions that responsive records exist in ATF files which should have been produced are not enough to overcome the presumption of good faith created by Chisholm's declaration.   After locating the FBI report on which White relies—White did not cite it using the correct exhibit number (Ex. X(a) (Doc. 25-4 at 46-47))—the Court sees that it did not suggest, much less indicate, that White had been the subject of an ATF investigation as White alleges.   In fact, the document as redacted by the producing agency does not even contain White's name.   Further, the content of the document indicates an ATF office *refused* to

participate in a law enforcement meeting, not that it conducted an investigation of White.

As for White conversation with another individual that he claims shows he was the target of an ATF investigation such that there should have been a larger file on him, that conversation, even as relayed by White, does not indicate White was a target.    Furthermore, it is hearsay and not sufficient to overcome the presumption of the ATF's good faith.

As for White's personal observation, he claims he saw three individuals that he suspects were ATF agents at two separate rallies White attended.    It is absurd to think such speculation even suggests the ATF had a larger investigative file on White that should have been uncovered using a search for his name.

Finally, even if responsive records did exist within the ATF's files, that fact, by itself, is not enough to demonstrate an inadequate search or bad faith.    The ATF conducted a search for White by his name and found a single page.    While it is possible there may be a responsive record not locatable through that search, that does not mean the search was inadequate so long as it was reasonably calculated to uncover all responsive records.

e.    *Glomar* Responses

In White's November 27, 2016, letter he requested "all records in your possession regarding" the following forty-eight individuals:

James Porrazzo of the American Front—New Resistance; Joshua Caleb Sutter aka David Woods aka Tyler Moses aka Shree-Shree Kaliki-Kalki Mandir aka Stephen Brown aka Thugee Behram, an informant; Jilian Hoy aka Comrade Morrison aka Jayalita Devi Dasi, an informant; John Paul Cupp, advocate for North Korea; Jason Adam Tonis, advocate for North Korea; Kevin Walsh, advocate for North Korea; Zaid Shakir al-Jishi, advocate for North Korea; Emily Putney or Rotney, girlfriend of Porrozzo; Chris Hayes of the American Front; August Kreis III of the Aryan Nations; Brett Stevens of Houston, Texas; David Lynch of the American Front (deceased); David Gletty, an informant; Joe LNU, gay lover of Gletty; Kelly Boaz aka Kevin Post, Orange County Florida Sheriff and FBI-JTTF Agent; Tom Martin of the Confederate Hammerskins; John Rock of the Confederate Hammerskins; Brian Klose of the Outlaw Bikers; Deborah Plowman of the Outlaw Bikers; Harold "Hippie" Kinlaw of the Outlaw Bikers; Carlos "Gino" Dubose of the Outlaw Bikers; Robert Killian aka "Doc" aka Michael Schneider, Orange County, Florida, Sheriff, and, FBI-JTTF Agent; Jason Hall, informant; Matthew Heimbach of the Traditionalist Workers Party; Brook Heimbach of the Traditionalist Workers Party; Matthew Parrott, an informant; Rick

Tyler, Congressional candidate in Cleveland, Tennessee; Dr. Matthew Raphael Johnson of the Traditionalist Worker's Party; Sonny Thomas of the Sonny Thomas Radio Show; Jeff Schoep of the National Socialist Movement; Steve Bowers of the National Socialist Movement; Rebecca Barnette of the National Socialist Movement; Paddy Tarleton of the Traditionalist Workers Party; Scott Hess of California; Tony Kovalis of California; Elisha Strom of Virginia, an informant; Chris Drake of Augusta, Georgia; Erica Hardwick, aka Erica Hoesch, originally of Hardy, Virginia; Kristy "Sin" Pryzbylla of the Outlaw Bikers; Robert Cusack of the Outlaw Bikers; Peter James of the Outlaw Bikers; Harold Turner, an informant; James Logsdon, aka James Langston aka James Lauston, an informant; Rick Spring of the Aryan Nations; Ron Wolf of Toledo, Ohio; Brian Holland, an informant; and Richard Brunson of the National Socialist Movement.

In its May 3, 2017, letter, the ATF provided *Glomar* responses, that is, it said it would not reveal whether responsive records exist regarding these third parties because to do so would be to unduly sacrifice the individuals' privacy interests.   It refused to acknowledge even whether it had any responsive records until White provided (1) written consent of the third party, (2) proof of death of the third party, or (3) a demonstration that the public interest in the disclosure outweighs the personal privacy interest of the third party.   It further stated that if any such records existed, they would be subject to Exemptions 6 and 7(C).   In response, White asserted that some—he does not identify which—of the individuals were deceased.   He also generally asserted that the public interest in uncovering corrupt government activities described in this lawsuit outweighed any privacy interests the individuals had.   He provided no credible evidence to substantiate the deaths of any of the individuals[18] or to substantiate a legitimate public interest.[19]

In connection with the FBI's response to White's requests for records about third parties, the Court has already found and explained that a *Glomar* response is appropriate and that White

---

[18]  White points out that the FBI is satisfied that Lynch is deceased and is producing records relating to him.   However, what one agency does not dictate what another must do.   In order to obtain ATF records about Lynch, White must provide evidence of Lynch's death to the ATF, which he has not done.

[19]  Again, White has conceded his claims for ATF records relating to Steve Bowers and Emily Rotney so the Court will grant summary judgment for the DOJ on this portion of White's claims.

has not demonstrated any public interest in the disclosure of personal information that outweighs the individuals' right to privacy, even where the third parties might have been government employees.   White has supported his claim of a public interest with hearsay and speculation, which are not sufficient to support the level of public interest necessary to overcome an individual's privacy rights.   Furthermore, White has not provided the ATF with evidence of the death of any of the forty-eight individuals or with their consent to disclose private information. Therefore, the Court finds the ATF's response concerning these individuals was proper.

To the extent White claimed the ATF officially revealed the existence of responsive records by acknowledging a relationship with any of the individuals, he is mistaken.   The Court has already reviewed the few individuals for whom White has provided a suggestion of acknowledgment of a relationship with the FBI—Rock, Strom, and Turner—but none of those acknowledgements was by the ATF, was official, or otherwise satisfied the requirements to fall within the "official acknowledgement" exception to availability of a *Glomar* response.

The Court further approves the ATF's assertion that Exemptions 6 and 7(C) apply to the individuals about whom they have asserted a *Glomar* response.   As a law enforcement agency, the ATF created its investigation files for law enforcement purposes, so those records clearly fall within Exemption 7.   Disclosure of private information about the individuals would clearly be an unwarranted invasion of their privacy when balanced against a unsubstantiated and virtually non-existent public interest.

f.   <u>Conclusion</u>

In light of the foregoing, the Court is satisfied that the DOJ has carried its summary judgment burden of showing that, in response to White's requests, the ATF conducted searches in response to all proper requests, that those searches were designed to uncover responsive

records, and that the agency is withholding only documents or portions of documents legitimately falling within FOIA exemptions.    The ATF has not improperly withheld agency records.    For these reasons, the Court will grant summary judgment for the DOJ and deny summary judgment for White on his claims based on his ATF FOIA requests.

        3.     <u>USMS</u>

        a.     <u>USMS Records System</u>

The DOJ has submitted the declaration of Katherine A. Day, Associate General Counsel of the USMS, to describe the USMS's record-keeping system.    Day Decl. (Doc. 95-8).    White has produced no evidence to contradict Day's declaration, so the Court accepts it as true for summary judgment purposes.

The USMS keeps information about pretrial detainees and prisoners in the Prisoner Processing and Population Management/Prisoner Tracking System ("PPM/PTS").    Information in that database is indexed by the names of individuals, which facilitates the agency's law enforcement purpose of maintaining custody of individuals charged with violation of federal law. The PPM/PTS is not indexed by the names of groups or organizations with which individuals may be associated.

        b.     <u>White's FOIA Requests</u>

On August 13, 2013, the USMS received a letter from White requesting records pertaining to himself.[20]    The USMS assigned the letter request number 2013USMS24506. White claims that the USMS identified 1500 pages of responsive records, and the USMS does not provide evidence otherwise.    The USMS never finished processing the records and, at the time of the DOJ's June 2018 response to White's motion for summary judgment, it had not

---

[20]  Neither party has submitted a copy of the letter.

produced any responsive records, although it expected to finish processing the request within thirty days of that response.   Day Decl. ¶ 4 (Doc. 95-8 at 2).

White also submitted a letter to the USMS dated December 15, 2016.   Day Decl. Ex. A (Doc. 95-3 at 9-14).   In it he requests "all documents, and, records in your possession" about thirty-three groups, operations, or organizations, and forty-nine individuals (Doc. 25-1 at 14-15).[21]   The USMS assigned the letter request number 2017USMS31415.   In a letter dated March 16, 2017, the USMS notified White it had received and was processing his request.   Day Decl. Ex. C (Doc. 95-8 at 15).   In a letter dated March 21, 2017, it invoked Exemptions 6 and 7(C) in issuing a *Glomar* response regarding named individuals until White obtained their consent, proof of death, an official acknowledgment of their investigation by the USMS, or an overriding public interest.   It further indicated it had found no records responsive to his requests regarding groups, organizations, or operations because the USMS files is organized by individual names, not organizations.   Day Decl. Ex. D (Doc. 95-8 at 17-18).   No evidence suggests White responded to the USMS's March 21, 2017, letter or provided any of the materials the USMS requested before it would acknowledge the existence of responsive documents about individuals.

c.   Propriety of Requests

White's December 15, 2016, letter, request number 2017USMS31415, requested "all documents, and, records in your possession" regarding the following groups:

> Any group, or operation associated with 480 Sherwood Dr., Lexington, South Carolina; American Front; New Resistance; Green Star; Rural People's Party; US Songun Study Group; New Bihar Mandir Temple; United Juche Front of North America; Swords of Songun; The Aryan Nations, or, any related group, in Pennsylvania, or, South Carolina; Any group claiming affiliation with the

---

[21]  In this request, White also asks for "all documents, and, records in your possession" about "how your agency implements its obligations under the Convention Against Torture, and, 42 U.S.C. § 2000-dd, including, but, not limited to, as applied to federal detainees in local, or, state, facilities."   However, in his Amended Complaint, he does not complain of the USMS's response to this request.

government of North Korea in Massachusetts, New York, New Jersey, or, South Carolina; Any
group claiming affiliation with Alexander Dugin, or, the Donetsk, or, Luhansk, People's Republics
in Massachusetts, New York, New Jersey, or, South Carolina; Any group claiming affiliation with
al-Qaeda in South Carolina; Manchuoko Temporary Government; US Juche Study Group; Russian
Defense League; 1st SS Cavalary Brigade; National Socialist Movement; Confederate
Hammerskins; League of the South; Soul Survivors Motorcycle Club; Outlaw Bikers of Osceola
County, Florida; Operation Primitive Affliction; Traditional Workers' Party; Aryan Renaissance
Society; Blue Lives Matter; Golden State Skinheads; Aryan National Alliance; Aryan Strikeforce;
Ohio Council of Concerned Citizens; White Lives Matter; California Skinheads (poss. California
State Skinheads); and Vinlander Social Club.

At the time it responded to White's request, the USMS reported it was unable to search

for these groups because its records are indexed by names of individuals rather than names of

groups.   Now the DOJ also argues the requests are overbroad and do not reasonably describe

the records sought because they seek "all documents, and, records in your possession" regarding

the groups.   For the same reasons the Court found White's similar requests to the FBI and AFT

to be overbroad, it finds these requests improper as well.

Additionally, White's request was overly burdensome in that it requested information that

was not able to be readily searched for in the USMS's files, which are not organized for

searching by organization name.   When a request does not describe the records in a way that

they can be located with a reasonable amount of effort, they are not reasonably described for

FOIA purposes.   *See Moore v. FBI*, 283 F. App'x 397, 398 (7th Cir. 2008).   Here, for the

USMS to find the records White requests, it would have to review each individual file in its

possession to locate references to the organization about which White asked.   Such endeavors

clearly exceed "a reasonable amount of effort" and are not required by the FOIA.   Thus, the

USMS was not obligated to undertake such a search.

White argues that it is inconceivable that the USMS would not have files organized by

organization names rather than individual names, but he provides no evidence to support this

speculation.   He also faults the USMS for "inconveniently" organizing its files to make his

search burdensome.    He fails to understand, however, that the agency does not keep records to serve White or any other FOIA requester.    On the contrary, it maintains its records to serve its law enforcement purposes, and for the USMS, which is charged with searching for and maintaining custody of individuals, that system is indexed by the names of those individuals.    If White wants the USMS to conduct a meaningful search, he has to provide meaningful requests, and this means requests by individual names.

d.    <u>*Glomar* Responses</u>

White's December 15, 2016, letter, assigned request number 2017USMS31415, requested "all documents, and, records in your possession" about the following forty-nine individuals:

> James Porrazzo of the American Front—New Resistance; Joshua Caleb Sutter aka David Woods aka Tyler Moses aka Shree-Shree Kaliki-Kalki Mandir aka Stephen Brown aka Thugee Behram, an informant; Jilian Hoy aka Comrade Morrison aka Jayalita Devi Dasi, an informant; John Paul Cupp, advocate for North Korea; Jason Adam Tonis, advocate for North Korea; Kevin Walsh, advocate for North Korea; Zaid Shakir al-Jishi, advocate for North Korea; Emily Rotney, girlfriend of Porrozzo; Chris Hayes of the American Front; Kent McLellan of the American Front; August Kreis III of the Aryan Nations; Brett Stevens of Houston, Texas; David Lynch of the American Front (deceased); David Gletty, an informant; Joe LNU, gay lover of Gletty; Kelly Boaz aka Kevin Post, Orange County Florida Sheriffs' Deputy, and, FBI-JTTF Agent; Tom Martin of the Confederate Hammerskins; John Rock of the Confederate Hammerskins; Brian Klose of the Outlaw Bikers; Deborah Plowman of the Outlaw Bikers; Harold "Hippie" Kinlaw of the Outlaw Bikers; Carlos "Gino" Dubose of the Outlaw Bikers; Robert Killian aka "Doc" aka Michael Schneider, Orange County, Florida, Sheriff, and, FBI-JTTF Agent; Jason Hall, informant; Matthew Heimbach of the Traditional Workers Party; Brook Heimbach of the Traditional Workers Party; Matthew Parrott, an informant; Rick Tyler, Congressional candidate in Cleveland, Tennessee; Dr. Matthew Raphael Johnson of the Traditional Workers Party; Sonny Thomas of the Sonny Thomas Radio Show; Jeff Schoep of the National Socialist Movement; Steve Bowers of the National Socialist Movement; Rebecca Barnette of the National Socialist Movement; Paddy Tarleton of the Traditional Workers Party; Scott Hess of California; Tony Korvalis of California; Elisha Strom, an informant for your agency; Chris Drake of Augusta, Georgia; Erica Hardwick, aka Erica Hoesch, an informant for your agency; Kristy "Sin" Pryzbylla of the Outlaw Bikers; Robert Cusack of the Outlaw Bikers; Peter James of the Outlaw Bikers; Harold Turner, an informant for your agency; James Logsdon, aka James Langston, aka James Lauston, an informant; Rick Spring of the Aryan Nations; Ron Wolf of Toledo, Ohio; Brian Holland, an informant; Richard Brunson of the National Socialist Movement; and an operation in New York City involving informants, and/or, agents, impersonating relatives of the Shah of Iran, including an informant impersonating Maj Gen Manchuehr Khosrowdad, the Shah's twin, and, "Princess Ashraf", all at the Pahlevi Building.

In its March 21, 2017, letter, the USMS provided *Glomar* responses, invoking

63

Exemptions 6 and 7(C).   It refused to acknowledge even whether it had any responsive records until White provided the individual's consent, proof of death, an official acknowledgement of a USMS investigation of the individual, or an overriding public interest.   White did not respond.[22]

In connection with the FBI's response to White's requests for records about third parties, the Court has already found and explained that a *Glomar* response is appropriate and that White has not demonstrated any public interest in the disclosure of personal information that outweighs the individuals' right to privacy, even where the third parties might have been government employees.   White has supported his claim of a public interest with hearsay and speculation, which are not sufficient to support the level of public interest necessary to overcome an individual's privacy rights.   Furthermore, White has not provided the USMS with evidence of death of any of the individuals or with their consent to disclose private information.   Therefore, the Court finds the USMS's response concerning these individuals was proper.

To the extent White claims the USMS officially revealed the existence of responsive records by acknowledging a relationship with any of the individuals, he is mistaken.   The Court has already reviewed the few individuals for whom White has provided a suggestion of acknowledgment of a relationship with the FBI—Rock, Strom, and Turner—but none of those acknowledgements was by the USMS, was official, or otherwise satisfied the requirements to fall within the "official acknowledgement" exception to availability of a *Glomar* response.

The Court further approves the USMS's assertion that Exemptions 6 and 7(C) apply to the individuals about whom they have asserted a *Glomar* response for the reasons stated earlier in this order in conjunction with White's requests to other agencies.

---

[22]   Again, White has conceded his claims for USMS records relating to Steve Bowers and Emily Rotney so the Court will grant summary judgment for the DOJ on this portion of White's claims.

e.    Records Being Produced

Finally, for White's request for records regarding himself in request number 2013USMS24506, the USMS has indicated there are responsive records, that as of June 2018 it was in the process of processing them, and that the release was expected to be completed within a month, that is, around July 2018.   Nothing in the record suggests those documents have not been processed and released to White.

It is true that the disclosure to White of records about himself was inexcusably delayed because of the USMS's lack of diligence.   White made his request in August 2013, and the records were likely produced, at the earliest, in July 2018, nearly five years later.   The evidence shows the USMS searched its records promptly, on or around August 30, 2013, and located numerous responsive records.   However, before the responsive records could be processed and non-exempt records could be released, the FOIA specialist assigned to White's request resigned, the previous FOIA officer died, and White's FOIA request fell through the cracks.   This has been remedied, and the USMS is processing White's request.

In light of the foregoing, the Court is satisfied that the DOJ has carried its summary judgment burden of showing that, in response to White's request for records about himself, the USMS has conducted or is conducting a reasonable search of its records to uncover and process responsive records for release.   Although it was delinquent in its initial efforts, that delinquency has been remedied, and the agency is processing—or has already processed—White's request, and it is no longer improperly withholding agency records.   The Court is satisfied that the USMS is meeting its obligations under the FOIA, and there is nothing further the Court would order the agency to do.   If White has any further complaints about how the USMS is carrying out its obligations under the FOIA—say, claims of specific exemptions—he should file an

administrative appeal and then, after exhausting his administrative remedies, file a new lawsuit.

### f.      Conclusion

For the foregoing reasons, the Court is satisfied that the DOJ has carried its summary judgment burden of showing that the USMS has conducted reasonable searches in response to all proper requests that were designed to uncover responsive records and that the USMS is withholding only documents legitimately falling within FOIA exemptions.    The USMS is not improperly withholding agency records.    For these reasons, the Court will grant summary judgment for the DOJ and deny summary judgment for White on his claims based on his USMS FOIA requests.

### 4.      BOP

### a.      BOP Records System

Again, the Court starts with a brief overview of the agency's records system.    The DOJ has submitted the declarations of John E. Wallace, a BOP Senior Attorney formerly assigned to the BOP Northeast Regional Office ("NERO"), Wallace Decl. (Doc. 95-7), and Erika Fenstermaker, a Government Information Specialist assigned to the BOP North Central Regional Office ("NCRO"), Fenstermaker Decl. (Doc. 95-4), to describe the BOP's record-keeping systems and the agency's responses to White two FOIA requests that remain in issue.    Both declarations attach *Vaughn* indexes describing the records withheld.    Wallace Decl. Ex. G (Doc. 95-7 at 30-38); Fenstermaker Decl. Ex. H (Doc. 95-4 at 28-49).

The BOP maintains over 180 record systems.    The systems concerning inmates that most frequently yield documents responsive to FOIA requests include:    the prison intelligence record system ("TRUINTEL"), the inmate administrative remedy record system, the inmate central records, the inmate physical and mental health record system, the office of

66

internal affairs investigative records, and the Federal Tort Claims Act record system.    The BOP

also uses the SENTRY information indexing system that allows nationwide BOP access to

information about inmates contained in the various databases maintained by the BOP.    Wallace

Decl. ¶ 5 (Doc. 95-7 at 3).

The inmate central records system contains what is referred to as inmates' "Central

Files."   An inmate's Central File is kept where he is or was last housed, if he has been released.

It contains information in six sections that address an inmate's sentence, detainers, and inmate

financial responsibility program; classification and parole material; mail, visits, and property;

conduct, work, and quarters reports; release processing; and general correspondence.    An

inmate may look at and copy most of the documents contained in his Central File with the

exception of records exempt under the FOIA.    Wallace Decl. ¶ 8 (Doc. 95-7 at 4).    Specific

information about other BOP records systems is discussed below in the context of White's

specific requests for information likely to be found in those systems.

When a FOIA request is received by the BOP Director, the designated person to receive

such requests, a technician reviews it to determine where responsive records are likely to be

located.    If responsive records are likely to be found in the BOP's Central Office—say, because

it requests policy development or contracting records—it will be assigned to the Central Office.

Processors there will scan the request, upload it into the BOP's FOIA database, FOIAXpress,

and assign a request number.    Fenstermaker Decl. ¶ 7 (Doc. 95-4 at 3).    If the technician

determines that a majority of the records are likely to be located at a regional office or at an

institution—say, because the records pertain to an individual inmate—the technician will email it

to the appropriate regional office, where regional office staff will log it and assign it a request

number.    Fenstermaker Decl. ¶ 8 (Doc. 95-4 at 3).    Regional office staff will then search the

regional office records or, if the records are likely to be at an institution, send the request to the

institution.   Fenstermaker Decl. ¶ 9 (Doc. 95-4 at 4).   Responsive records are then provided for

review for exemptions and/or redaction.   Fenstermaker Decl. ¶ 10 (Doc. 95-4 at 4).

      White has produced no evidence to contradict these declarations, so the Court accepts

them as true for summary judgment purposes.

b.   <u>White's FOIA Requests</u>

      In a letter to the BOP dated August 3, 2013, White requested "all records relating to [his]

imprisonments" in the BOP from October 17, 2008, to April 20, 2011, and from June 8, 2012, to

the present.   Wallace Decl. Ex. A (Doc. 95-7 at 20).   Specifically, White listed (1) SIS

[Special Investigative Services] investigations of his emails and contacts with Meghan White and

Sabrina Gnos, (2) any other records relating to communications about Meghan White or Sabrina

Gnos, (3) records relating to his confinement in the special housing unit ("SHU") during certain

periods, including maintenance records relating to the heating and sewage systems in the unit of

his confinement, and (4) all other records.   The BOP assigned the letter BOP NERO Request #

2013-11705.   It located 26 pages of responsive records and, on January 13, 2014, released

twelve pages in their entirety, and released fourteen redacted pages relying on Exemptions 6,

7(C), and 7(F). Wallace Decl. Ex. C (Doc. 95-7 at 24-25).   White appealed the redactions and

claimed the BOP failed to locate all responsive records; he did not offer the information the BOP

said it needed before it could release records relating to third parties or explain any public

interest in disclosure of the records he sought.   Wallace Decl. Ex. C (Doc. 95-7 at 26).   The

decision was affirmed on appeal.

      In a letter to the BOP NCRO dated August 7, 2016, White requested a number of records

about himself during his incarceration, as well as certain maintenance records and log books

68

during certain periods of his confinement in the SHU of the Metropolitan Correctional Center at

Chicago, Illinois ("MCC-Chicago").   Fenstermaker Decl. Ex. B (Doc. 95-5 at 9-10).   The

NCRO informed White he was required to send his FOIA request to the BOP Director pursuant

to BOP FOIA regulations.   Fenstermaker Decl. Ex. C (Doc. 95-5 at 12-13).   The BOP Director

received the request on September 15, 2016, and assigned it to the NCRO for processing.   The

NCRO assigned the letter request number 2016-07558.   In a letter dated September 26, 2016,

the NCRO notified White it had received and was processing his request but that a response

could take up to nine months.   He was invited to narrow his requests to speed up the processing.

Fenstermaker Decl. Ex. D (Doc. 95-5 at 15-16).   With a letter dated February 9, 2018, the

NCRO released some documents in full and some in part, invoking Exemptions 5, 6 and 7(C),

and withheld others in their entirety.   Fenstermaker Decl. Ex. E (Doc. 95-5 at 18-19).   The

NCRO produced supplemental releases on March 20, 2018, and June 6, 2018.   Fenstermaker

Decl. Exs. F & G (Doc. 95-5 at 21-23, 25-26).[23]

        The Court addresses each of White's FOIA requests to the BOP that remain in issue, the

relevant record repositories, and the BOP's response, in turn.

### c.   BOP NERO Request 2013-11705

*Propriety of Request*

        The Court first considers White's general request in BOP NERO Request 2013-11705 for

"all records relating to [his] imprisonments" in the BOP from October 17, 2008, to April 20,

2011, and from June 8, 2012, to the present, and with respect to his specific request in part (4) of

his letter for "all other documents."   Wallace Decl. Ex. A (Doc. 95-7 at 20).   The BOP argues

---

[23]  White also submitted a third set of requests in a letter dated November 20, 2016, which was
assigned BOP request number 2017-01269.   The Court has already granted summary judgment
for the DOJ on that claim (Doc. 59 at 12).

these were not proper requests under § 552(a)(3)(A) because they did not reasonably describe the records sought with any degree of specificity.   Without any details about the records White sought, the BOP argues, a search would be overly burdensome, so it was justified in not taking any action on the specific request.

The Court agrees that White's request for "all records" and "all other documents" was overbroad and did not trigger the BOP's duty to search for records based on such a vague request.   The Court notes that in White's August 3, 2013, letter, he made other specific requests that the BOP did not consider overly broad because of a lack of specificity.   In response to those requests, it searched White's Central File, the logical place for the requested records to be found.   The BOP responded to those other specific requests appropriately, as explained elsewhere in this order.   In addition, White's 2016 FOIA request cured some of the imprecision of his 2013 request by asking for specific types of documents.   That request is addressed later in this order.

*Adequacy of Search*

In BOP NERO Request 2013-11705, White requests "(3) Records relating to my confinement in the SHU at MCC-Chicago from November to December 2008 and January-April 2011 and in the SHU at FCI-Beckley from August to December 2010, including maintenance records relating to the heating and sewage systems on the 11th Floor/Unite Z at MCC Chicago." Wallace Decl. Ex. A (Doc. 95-7 at 20).   "The SHU" is the special housing unit the BOP uses as one form of restrictive housing, for example, for administrative detention or disciplinary segregation.   In response, the BOP searched White's Central File because it believed this was the most likely place to find responsive documents concerning White's placement in the SHU. It located twenty-six pages of responsive records in White's Central File concerning his time in

70

the SHU at various BOP facilities.    It released twelve pages in their entirety, and released

fourteen redacted pages relying on Exemptions 6, 7(C), and 7(F).    The BOP NERO and

institutional personnel also searched records of the facilities department at MCC-Chicago to find

records responsive to the building maintenance portion of White's request.    They located no

responsive records.

      White suggests the BOP's searches were inadequate because the results did not include

certain items such as, for example, SENTRY reports, incident reports, disciplinary records, and

maintenance records.    He speculates that these records must exist and that the failure to find

them is evidence of the inadequacy of the BOP's search.    The BOP argues that SENTRY

reports are derivative of information in other databases and that the search of White's Central

File and the institutional facilities department records was a sufficient response to White's

requests.

      As noted earlier in this order, an agency must conduct a good faith search that is

reasonably calculated to uncover all relevant documents.    It must search its record systems

where responsive information is likely to be located, *Oglesby v. United States Dep't of Army*,

920 F.2d 57, 68 (D.C. Cir. 1990), using "methods which can be reasonably expected to produce

the information requested," *Rubman v. U.S. Citizenship & Immigration Servs.*, 800 F.3d 381, 387

(7th Cir. 2015) (internal quotations omitted).    Where an agency explains that its search met

these standards, its good faith is presumed and can be overcome by evidence that raises doubt

about the adequacy of the search.    *Rubman*, 800 F.3d at 387; *see Carney v. United States Dep't*

*of Justice*, 19 F.3d 807, 813 (2d Cir. 1994) (bare allegations and speculation insufficient to

overcome presumption).

      The BOP has explained that information about White's SHU confinement was most

71

likely to be found in his Central File and that maintenance records for MCC-Chicago for the time

White was in the MCC-Chicago SHU were most likely to be found in the MCC-Chicago

facilities department files.   That makes sense.   That neither of these searched produced all the

responsive records that might exist in the entirety of the BOP's many files or that White expected

to exist does not mean the searches were inadequate under the FOIA.   Absent some evidence

that the BOP's search was not conducted in good faith—that is, evidence beyond White's

speculation that certain documents "must exist"—the presumption of the agency's good faith

prevails.   "The issue is *not* whether other documents may exist, but rather whether the search

for undisclosed documents was adequate."   *In re Wade*, 969 F.2d 241, 249 n. 11 (emphasis in

original); *accord Rubman*, 800 F.3d at 387.   It was.

　　*Exemptions*

　　In BOP NERO Request 2013-11705, White requests "(1) SIS Investigations of my emails

and contacts with Meghan White and Sabrina Gnos, conducted in June and July 2012 at FDC-

Miami and FTC-Oklahoma; [and] (2) Any other records relating to communications about

Meghan White or Sabrina Gnos, particularly in 2010 at FCI-Beckley."   Wallace Decl. Ex. A

(Doc. 95-7 at 20).   The BOP did not conduct a search for responsive records because the

requests sought information regarding third parties—the two individuals named in the requests—

and White had not provided their consent, proof that the individuals were deceased, or any

justification that the public interest in disclosing the records outweighed the individuals' privacy

interests.

　　The Court finds this response by the BOP was reasonable and in compliance with the

FOIA.   The records White sought, if any exist, would fall under Exemption 7(C).   They are

records the BOP would have collected in performing its law enforcement functions by its Special

Investigative Services ("SIS"), the BOP's internal investigative unit, and generally by BOP personnel to appropriately execute sentences imposed in criminal cases, to protect inmates and staff within prisons, and to prevent further criminal activity.   Any records referencing the two individuals "could reasonably be expected to constitute an unwarranted invasion of personal privacy" even if their names were redacted because the records would be associated with them by the very request.   Additionally, White has not articulated any public interest in disclosure of these records.   For these reasons, the records would not be subject to disclosure.   It is true the BOP could have provided an express *Glomar* response or conducted a search and indicated records existed but were being withheld pursuant to Exemption 7(C).   However, where it is clear the records could be withheld in the absence of consent, proof of death, or a public interest, it is enough that the agency assert the exemption.

White also complains about the redaction of the documents produced in response to BOP NERO Request 2013-11705 for "(3) Records relating to my confinement in the SHU at MCC-Chicago from November to December 2008 and January-April 2011 and in the SHU at FCI-Beckley from August to December 2010, including maintenance records relating to the heating and sewage systems on the 11th Floor/Unite Z at MCC Chicago."   Wallace Decl. Ex. A (Doc. 95-7 at 20).   The BOP located twenty-six pages of records in White's Central File, the database most likely to identify responsive records, about his SHU confinement, produced twelve full pages and produced fourteen pages in redacted form relying on Exemptions 6, 7(C), and 7(F).

The BOP has prepared a *Vaughn* index explaining the rationale for its redactions.[24] Wallace Decl. Ex. G (Doc. 95-7 at 30-38).   That index indicates the redactions are of individual

---

[24]  Although the BOP claims to have produced fourteen redacted pages, the *Vaughn* index explains redactions on fifteen pages.

inmate names and registration numbers, affiliations with disruptive groups (*i.e.*, prison gangs), separatee identities, and staff names.   The BOP contends that, while it is in the public interest to know the BOP activities reflected in those documents, it would add nothing to the public's understanding of the government's performance of those activities to reveal the individuals involved, and it would threaten inmate and staff security to disclose their identities and any disruptive group affiliations.

White claims the BOP records are not law enforcement records so cannot qualify under Exemption 7 generally.   He also claims any individual's right to privacy is outweighed by an overriding public interest in exposing the BOP's use of torture and disruption operations.

The Court has already explained Exemptions 6 and 7(C) earlier in this order.   The threshold question for application of the categories in Exemption 7 is that the records are compiled for law enforcement purposes.   It is clear that the BOP records in issue are compiled for law enforcement purposes.   The BOP is the agency that executes most sentences of federally convicted criminals by confining them in penal institutions or otherwise supervising them during the service of their sentences.   In executing those sentences, the BOP is further charged as part of its law enforcement mission with protecting and caring for inmates in its custody, preventing inmates from conducting further criminal activity, protecting agency employees that carry out the agency's functions, and protecting the general public from convicted criminals.   All of these functions are law enforcement functions, and virtually all of the records created in accomplishing those functions are properly considered law enforcement records.   White's threshold objection to application of Exemption 7 has no merit.

As for the privacy exemptions set forth in Exemptions 6 and 7(C), mentioning an individual or details about an individual such as their separatee status, their disruptive group

affiliation, or their involvement in specific prison incidents could reasonably be expected to constitute an unwarranted invasion of their personal privacy and could lead to their harassment. White has not provided the individuals' consent to disclosure and has not provided evidence of their death.   Instead, he relies on his assertion of a public interest in uncovering BOP misconduct through the use of torture or other inhumane, degrading treatment of inmates.

However, White fails to cite any evidence from which a reasonable person would find such activities exist.   White's citation of evidence to demonstrate the BOP's use of torture or other inhumane treatment is speculative.   For example, he points to evidence that on one occasion when he was in the SHU at MCC-Chicago there was a sewage back-up that left the range in unsanitary condition (Ex. H(a)(i) (Doc. 90-1 at 52-56)).   The records White submits show that the back-up occurred, that plumbers were summoned to fix it, and that measures were taken to sanitize the area afterward.   White complains that several of the approximately thirty inmates on the range were moved to different cells, but he was not.   He calls this torture when all the evidence really shows is that the BOP attempted to address a run-of-the-mill sewage flooding problem by moving some inmates and not others while the problem was being resolved. No reasonable person would construe such evidence to indicate torture or any other improper government activity.   *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004) (assertions of a public interest in uncovering government impropriety must "warrant a belief by a reasonable person that the alleged Government impropriety might have occurred").

Similarly, he points to psychological assessment from 2010 while he was in the FCI-Beckley SHU and from 2011 while he was in the MCC-Chicago SHU to argue BOP psychology staff was negligent (Ex. H(a)(ii) (Doc. 90-1 at 57-66)).   Those records reflect monthly assessments of White's mental condition while in the SHU, including several assessments that

75

his psychological adjustment was unsatisfactory and his behavior was becoming disruptive to the institution.   He also points to incident reports for his disruptive behavior and records of discipline imposed as a result (Ex. H(a)(vii) (Doc. 90-1 at 67-72)).   Nothing in this evidence suggests torture or other improper government activity to satisfy the *Favish* standard for establishing a public interest in uncovering government impropriety.

In sum, as with White's conjecture about activities of the FBI, ATF, and USMS to target citizens' for exercising their First Amendment free speech rights, his assertions about the BOP's nefarious activity are not supported by evidence.   He has further not explained how the disclosure of private information about individuals would shed any additional light on the functioning of government when the disclosed parts of the records adequately show what happened.   Accordingly, the Court finds White has not established any public interest in disclosure of the redacted material that outweighs the privacy rights of the individuals whose privacy would be violated.

The Court also briefly addresses White's objection to the BOP's assertion of Exemption 7(F).[25]   Exemption 7(F) applies to records compiled for law enforcement purposes that "could reasonably be expected to endanger the life or physical safety of any individual."   5 U.S.C. § 552(b)(7)(F).   Much of the redacted information is the type of information the BOP must monitor to keep inmates, staff, and the public safe because it is related to interpersonal and intergroup dynamics within the prison.   Knowing who is involved in certain incidents, who has a history of animosity toward others, and who is affiliated with groups that have displayed

---

[25]  Although objections to the assertion of Exemption 7(F) are technically not part of this lawsuit because they are not pled in White's Amended Complaint, which only complains of the use of Exemptions 6 and 7(C), the Court addresses Exemption 7(F) here simply in the interest of thoroughness.

animosity toward each other is critical to maintaining safety and order within the institution. This type of information is also subject to abuse or exploitation if it is used for other purposes and may reveal and endanger the prison's confidential sources for some of that information. Accordingly, it is appropriate for the BOP to withhold this information pursuant to Exemption 7(F) to protect the life and physical safety of inmates and staff.

The Court finds no fault with the BOP's assertion of exemptions for the redacted material in the documents produced in response to BOP NERO Request # 2013-11705.

d.      BOP Request 2016-07558

In response to White's letter request dated August 7, 2016, the BOP released a total of 602 full pages and 495 redacted pages of responsive records, and it withheld 570 pages of responsive records.   It justified the records withheld under Exemptions 5, 6, 7(C), 7(E), or 7(F) as explained in its *Vaughn* index.

As a preliminary matter, the Court finds the vast majority of White's complaints about the BOP's response to this FOIA request is outside the scope of this litigation.   The BOP produced responsive records to White from February to June 2018, long after White tendered his Amended Complaint in February 2017 and the Court allowed it to be filed in July 2017.   Thus, while White's Amended Complaint may have complained of the BOP's failure to timely respond to his request, it could not have included objections to the assertion of FOIA exemptions that had not even happened yet.   The BOP has already responded to Request 2016-07558, and that is all the Court would have ordered.   Thus, the BOP is entitled to summary judgment on White's claim based on this request.   To the extent White complains about the adequacy of that response, he should administratively appeal those responses and file a new lawsuit. Alternatively, even if those issues had been included in this lawsuit, the Court would have

77

rejected them for the reasons explained below.

*White's Medical and Psychological Records*

In BOP Request 2016-07558, White requested "all medical records" and "all psychological records" regarding himself.   When it received White's request, the BOP identified that responsive records were likely to be found in the inmate physical and mental health record system and assigned White's request to the legal liaison at the United States Penitentiary at Marion, Illinois ("USP-Marion"), where those records for White were kept.   In that system, the BOP maintains an inmate's complete medical record in the electronic Bureau Electronic Medical Record ("BEMR") database and an inmate's psychological records in the Psychology Data System ("PDS") database, both of which are accessible by BOP health services staff at the institution where an inmate is confined.   In response to White's request, a medical records technician at USP-Marion searched the BEMR and a psychologist at USP-Marion searched the PDS using White's register number.   The technician located 435 pages of responsive medical records, 384 of which were released in full and 51 of which were released in part.   The psychologist located thirty-two pages of responsive psychological records, twenty-six of which were release in full and six of which were released in part.   The BOP withheld material in both sets of documents pursuant to Exemption 7(F).

*White's Requests for Administrative Remedies and Tort Claims*

In BOP Request 2016-07558, White asked for "all requests for administrative remedy and, tort claims" regarding himself.   When it received White's request, the BOP decided that responsive records were likely to be found in the records accessible by the Administrative Remedy Section of the Office of General Counsel in the Central Office.   In response to White's request, an administrative remedy specialist searched SENTRY to find information about

White's administrative remedies, tort claims, and appeals using White's register number and the proper SENTRY code.    The specialist then used the information in SENTRY to locate copies of White's remedies, tort claims, and appeals, which are organized by year and by remedy number. Because the BOP has a policy of destroying administrative remedies three years after they are filed, the specialist was only able to locate remedies filed after 2014.    The agency located seventy-three pages of responsive records of which forty-eight pages were produced in full, twenty-three pages were produced in part, and two pages were withheld.    These documents included records of White's administrative remedies and his administrative tort claims.    Upon further review, it was discovered that the search had omitted records regarding three requests for administrative remedies filed at the institutional level.    Searches at the relevant institutions revealed twelve additional responsive pages, of which six were released in full and six were released in part in March 2018.    The BOP withheld material pursuant to Exemptions 6. 7(C), 7(E), and 7(F).

Upon further review, the BOP discovered that the initial release also failed to include all administrative tort claims.    Because administrative tort claims are maintained by BOP regional offices in a record system called Content Manager—Administrative Torts ("Content Manager"), the request was sent to the NCRO for a further search of Content Manager records.    Content Manager was instituted before White became a federal inmate, so it included all of his administrative tort claims.    A paralegal searched Content Manager using White's register number and located 6 administrative tort claims comprising 352 pages of records concerning those claims.    The BOP produced 50 pages in full and 2 pages in part, and it withheld 300 pages.    The BOP withheld material pursuant to Exemptions 5, 6. 7(C), 7(E), and 7(F).

*White's Requests for Disciplinary Records*

When it received White's request for his disciplinary records, the BOP decided that responsive records were likely to be found in White's Central File in the section devoted to his conduct, work, and quarters reports (Section Four), although expunged disciplinary records for the prior year may have been located elsewhere.   Since an inmate's Central File is located at the institution where he is housed, this request was sent to the legal liaison at USP-Marion who then gave the request to White's case manager.   The case manager searched by hand Section Four of White's Central File and located thirty-one pages of responsive records.   Inquiries to two other institutions where White had received discipline resulted in locating twenty-three more pages of responsive records in the electronic files of disciplinary hearing officers at those institutions. The BOP released seven pages in full and forty-four pages in part, and withheld three pages. The BOP withheld material pursuant to Exemptions 6. 7(C), 7(E), and 7(F).

*White's Requests for SENTRY Records*

With respect to White's request for his SENTRY records, as explained above, SENTRY enables searching of other BOP databases by "transaction" or type of information.   When an inmate does not specify what types of records he seeks from SENTRY, the BOP performs a standard set of SENTRY transaction inquiries using the inmates register number:   discipline and incident report history; intake screening information (kept in the inmate's Central File); central inmate monitoring, security designation, and custody classification data; inmate load data; profile information; name and number history; assignment history; and administrative remedy, sentence monitoring, and financial responsibility data.   Since some of this information must come from White's Central File, the request was sent to White's Unit Manager at USP-Marion   The Unit Manager located White's intake screening information in his Central File and

searched SENTRY for the other standard transactions using White's register number.   The search of SENTRY was completed by other BOP personnel.   In all, the searches yielded 123 pages of responsive records (of which three pages were blank).   The BOP released eighty-two pages in full and thirty-eight pages in part.   It withheld material pursuant to Exemptions 6. 7(C), 7(E), and 7(F).

*White's Requests for Intelligence and Communications Records*

In BOP Request 2016-07558, White asked for "all Prison Security, and, Intelligence Record System [JUSTICE/BOP-001] records" regarding himself and "all communications between Bureau of Prisons personnel, and, between Bureau of Prisons personnel, and, other law enforcement agencies, any US Attorney's Office, or, any agency of the Attorney General, including the US Department of Justice Civil Rights Division" regarding himself.

The BOP's standard approach is to construe requests for intelligence records to seek TRUINTEL records maintained by SIS, the Special Investigative Services, about the inmate's current institution.   SIS is the unit responsible for investigating inmate and staff misconduct, gathering intelligence on criminal activities, and investigating threats to the safety of inmates and staff.   TRUINTEL can be searched by intelligence personnel by institution, date, type of incident, inmate name, and inmate register number.   In White's case, because he was housed in the communications management unit ("CMU"), the BOP identified the Counterterrorism Unit ("CTU"), which monitors communications in and out of the CMU, as a potential source for responsive intelligence records.   As for White's request for communications regarding himself, since he did not provide any parameters, the BOP construed this request also to seek records maintained by SIS and the CTU.

A search of TRUINTEL records by USP-Marion intelligence personnel yielded 100

pages of responsive records.    A search of the additional CTU records by White's register

number yielded sixteen pages of responsive records.    The BOP withheld six pages in part and

110 pages in full pursuant to Exemptions 6. 7(C), 7(E), and 7(F).

*White's Requests for MCC-Chicago SHU Maintenance Records*

In BOP Request 2016-07558, White asked for "All maintenance records related to the

11th floor Special Housing Unit of the Metropolitan Correctional Center Chicago between

October 17, 2008, and December 29, 2008, particularly, but not limited to, records related to

heating problems, insect infestations, and, the flooding of cells with human fecal material."

This request overlapped with records White sought in BOP NERO Request 2013-11705,

addressed above for which no records were found.    Because maintenance records regarding a

specific facility are maintained at that facility, the request was sent to MCC-Chicago.    The

Facilities Manager searched the Total Maintenance System ("TMS"), a computer program used

to track maintenance issues and work orders, but records from 2008 were not retrievable due to a

2014 change in the TMS and/or a records retention policy calling for destruction of documents

after seven years.    Not surprisingly, the search of TMS yielded no responsive documents.

*White's Requests for MCC-Chicago SHU Log Books*

In BOP Request 2016-07558, White asked for "The green SHU log books from the

Metropolitan Correctional Center's 11th floor for the period October 17, 2008, to December 29,

2008."    Because institution log books are maintained at that institution, the request was sent to

MCC-Chicago.    A search of the archives of the closed log books located three responsive books

containing 293 responsive pages.    The BOP released two pages in full and 291 pages in part.

Upon further review after White pointed out the missing documents in his summary judgment

motion, the BOP discovered that the initial release was missing some pages.    A new search for

the missing pages yielded twenty-seven additional pages, all of which were released in part. The BOP relied on Exemptions 6. 7(C), 7(E), and 7(F) for the withheld material.

### i.      Adequacy of Searches

The Court first addresses White's contention that the BOP did not conduct adequate searches because it did not release documents it believes the BOP has such as, for example, incident reports, disciplinary reports, maintenance records, and other general categories of records.    As noted above, however, an agency need only conduct a good faith search of the records where they are likely to be found, and the Fenstermaker Declaration explains that this has been done, and even redone when it became apparent a search missed something.    To the extent some of the records were not identified, it was the result of record destruction policies rather than inadequate searches.    Furthermore, it appears after review of the *Vaughn* index that the general categories of records White claims are missing have, indeed, been accounted for among the records withheld in full pursuant to exemptions.    White has not presented any evidence or argument that would raise doubt about the adequacy of the BOP's searches for responsive documents.

### ii.      Exemptions

In its releases, the BOP relied on Exemptions 6 and 7(C) to withhold staff names, signatures, initials, BOP identification numbers; staff telephone numbers and email addresses; inmate separatee names, register numbers, classification information, and release information; names, register numbers, housing assignments, addresses, medical status, classification assignments, and statements of other inmates; and names, addresses, telephone numbers and email addresses of third parties who are neither inmates nor BOP staff.    It found the information would invade the privacy of privacy of staff, inmates and third parties, subjecting them to

harassment, threats, attack, or other kinds of targeting, and that there was no countervailing public interest in disclosure of those details.

The BOP also claimed the ability to assert exemptions in subcategories of Exemption 7, which is applicable only to records compiled for law enforcement purposes.   White misunderstands this requirement when he states that the records must have been compiled to further a law enforcement *investigation* or *proceeding*; they need only have been compiled for law enforcement *purposes*.   The BOP offers many of the same explanations it offered in connection with its user of Exemption 7 subcategories in response to BOP NERO Request 2013-11705 and notes that the withheld records were included in White's official BOP records compiled for the purpose of its law enforcement mission of protecting inmates, staff, and the community.

With respect to Exemption 7(F), the BOP has withheld personal privacy information that it also withheld under Exemptions 6 and 7(C); White's AIDS or HIV status, sex offender status, court-related documents, and intake form risk assessments to prevent dangerous inferences[26] arising from possessing or not possessing that information in paper form; the position title of a psychology staff member because of dangerous inferences that may arise about inmates she sees; publication pages that contain information suggesting White's affiliation with a group that may

---

[26]  The "dangerous inferences" mentioned in this order stem from a common practice among inmates in prison.   Inmates will ask to see documentary evidence of other inmates' HIV/AIDS status, cooperator status, or other status/activity that might make them vulnerable to harassment, abuse, or retaliation by other inmates.   If the BOP were to allow inmates to have documentary evidence of a negative HIV/AIDS status, non-cooperation with the Government, or other status/activity, inmates will infer that an inmate who is unable to provide such evidence is HIV/AIDS-positive, a "snitch," or other has an undesirable status.   To prevent these dangerous inferences, the BOP has a blanket policy of forbidding inmates from possessing documentary evidence of these statuses or activities, although the BOP will disclose the information to the inmate orally or show him the documentary evidence without allowing him to keep a copy.

endanger him among other inmates and that are otherwise contraband for institutional security reasons because of their incendiary nature; the reasons for White's administrative detention status; information regarding BOP classification and monitoring of inmates to protect the safety of inmates, staff, and the community; information that could identify and endanger sources for BOP investigations; information about disruptive activities and responses within an institution; and the types of personnel and equipment or keys available in various prison areas that could be used by inmates to plan nefarious activities.

In its releases, the BOP relied on Exemption 7(E), which exempts records compiled for law enforcement purposes that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."   5 U.S.C. § 552(b)(7)(E).   Under this exemption, it withheld inmate profile and security designation data for White because they would reveal management, tracking, classification, and monitoring criteria that could be manipulated if known to an inmate, that could allow an inmate to evade monitoring, or that could subject an inmate to threats, harassment, or assault by other inmates; information about the BOP's sources of information and methods of acquiring it; information about White's group affiliation that may subject him to threats or assault by other inmates; the reasons for White's administrative detention status and the methods for ascertaining threats to inmate safety; the BOP's assessment of and responses to potential institutional threats or disruptive activities; and the types of security personnel and equipment available on housing ranges.

In its releases, the BOP relied on Exemption 5, which exempts from release "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than

an agency in litigation with the agency."   5 U.S.C. § 552(b)(5).   Under this exemption, the BOP withheld intra-DOJ communications regarding White's administrative tort claims between BOP attorneys and other BOP staff members.   It also withheld under the attorney work product doctrine, the attorney-client privilege, and/or the deliberative process privilege, staff memoranda and other documents for use by counsel regarding the investigation and resolution of White's tort claims in preparation for Federal Tort Claims Act lawsuits.

The Court has reviewed the BOP's claims of exemption as set forth in the *Vaughn* index for these releases and as thoroughly explained in the Fenstermaker Declaration.   It finds that the subject records were compiled for the BOP's law enforcement purposes and finds the BOP has offered at least one legitimate reason for declining to release each piece of withheld information. This satisfies the agency's burden of explaining in detail its assertions of the exemptions.   On the other side, White has not provided any public interest that would be served by the disclosure of the withheld information.   He relies on speculation or his own personal interests in other litigation he is pursuing, neither of which, when balanced against the interests protected by the exemptions, are sufficient to justify release.   To the extent the BOP has withheld in part certain records that were produced in full to White as discovery in another case, White has suffered no harm from the redactions to the records in this case since he already has unredacted copies.

e.   <u>Conclusion</u>

For these reasons, the Court is satisfied that no reasonable factfinder could conclude that the BOP did not make a good faith search for the records requested in proper requests in a way that was reasonably calculated to locate those records.   Nor could a reasonable factfinder conclude that the BOP improperly withheld agency records from White.   Accordingly, the DOJ is entitled to summary judgment on White's claims based on his FOIA requests to the BOP.

86

IV.     **Costs**

The Court declines to award costs to White because he has not carried his burden of showing he substantially prevailed in this litigation.     *See* 5 U.S.C. § 552(a)(4)(E)(i).   White has not obtained victory by judicial order; the Court has granted summary judgment for the DOJ on all counts.   Nor has he obtained an enforceable written agreement with the DOJ or a consent decree.   Finally, with one minor exception, there has been no voluntary or unilateral change in the agencies' positions.   The responsive agencies have never taken the position that they would not respond to White's FOIA requests or that they would not release nonexempt responsive records.   It is true that they have not always complied with the required timelines, but they have always indicated an intent to comply with FOIA in responding to White's requests and now either have or are on track to respond to those requests on an appropriate timeline.   The simple fact that documents were released after White filed this lawsuit is not enough to establish that he substantially prevailed by obtaining a voluntary or unilateral change in position.   *First Amendment Coalition v. USDOJ*, 878 F.3d 1119, 1128 (9th Cir. 2017).

The only exception is with respect to White's 2013 request to the USMS for information about himself, which fell through the cracks because of a death, a resignation, and the inadvertent failure to reassign the matter.   The USMS did not detect this oversight until White filed this lawsuit, so the lawsuit was, indeed, a catalyst that caused the agency to search for and release documents it had no plans to release at that time.   However, White's 2013 request to the USMS for records about himself is such a miniscule portion of this lawsuit, which complains of more than 200 FOIA requests to four different agencies, that victory on that one point cannot reasonably be construed as substantially prevailing in this litigation as a whole.

Even if it could be said that White's lawsuit was a catalyst for the agencies' ultimate

responses, the Court would exercise its discretion to deny White an award of costs.    He has

bombarded the agencies with vague requests for records, many of which are clearly exempt.

He justifies those requests with fanciful assertions of a "public interest" that really amount to his

own private interest in relief from his own sentence or revenge for perceived past wrongs done to

him.    He has caused the agencies an inordinate amount of work without any substantiated

public interest in shedding light on the way government functions.    The Court has found he is

entitled to some release of responsive records even for those personal interests, but it will not

force the DOJ to pay White's litigation costs in connection with obtaining those records.

For these reasons, the Court declines to award White his costs for this litigation.

## V.    Conclusion

The Court returns to the three categories of FOIA claims White raises in his Amended

Complaint.

The first is that the agencies administratively defaulted by failing to respond to White's

requests in the time periods set forth in the FOIA.    These failures entitle White to responses that

comply with the agencies' obligations to balance private and public interests under the FOIA, but

they do not entitle White to wholesale production of every responsive document.    Since White's

Amended Complaint, the agencies have either completely responded or are in the process of

responding to those requests.    Having found that the FBI's ongoing processing and release

schedule is adequate, the Court would order no more than is already being done.    Accordingly,

the DOJ is entitled to summary judgment on this category of White's claims.    To the extent

White objects to the assertion of any exemptions not already addressed in this order, he may file

another lawsuit after exhausting his administrative remedies.

The second is that the agencies have not conducted adequate searches and thus have

falsely denied having any responsive records.    The Court has noted, however, that an agency is not required to uncover every possible responsive record; it is only required to conduct good faith searches after being presented with a proper request.    Each agency has explained how it has done this, and there are no indications of overlooked material.    Therefore, the DOJ is entitled to summary judgment on this category of White's claims.

The third is that the agencies improperly withheld information pursuant to Exemptions 6 and 7(C).    However, the agencies have explained how their assertions of these exemptions serve to protect the privacy interests of third parties, and White has not presented evidence of a countervailing public interest in sacrificing those privacy interests.    Nor has he shown that any agency has officially acknowledged a relationship with an individual such that a *Glomar* response is inappropriate.    Accordingly, the DOJ is entitled to summary judgment on this category of White's claims.

In his other filings, White has sought to expand this litigation beyond the claims articulated in his Amended Complaint.    Because those claims were not pled, they are not at issue in this litigation.    To the extent the Court has addressed them anyway, for the reasons set forth above, the DOJ would be entitled to summary judgment on those claims as well.

For all of these reasons, the Court:

- **DENIES** White's motion for summary judgment (Doc. 90);

- **GRANTS** the DOJ's cross-motion for summary judgment (Doc. 98); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:   May 19, 2020**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**

89